1  CLIFF GARDNER
   State Bar # 93782
2  LAZULI WHITT
   State Bar # 221353
3  1448 San Pablo Ave.
   Berkeley, CA 94702
4  510-524-1093
   casetris@aol.com
5
   Attorneys for Petitioner
6  Bulos Zumot

7

8              UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11
   BULOS ZUMOT,                    )        No.:
12                                  )
                                    )
13              Petitioner,         )
         v.                         )
14                                  )
   DEAN BORDERS, in his capacity    )
15 as Warden of the California Institution )
   for Men,                        )
16                                  )
                Respondent.         )
17 _____)

18

19

20
          PETITION FOR WRIT OF HABEAS CORPUS AND
21
   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
22

23

24

25

26

27

28

TABLE OF CONTENTS

PETITION FOR WRIT OF HABEAS CORPUS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    False Evidence (Video Footage) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    False Evidence (August 24 Death Threat) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    Cumulative Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TIMELINESS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    Introduction: The Time Of The Fire And The State And Defense Theories
          Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    The Evidence At Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          1.    The evening of October 14, 2009 and early morning hours of
               October 15, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          2.    Mr. Zumot's whereabouts throughout the day of October 15 and
               at the time of the crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          3.    The state destroys Mr. Zumot's alibi, and shows him to be a liar,
               with testimony from police officers and video footage about when
               he arrived at the cafe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

i

4.    The state presents evidence that only weeks before Ms. Schipsi
      was killed, Mr. Zumot telephoned her and threatened to kill her . . 17

5.    The absence of physical evidence tying Mr. Zumot to either Ms
      Schipsi's death or the burning of the cottage . . . . . . . . . . . . . . . . 22

6.    The deleted texts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.    Post-conviction Investigation Shows That The State Presented False
      Evidence And Argument About Both The Video Footage And The
      August 24 Threat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      1.    The discovery provided to defense counsel prior to trial regarding
            the video footage, the evidence the prosecutor introduced at trial
            and the arguments the prosecutor presented at trial were all false . 28

      2.    The time it takes to drive from the cottage to the café . . . . . . . . . 35

      3.    The evidence the prosecutor introduced about the August 24
            threat to kill, and the repeated arguments the prosecutor made in
            reliance on that evidence, were all false . . . . . . . . . . . . . . . . . . . . . 37

D.    In Its Return Before The Superior Court The State Admits Presenting
      False Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E.    The Evidentiary Hearing And The State-Court Decision . . . . . . . . . . . . . 42

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

I.    THE STATE'S PRESENTATION OF FALSE EVIDENCE AND
      ARGUMENT ABOUT THE LOREX FOOTAGE AND THE AUGUST 24
      DEATH THREAT REQUIRES RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

A.    The Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

B.    Because Mr. Zumot Relied Entirely On An Alibi Defense, And That
      Defense Was Based On His Own Testimony And Credibility, The
      State's Presentation Of False Evidence Directly Undercutting Both The
      Alibi And His Credibility Requires Relief . . . . . . . . . . . . . . . . . . . . . . . 48

C.    28 U.S.C. § 2254(d) Does Not Bar Relief Because The State Court
      Applied A Legal Standard Directly Contrary To Supreme Court
      Precedent, Ignored Critical Facts Which Were Plainly Relevant To
      The Constitutional Issue And Relied On Facts Completely Irrelevant
      To The Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      1.    The statutory framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      2.    The state habeas court's finding that "the prosecution did not
            present false testimony" is not entitled to deference because the
            state court ignored critical facts, ignored the state's concessions
            and relied on facts which simply do not relate to the claim . . . . . . 56

3.  The state habeas court's alternate finding that the false evidence was not material is not entitled to deference because the state court applied a legal standard squarely contrary to Supreme Court precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

II.  DEFENSE COUNSEL'S FAILURE TO EXPOSE FALSE EVIDENCE WHICH DIRECTLY UNDERCUT BOTH PETITIONER'S ALIBI AND HIS CREDIBILITY REQUIRES RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.  Defense Counsel Rendered Ineffective Assistance Of Counsel In Failing To Expose The False Evidence In Connection With Both The Lorex Video Footage And The August 24 Threat . . . . . . . . . . . . . . . . . . . . . . . . 64

1.  Counsel's failure to expose the truth about the video footage or the August 24 threat fell below an objective standard of care . . . . 65

2.  Counsel's failure to expose the false evidence undermines confidence in the outcome of trial . . . . . . . . . . . . . . . . . . . . . . . . . 67

C.  Section 2254(d) Does Not Bar Relief On This Claim Because The State Habeas Court Ignored Key Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

III.  THE PETITION IS TIMELY FILE BECAUSE IT WAS FILED WITHIN THE ONE-YEAR STATUTE OF LIMITATIONS SET FORTH IN 28 U.S.C. § 2244. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

CLIFF GARDNER
State Bar # 93782
LAZULI WHITT
State Bar # 221353
1448 San Pablo Ave.
Berkeley, CA 94702
510-524-1093
casetris@aol.com

Attorneys for Petitioner
Bulos Zumot

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BULOS ZUMOT,                                    )          No.:
                                                )
                                                )
                     Petitioner,                )
        v.                                      )
                                                )
DEAN BORDERS, in his capacity                   )
as Warden of the California Institution         )
for Men,                                        )
                                                )
                     Respondent.                )
_____)

INTRODUCTION

At 6:40 on the evening of October 15, 2009, authorities received a 911 call about a

fire in a small cottage on Addison Avenue in Palo Alto.  2 RT 219-220, 294.[1]  Numerous

eyewitnesses, including the owner of the building who was on site and a former tenant,

passed the building between 6:25 and 6:35 and saw no fire.  7 RT 678, 692, 694, 717-718.

Consistent with this testimony, the state's own expert -- fire investigator Barbara Maxwell

---

[1]        For purposes of citation, the Reporter's Transcript on Appeal is referred to
as RT.  The Clerk's Transcript on Appeal is referred to as the CT.  Both the RT and the
CT are attached as Exhibit XX.

-- determined the fire was intentionally set sometime between 6:35 p.m. and 6:40 p.m. 3 RT 272, 294. Inside the cottage, firefighters found the body of Jennifer Schipsi; she had been strangled before the fire started. 3 RT 201, 381.

Ms. Schipsi's boyfriend, petitioner Bulos Zumot, was charged with murder. Prior to trial he waived his privilege against self incrimination, spoke with police and gave his side of the story. At trial, he again waived his privilege against self-incrimination and again offered his side of the story. On both occasions, Mr. Zumot explained that he had an alibi. At the time the fire had to have been set, he was on his way to work at the café he owned in Palo Alto. He spoke on the phone with a café employee at 6:39 just as he was parking near the café. He parked and walked into the café within a minute or two of that call -- sometime around 6:41. He told police that the café had a "Lorex" video system which would confirm his alibi.

Police seized the video surveillance system from the café. During the discovery process prior to trial, they disclosed to the defense reports regarding the video footage. But these reports did not confirm petitioner's alibi, they destroyed it.

Thus, in a February 20, 2010 report, Officer Aaron Sunseri explained that according to the Lorex footage, Mr. Zumot did not "enter[] [the] café" until 6:47:38 -- nine seconds *after* the video showed a fire truck racing down University Avenue to get to the Addison Avenue fire. If Sunseri was right that Mr. Zumot did not arrive at the café until 6:47:38, Mr. Zumot had time to set the fire and drive to the café. In other words, he had no alibi.

In a second police report dated March 16, 2010, Agent Sunseri disclosed a second police report in discovery. In this report Sunseri repeated the claim that Mr. Zumot did not appear on the Lorex footage until nine seconds after the fire truck passed. Yet again,

if Mr. Zumot did not arrive until after the fire truck passed at 6:47:38, he had no alibi.

Trial began in January 2011.  At trial, the state destroyed both petitioner's credibility and his alibi by introducing testimony about and actual video footage from the café surveillance system.  But the prosecutor did not wait until the presentation of evidence -- on three occasions during his opening statements he told jurors the video evidence would squarely contradict petitioner's alibi:

> "Surveillance video puts the defendant walking into his café at about 6:47 p.m."
>
> "At 6:47, before the defendant has even walked into the café, you can see the red lights of an emergency vehicle going eastbound on University Avenue towards Addison."
>
> "Its only then that the defendant enters his café, at 6:47 p.m."

2 RT 141, 143.

At trial, the prosecutor called police Officer Quisenberry who reviewed the video footage and confirmed that "we see the defendant enter" the café at 6:47:38.  13 RT 1420-1421.  Later, the prosecutor called Agent Sunseri who repeated the very same claims he made in both of his police reports, testifying that the first time Mr. Zumot appeared on the video footage was at 6:47, after the fire truck passed.  15 RT 1727.  As presented to the jury, this video evidence and testimony flatly rebutted petitioner's version of events, not only undercutting petitioner's alibi but showing he was a liar as well.

But the video evidence did not stand alone.  The state introduced powerful testimony that on August 24, 2009 -- only seven weeks before the murder -- Mr. Zumot threatened to kill Ms. Schipsi.  Police Officer Moore testified that at 1:30 on the afternoon of August 24, 2009, she responded to a domestic violence call from Ms. Schipsi.  Ms. Schipsi said that Mr. Zumot had just telephoned her, calling her a "bitch"

and a "whore" and threatening to kill her.  Later, Ms. Schipsi added that this threatening

call came from a blocked number.  Ms. Schipsi was so frightened she obtained an

emergency protective order that same day.  The state called two additional witnesses to

testify about this August 24 death threat.  In rebuttal, Mr. Zumot himself testified and

denied the incident entirely.  The state's theory, of course, was that once again Mr. Zumot

was a liar; for understandable reasons, during his closing argument the prosecutor would

rely on this explicit death threat 11 times in urging jurors to convict of first degree

murder:

> "There's only one person who had the motive, the opportunity, the desire, and, in fact, told her not seven weeks before he killed her that he was going to kill her . . . ."  22 RT 2535.

The jury convicted.

        In conjunction with his 2013 appeal, Mr. Zumot performed an exhaustive post-

conviction investigation.  That investigation told a very different story.

        Petitioner will start with the video footage.  A post-conviction examination of

actual video footage taken from the café's video surveillance system showed that the

police reports provided to the defense in discovery, the trial testimony from Detective

Quisenberry and Agent Sunseri and the prosecutor's argument that Mr. Zumot did not

arrive at the café until 6:47:38 were all patently false.  To the contrary, because the video

footage indisputably showed petitioner already in the café both at 6:47:12 and 6:45 that

evening (as the prosecution would later concede in state post-conviction proceedings),

Mr. Zumot must have arrived earlier *just as he testified*.

        Similarly, a post-conviction investigation of telephone records in the prosecutor's

possession prior to trial but never presented to the jury showed that Ms. Schipsi simply

lied to police about the August 24 call and that, in fact, it had been made by her longtime friend Roy Endemann.  After the telephone records came to light in state post-conviction proceedings, police interviewed Mr. Endemann who confessed that at Ms. Schipsi's request, he "called her from a private number for the purposes of making it look like she was getting harassing phone calls from [petitioner]" as part of a scheme by Ms. Schipsi to mislead people into thinking Mr. Zumot was harassing her.  In other words, petitioner had not threatened to kill Ms. Schipsi, *just as he testified.*

Petitioner sought relief in state court, providing the video footage, the telephone records and a transcript of the Endemann interview.  He alleged the state presented false evidence and argument in connection with both the Lorex footage and the August 24 death threat.  In addition, based on declarations from trial counsel explaining that he had no tactical reason at all for failing to expose the falsity of this evidence, failing to review the actual video footage or failing to obtain and examine the telephone records, petitioner separately alleged counsel provided ineffective assistance of counsel.  During state post-conviction proceedings, and presented with video footage, telephone records and Roy Endemann's own admissions, the prosecution conceded (1) the video footage actually *did* show that petitioner was in the café prior to 6:47:38 (at 6:45 and 6:47:12) and (2) the telephone records and Endemann interview actually *did* show the August 24 threat during the blocked call was not from petitioner.  The state admitted the new Lorex footage established petitioner was inside the café "before the clip shown at trial."  Return 41.  The state "acknowledge[d]" that in light of this new footage, petitioner was actually inside the café "earlier than discussed at trial."  Return 78.  The state admitted that the telephone records show Ms. Schipsi did not receive any telephone call at all from petitioner on August 24, 2009.  Return 45.

Despite the state's concessions as to the video footage (and the footage itself), the habeas court ruled that as to the video footage "[t]he court finds the prosecution did not

present false testimony . . . ." Despite the state's concessions as to the telephone records (and both the records and the Endemann police interview), the habeas court ruled that as to the August 24 threat "the court finds the prosecution did not present false evidence concerning the August 24 call." The court did not discuss petitioner's ineffective assistance of counsel claim at all, except to say in a single sentence at the and of its order that "[h]is claims of ineffective assistance of Counsel also fail." Petitioner's subsequent habeas petitions to the state appellate and supreme courts were summarily denied without explanation.

This Petition for Writ of Habeas Corpus follows. It raises the identical false evidence and ineffective assistance claims presented in state court.

JURISDICTIONAL ALLEGATIONS

Petitioner Bulos Zumot, through counsel, files this petition for writ of habeas corpus. By this verified petition petitioner alleges as follows:

I.

Petitioner is unlawfully confined by the California Department of Corrections pursuant to a judgment of the Superior Court for Santa Clara County in *People v. Zumot,* No. BB943863.

II.

Petitioner was convicted of one count of first-degree murder and one count of arson. The trial court sentenced petitioner to a 25 year-to-life term for the murder and an additional eight year term for the arson.

III.

Petitioner pled not guilty.  He was tried by jury.  Petitioner testified at trial and has always maintained his innocence.

IV.

Petitioner appealed his conviction to the Court of Appeal, Sixth Appellate District.  On December 12, 2013, the Court of Appeal affirmed the conviction and sentence.  *See People v. Zumot,* 2013 Cal. App. Unpub. LEXIS 1971 (2013).  Mr. Zumot timely filed a Petition for Review in the California Supreme Court.  On March 19, 2014 the Supreme Court denied review.  *People v. Zumot,* S215836, Order of March 14, 2014, attached as Exhibit SS.  The case was final on appeal on June 17, 2014 when the 90-day time period within which to seek certiorari from the United States Supreme Court expired.

V.

While petitioner's appeal was pending in the California Court of Appeal, Sixth Appellate District, on September 9, 2013, petitioner filed a Petition for Writ of Habeas Corpus in that court as well.  *In re Bulos Zumot,* H040124, Petition for Writ of Habeas Corpus, attached as Exhibit TT.  The appellate court issued an Order to Show Cause returnable before the Santa Clara County Superior Court.  *In re Bulos Zumot,* H040124, Order to Show Cause, attached as Exhibit UU.  The superior court denied relief on November 22, 2016.  *In re Bulos Zumot,* BB943863, Order of November 22, 2016, attached as Exhibit CC.  On January 19, 2017, petitioner filed a Petition for Writ of Habeas Corpus in the state appellate court.  *In re Bulos Zumot,* H044302, Petition for Writ of Habeas Corpus, attached as Exhibit QQ.  On August 31, 2017, the appellate court summarily denied the petition.  *In re Bulos Zumot,* H044302, Order of August 31, 2017, attached as Exhibit RR.  On October 25, 2015, petitioner timely filed a Petition for Writ of Habeas Corpus in the California Supreme Court.  *In re Bulos Zumot,* S245050, Petition for Writ of Habeas Corpus, attached as Exhibit VV.  On March 14, 2018, the California Supreme Court denied the petition.  *In re Bulos Zumot,* S245050, Order of March 14,

2018, attached as Exhibit WW.

## VI.

As to the matters raised in paragraph VII-IX of this petition, no other petitions for writ of habeas corpus have been filed.  Petitioner has no adequate remedy at law.

## CLAIMS FOR RELIEF

## VII.

## **False Evidence (Video Footage)**

Petitioner's judgment of conviction has been unlawfully and unconstitutionally imposed in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The state presented false evidence and argument at trial.  The following facts now known to petitioner support this claim:

A.   At either 6:39 or 6:40 on the evening of October 15, 2009, a fire was reported at a cottage at 969 Addison Avenue in Palo Alto.  2 RT 219-220, 294.

B.   Firefighters responded and found the body of Jennifer Schipsi inside the cottage, lying on a bed in the bedroom.  2 RT 201.  There was a red melted gas container lying on the bed near her body.  2 RT 171; 9 RT 1004.  Ms. Schipsi had died of strangulation before the fire started.  3 RT 381.

C.   State fire expert Barbara Maxwell determined that the fire was intentionally

set between 6:35 and 6:40.  3 RT 294.  Fire captain Carter French who was at the scene of the fire explained that the fire burned "fast and hot."  1 RT 204.

D.    At the time of the fire, Ms. Schipsi was living at the cottage with her boyfriend Bulos Zumot, petitioner in this case.  20 RT 2033.  Mr. Zumot owned a café on University Avenue in downtown Palo Alto.  4 RT 407-408.

E.    The state's theory of the crime itself was that Mr. Zumot killed Ms. Schipsi, set the fire at 969 Addison and then drove to his café.

F.    The defense theory was that Mr. Zumot was in San Jose on the late afternoon of October 15 and drove directly to his Palo Alto café.  He called an employee of the café at 6:39 as he (Mr. Zumot) was looking for parking outside the café and entered the café moments later.  Accordingly, he could not have set the fire at Addison Avenue.

G.    Mr. Zumot told police that his café had a video surveillance system -- known as a Lorex system -- which would show when he arrived at the café.

H.    Police seized the Lorex system.

I.    According to police, the time stamp on the Lorex system's video footage was off by one hour and seven minutes.  13 RT 1407-1412.

J.    The state provided discovery to the defense prior to trial.  Included in that discovery was a February 10, 2010 report from Agent Sunseri of the Palo Alto Police Department which summarized Agent Sunseri's review of video

footage on the Lorex surveillance system.  Police Report of February 10, 2010, attached as Exhibit A.  Agent Sunseri reported that the Lorex footage showed the following: (1) at 6:01 a café employee arrives, (2) at 6:27 a second employee arrives, (3) at 6:47:29, "an emergency vehicle is seen through the front window of the café going eastbound on University Ave." and (4) at 6:47:38 Mr. Zumot "enters café from Ramona St. Entrance, sits down to tea and hookah." *Ibid*.

K.   The state disclosed an April 7, 2010, police report also from Agent Sunseri which said that he had "reviewed surveillance footage on a Lorex brand digital surveillance system that was seized from suspect Zumot's café." Police Report of April 10, 2010, attached as Exhibit B.  Sunseri reported that Mr. Zumot did not arrive in the café until "nine seconds" after the fire engines pass. *Ibid*.

L.   In opening statements, the prosecutor told the jury the Lorex footage from October 15 would show "the defendant walking into his café at about 6:47." 2 RT 141.  Later he repeated that the video footage would show Mr. Zumot did not "enter[] his café" until 6:47, after the fire engines had passed.  2 RT 143.

M.   At trial, Detective Quisenberry testified that after examining the Lorex video footage, "we see the defendant enter" the café at 6:47:38.  13 RT 1420-1421.  Later Officer Quisenberry reiterated Mr. Zumot cannot be seen on the video footage before 6:47:35, and only appears *after* the fire engine had already passed the café.  13 RT 1427-1432.

N.   At trial, Agent Sunseri testified consistent with his police report that the fire

engine passed at 6:47:29 "and then, right after that, you see Mr. Zumot."
15 RT 1727.

O.     The prosecutor showed the jury selected clips of the actual Lorex footage
       including a clip at 6:47 which showed Mr. Zumot arriving at the café at
       6:47:38.  13 RT 1420-1421; DVD attached as Exhibit Q.  While showing
       the clip, Detective Quisenberry told jurors that based on the Lorex footage
       "you haven't seen [Mr. Zumot]" before 6:47:34 and that the "first time I see
       him" is after 6:47:34.  13 RT 1428-1429.

P.     Mr. Zumot waived his privilege against self-incrimination and testified.  He
       told the jury that he (1) telephoned one of his two employees (Mr. Jehad Al-
       Bataeneh) at the café at 6:39 as he (Mr. Zumot) was looking for parking
       near the café, (2) entered the café within a minute or so after finding a
       parking spot, (3) walked outside the café when he heard a fire engine
       passing and (4) walked back in the café after the fire engine passed.  20 RT
       2013-2015.

Q.     One of the café employees, Ahmed Alaghabash also testified, confirming
       that Mr. Zumot arrived about 6:40, several minutes *before* the fire truck
       passed.  17 RT 1851.

R.     In closing argument the prosecutor relied on the testimony about the Lorex
       footage offered by Sunseri and Quisenberry and the Lorex footage itself,
       telling jurors that Mr. Zumot had *not* arrived at the café until *after* the fire
       engine passed.  22 RT 2626.

S.     The prosecutor urged the jury not to believe Mr. Alaghabash's testimony

(that Mr. Zumot had arrived at 6:40) precisely because the Lorex footage showed Mr. Zumot did not arrive in the café until after the fire truck passed. 22 RT 2549.

T.    The jury rejected the alibi and convicted Mr. Zumot of murder.

U.    The Lorex machine itself was introduced (and admitted) at trial as exhibit 117.  13 RT 1407l; 22 RT 2661.  Because the trial prosecutor refused to allow petitioner's appellate counsel access to the exhibit, appellate counsel obtained an order from the California Court of Appeal, Sixth Appellate District permitting him to examine the actual Lorex footage.  Application to Permit Appellate Counsel to View Entire Record on Appeal, Including Exhibit 117, attached as Exhibit J; Declaration of David Notowitz ("Notowitz Declaration") attached as Exhibit K at para. 6.

V.    The DVDs attached as Exhibits L, N and P contain three distinct portions of this footage.  Notowitz Declaration at para. 8; Declaration of Lazuli Whitt ("Whitt Declaration"), attached as Exhibit Z at para. 5.

W.    Exhibit L is a 17-second clip containing footage from camera four in the café.  It shows the interior of the café at 6:47:12 through 6:47:29 -- *before* Mr. Zumot arrived in the café under the theory of the state conveyed in the police reports in Exhibit A and B, testified to by Sunseri and Quisenberry, and argued for by the prosecutor.  Exhibit L shows Mr. Zumot and one of his employees -- Ahmed Alaghbash -- already inside the café, coming downstairs from the upstairs of the café and leaving the café by the Ramona street entrance.  Exhibit L; Declaration of Ahmed Alaghbash ("Alaghbash Declaration") attached as Exhibit M at para. 9.

X.    In its Return, after the California Court of Appeal issued an Order to Show Cause returnable before the Superior Court, the state admitted that the Lorex footage shows Mr. Zumot inside the café at 6:47:12. *In re Bulos Zumot*, BB943863, Return to Petition for Writ of Habeas Corpus ("Return") at 41 attached to this Petition as Exhibit DD.

Y.    Exhibit N is a several minute clip containing footage from camera seven inside the café from 6:43 through 6:48. It shows both employees of the café, Mr. Alaghbash and Mr. Al-Bataeneh, preparing the café for the evening. At approximately 6:45:45 Mr. Alaghbash is talking to Mr. Al-Bataeneh who is in the kitchen. Exhibit N; Alaghbash Declaration at para. 8; Declaration of Jehad Al-Bataenah ("Al-Bataeneh Declaration") attached as Exhibit O, at para. 8. While this conversation is going on -- at 6:45:49 to 6:45:52 -- the Lorex footage shows a third person walking down the hallway of the café towards the stairs that lead to the second floor office. Exhibit N; Alaghbash Declaration at para. 8; Al-Bataeneh Declaration at para. 8. Both Mr. Alaghbash and Mr. Al-Bateaneh identify this man as Mr. Zumot. *Ibid.*

Z.    In its Return before the Santa Clara Superior Court, the state admitted that this Lorex footage shows Mr. Zumot inside the café at 6:45. Exhibit DD, Return at 41.

AA.    Because the state conceded that Mr. Zumot was in the café at 6:47:12 and 6:45:49 -- and because at trial the prosecutor introduced both evidence and argument that Mr. Zumot did not enter the café until 6:47:38 -- the state presented false evidence and argument at trial.

BB.  The presence of Mr. Zumot in the café at 6:45 or 6:47:12 is nowhere mentioned in the discovery provided to defense counsel.  Exhibits A, B.  It is nowhere mentioned in the testimony of either Sunseri or Quisenberry.  13 RT 1420-1421, 1427-1432; 15 RT 1711-1712, 1727.  It is nowhere mentioned in either the opening or closing arguments of the prosecutor.  2 RT 141, 142, 143; 22 RT 2549, 2626.

CC.  According to press accounts of the footage shown that day, the jury did not see this footage at all:

"Video places Zumot at his lounge just after fire.

"Surveillance footage shows fire engines drive by just before Zumot enters Da Hookah spot.

"The video showed Zumot entering his business at about 6:47 p.m. on October 15, 2009, and then sitting for a few minutes on the sofa just outside the lounge's Ramona Street entrance.  He then receives a call and leaves.

"Less than a minute before Zumot's first appearance in the video, the flashing lights of an emergency vehicle could be seen streaking down University Avenue."  Palo Alto Online, Video Places Zumot At His Lounge Just After Fire, attached to this Petition as Exhibit HH.

DD.  Two witnesses who were in court that day agreed that the footage showing petitioner inside the café prior to 6:47:38 was not shown to the jury. Declaration of Kholoud Diggs ("Kholoud Diggs Declaration") attached to this Petition as Exhibit II; Declaration of David Zumot ("David Zumot Declaration") attached to this Petition as Exhibit JJ.  Trial counsel for Mr. Zumot also agrees this footage was not shown to the jury.  Exhibit PP.

EE.  If as the state now concedes Mr. Zumot was indeed in the café prior to 6:47:38, he had to have entered the café sometime before that.  This means that the state's evidence and argument that Mr. Zumot did not "enter[] his

café" before 6:47:38 was necessarily false.

FF.     Exhibit P is a five second clip containing footage from camera seven at
        6:41. It shows someone coming into the café from the Ramona Street
        entrance. Both Mr. Alaghbash and Mr. Al-Bataenah have identified this
        man as Mr. Zumot. Alaghbash Declaration at paras. 6-7; Al-Bataeneh
        Declaration at paras. 6-7; *See also* Supplemental Declaration of Ahmed
        Alaghbash attached as Exhibit EE at para 3; Supplemental Declaration of
        Jehad Al-Bataeneh attached as Exhibit FF at paras. 3, 4. Although the
        person looks like they are wearing a red short-sleeved t-shirt, this is an
        optical illusion based on the red wall in the café, the lighting, and the poor
        video quality. Supplemental Declaration of David Notowitz ("Notowitz
        Supplemental Declaration") attached to this Petition as Exhibit GG, at para.
        3.

GG.     In its Return, the state contended that the person entering at 6:41 was not
        Mr. Zumot but was his former employee Mr. Alaghabash. Return 56. The
        video footage in Exhibits L and N shows that Mr. Alaghabash was wearing
        a blue shirt that day. Mr. Alaghabash examined the video footage and
        declared it was Mr. Zumot. Declaration of Ahmed Alaghabash
        ("Alaghabash Declaration") attached as Exhibit M to this Petition at paras.
        6, 7.

HH.     The superior court held an evidentiary hearing. Video expert Notowitz
        testified that on the video footage, a person walking in front of the red wall
        of the café would appear to be wearing a red shirt. *People v. Zumot*,
        BB943863, Reporter's Transcript of Evidentiary Hearing, May 20, 2016,
        ("EH") attached as Exhibit NN to this Petition at pp. 28-29.

II.     Mr. Alaghbash testified that the person at 6:41 was Mr. Zumot.  EH 88.
        Mr. Jehad Al Bataeneh also testified that the person walking in at 6:41 was
        Mr. Zumot.  EH 75.

JJ.     The trial prosecutor told the jury that Mr. Zumot did not enter the café until
        6:47:38.  The presentation of this false evidence, the failure to correct this
        false evidence when it came into evidence and the presentation of false
        argument based on that evidence violated the federal constitution.

KK.     There is a reasonable likelihood this false evidence could have affected the
        verdict.  It takes eight minutes to drive from the café to the cottage.  7 RT
        737; 13 RT 1426-1427; 16 RT 1727; Declaration of Joe Parisi ("Parisi
        Declaration") at para. 4, attached as Exhibit S; Declaration of Alec Weldon
        ("Weldon Declaration") at para 3, attached as Exhibit T; Declaration of
        Amanda Freel ("Freel Declaration") attached as Exhibit D at para. 3;
        Declaration of Jonathan Robinson ("Robinson Declaration") at para. 3,
        attached as Exhibit U.  It takes five minutes on average to find parking
        outside the café and walk to the café.  Parisi Declaration at para. 4; Weldon
        Declaration at para. 3; Freel Declaration at para. 3; Robinson Declaration at
        para. 3.

LL.     Jurors deciding when Mr. Zumot arrived at the café, and whether he was
        lying when he testified he arrived prior to 6:47:38, should not have been
        presented with false testimony and argument that video footage definitively
        showed he did arrive until 6:47:38.

MM.     This claim has been presented to the state superior court, state court of
        appeal and the state supreme court.  *See In re Bulos Zumot*, BB943863,

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.                                16

Order of November 22, 2016, attached as Exhibit CC; *In re Bulos Zumot*, H044302, Petition for Writ of Habeas Corpus, attached as Exhibit QQ; *In re Bulos Zumot*, S245050, Petition for Writ of Habeas Corpus, attached as Exhibit VV.

## VIII.

## False Evidence (August 24 Death Threat)

Petitioner's judgment of conviction has been unlawfully and unconstitutionally imposed in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The state presented false evidence and argument at trial.  The following facts now known to petitioner support this claim:

A.    Petitioner incorporates by reference each of the factual allegations in Paragraph VII.

B.    At trial the state called police Officer Moore to testify that at 1:30 on the afternoon of August 24, 2009, she (Moore) and Officer Monroe responded to Ms. Schipsi's home after Ms. Schipsi had called police.  16 RT 1766. According to Moore, Ms. Schipsi said that Mr. Zumot "had called her and had threatened her life over the phone."  16 RT 1767.  The call was "earlier that day."  16 RT 1769.  Ms. Schipsi told Moore that he called her a "bitch" and "said that he was going to kill her."  16 RT 1767-1768.  She obtained an emergency protective order against Mr. Zumot.  16 RT 1776-1777. Moore said Ms. Schipsi was "very scared," "nervous," and in "fear for her life."  16 RT 1767-1769.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.   The state called Leslie Mills to testify Ms. Schipsi said that Mr. Zumot had called her and threatened "he would kill [her] and burn [her] house down." 16 RT 1781.

D.   Ms. Schipsi said the threatening call came from a blocked number.  16 RT 1786.

E.   At trial, Mr. Zumot testified and denied making the call.  18 RT 1954.

F.   After Mr. Zumot was convicted, appellate counsel obtained a police report regarding the August 24 incident prepared by Officer Monroe.  According to the report, Ms. Schipsi said (1) the telephone call occurred at 12:50 that afternoon, and (2) the threatening telephone call came into Ms. Schipsi's cell phone.  Police Report of August 24, 2009, attached as Exhibit V at p. 4.

G.   Prior to trial, the state itself obtained records for Ms. Schipsi's cell phone -- (650) 319-5044.  These records for August 24, 2009 were never shown to the jury.

H.   These records confirm that Ms. Schipsi called Palo Alto police at (650) 504-4015 at exactly 12:51 p.m. on August 24, 2009 -- only one minute after the alleged threatening call came in.  Telephone Records of Jennifer Schipsi for August 24, 2009, attached as Exhibit W; Parisi Declaration at para. 4.

I.   On August 24, 2009 -- the date the 12:50 p.m. threatening call was made -- Mr. Zumot's cell number was (650) 575-2872, the same number he had in October 2009.  12 RT 1307; Call Detail of Bulos Zumot of October 14, 2009 and October 15, 2009, attached as Exhibit X.  On August 24, 2009,

1    Mr. Zumot had an additional cell phone number of (408) 655-6944.  Exhibit

2    V at p. 2.

3

4    J.    Ms. Schipsi's cell phone records establish (1) Ms. Schipsi *did* in fact

5    receive a call at 12:50 p.m., (2) the call she received at 12:50 was *not* from

6    Mr. Zumot's telephone number but from (831) 207-3669 and (3) there are

7    *no calls at all* on August 24, 2009 from Mr. Zumot's numbers.  *See* Exhibit

8    W.

9

10    K.    Prior to trial, the state subpoenaed the telephone records for (831) 207-3669

11    beginning on July 15, 2009.  This telephone did not belong to Mr. Zumot

12    but to Roy Endemann.  Telephone Records of Roy Endemann for August

13    24, 2009, attached as Exhibit Y at p. 2.  The record shows Mr. Endemann

14    knew Ms. Schipsi for many years.  15 RT 1613.  Mr. Endemann's cell

15    phone records confirm that it was he who made the call to Jennifer Schipsi

16    at 12:50 on August 24, 2009.  Exhibit Y at p. 3.

17

18    L.    According to Mr. Endemann's telephone records, at 12:50 on the afternoon

19    of August 24, Mr. Endemann called Ms. Schipsi; in dialing her number he

20    dialed "67" before dialing her number.  Exhibit Y at p. 3.

21

22    M.    Dialing 67 before placing a call is how callers try to block or restrict their

23    number from appearing on the screen of the person they are calling.

24    Declaration of Robert Aguero ("Aguero Declaration") attached as Exhibit

25    AA at para. 5.  When a caller uses "67" to block a number from appearing

26    on the call recipient's screen, the number will still show up on subpoenaed

27    telephone records themselves.  Aguero Declaration at para. 6.

28

N.      From July 15, 2009 through the end of August, 2009.  Mr. Endemann called Ms. Schipsi *283* times.  Declaration of Cliff Gardner ("Gardner Declaration") attached as Exhibit BB, at para. 3.  Of these 283 calls, only one call to Ms. Schipsi was ever blocked -- the 12:50 p.m. call on August 24 call.  Gardner Declaration at para. 3.

O.      In September 2013, petitioner filed a Petition for Writ of Habeas Corpus in the California Court of Appeal attaching the telephone records and alleging, inter alia, claims that the state had presented false evidence in connection with the August 24 telephone call and that petitioner's counsel had been ineffective in failing to expose the false evidence.  *In re Bulos Zumot*, H040124, Petition for Writ of Habeas Corpus, attached as Exhibit TT. After the Court of Appeal ordered the state to file an Informal Response to the habeas petition, the trial prosecutor contacted Agent Sunseri about this case.

P.      Agent Sunseri was told to interview Mr. Endemann about the 12:50 August 24, 2009 telephone call which telephone records attached to petitioner's habeas petition showed was made from Mr. Endemann's telephone to Jennifer Schipsi.  October 14, 2013 Interview of Roy Endemann ("Endemann Interview") attached as Exhibit KK at p. 1.

Q.      Agent Sunseri interviewed Roy Endemann on October 14, 2013. Endemann Interview at 1.

R.      No police report about this interview has ever been disclosed to the defense.

S.      Until May 2014 -- seven months after the Endemann interview -- neither

1    Agent Sunseri, the trial prosecutor nor any of the state's post-conviction

2    lawyers disclosed to the defense that such an interview had taken place.

3

4    T.    In May of 2014 the state finally disclosed to the defense that it had

5          interviewed Mr. Endemann and provided a tape recording of that interview.

6

7    U.    In that interview Mr. Endemann told Agent Sunseri that Ms. Schipsi was

8          seeking an emergency stay-away order preventing contact from petitioner,

9          and she asked Mr. Endemann to call her from a blocked number so it would

10         "look[] like she had more blocked calls."  Endemann Interview 3.

11

12   V.    In that interview, Mr. Endemann explained that his purpose in calling Ms.

13         Schipsi from a blocked number was to "make sure that they gave her the

14         stay away order" and that the only way she would obtain the order was "if

15         she had more blocked calls."  Endemann Interview 3.

16

17   W.    In that interview, when Mr. Endemann was asked if the blocked calls were

18         Ms. Schipsi's idea, Mr. Endemann said "it was something she wanted me to

19         do."  Endemann Interview 3.

20

21   X.    In that interview, Agent Sunseri asked Mr. Endemann directly if he had

22         "called [Ms. Schipsi] from a private number for the purpose of making it

23         look like she was getting harassing phone calls from [petitioner]."  Mr.

24         Endemann answered "I'd say yeah."  Endemann Interview 5.

25

26   Y.    In that interview, Mr. Endemann confirmed that Ms. Schipsi told him "I

27         want you to call my phone from a blocked number."  Endemann Interview

28         7.

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.                              21

Z.    In November 2013 -- after the Endemann interview had been conducted *but before it was ever disclosed to the defense* -- the state filed an Opposition to Petition for Writ of Habeas Corpus in the Court of Appeal. *In re Bulos Zumot*, H040124, Opposition to Petition for Writ of Habeas Corpus, attached as Exhibit YY.

AA.    On page 23 of the state's November 2013 filing in the Court of Appeal, the state defended defense counsel's failure to introduce evidence showing that Roy Endemann made the August 24 call. The state did not inform the Court of Appeal (or the defense) that Roy Endemann had admitted making the call. Instead, the state argued that defense counsel may have elected not to pursue the area because he could have known "petitioner had borrowed Roy's phone and used it to make the call." *In re Bulos Zumot*, H040124, Opposition to Petition for Writ of Habeas Corpus at p. 23, attached as Exhibit YY..

BB.    On August 24, 2009 -- after Ms. Schipsi met with police at her house to report that petitioner had telephoned her and threatened to kill her -- Ms. Schipsi telephoned Heather Winters. Ms. Winters's telephone number was (650) 796-0612. Owner Information, attached as Exhibit LL. This call appears on Ms. Schipsi's telephone records as a 22 minute, 19 second call placed by Ms. Schipsi at 5:23 p.m. on August 24, 2009. Exhibit W at p. 7. A recording of this call was disclosed by the state in discovery prior to trial as DM-90.

CC.    In that August 24 telephone call Ms. Schipsi reported to Ms. Winters that because of the stay away order she had obtained that day, "if [petitioner] even calls me they're arresting him tonight."

DD.   Ms. Schipsi then told Ms. Winters "I had the sergeant over here, I had, ummm, officer Monroe here which is one of the guys that's on the night shift . . . ."

EE.   Officer Monroe was one of the officers who responded when Ms. Schipsi contacted police on August 24. 2009, and reported that petitioner had called her and threatened her life.  Exhibit V at p. 1.

FF.   Ms. Schipsi told Ms. Winters that police "they got on the phone immediately, got a judge on the phone available to grant and issue an emergency stay away order."

GG.   Ms. Schipsi reported to Ms. Winters that petitioner said "I'm going to fucking kill you" and "fucking bitch, you're dead" and then he "hung up on me."

HH.   A true and accurate transcript of this portion of the telephone call between Ms. Schipsi and Ms. Winters is attached as Exhibit MM.

II.   The state called Heather Winters as a witness at trial.  RT 1640.

JJ.   On direct examination, Ms. Winters told the jury that Ms. Schipsi telephoned her in August 2009 and said that petitioner threatened to kill her.  RT 1642.

KK.   The state's evidence and argument on the August 24, 2009 call were both false.  The presentation of this false evidence, the failure to correct this false evidence when it came into evidence and the presentation of false

argument based on that evidence violated the federal constitution.

LL.    There is a reasonable likelihood this false evidence could have affected the verdict here.

MM.    This claim has been presented to the state superior court, state court of appeal and the state supreme court.  *See In re Bulos Zumot*, BB943863, Order of November 22, 2016, attached as Exhibit CC; *In re Bulos Zumot*, H044302, Petition for Writ of Habeas Corpus, attached as Exhibit QQ; *In re Bulos Zumot*, S245050, Petition for Writ of Habeas Corpus, attached as Exhibit VV.

IX.

**Ineffective Assistance Of Counsel**

Petitioner's judgment of conviction has been unlawfully and unconstitutionally imposed in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Petitioner received ineffective assistance of counsel at trial:

A.    Petitioner incorporates by reference each of the factual allegations in Paragraphs VII and VIII.

B.    Prior to trial, Mr. Zumot was initially represented by attorney Cameron Bowman.  Mr. Bowman made repeated written requests to the prosecution for a copy of the Lorex footage in four separate letters dated October 26, 2009, October 30, 2009, December 11, 2009 and December 21, 2009.

Letters from Cameron Bowman, attached as Exhibit C.

C.     Eventually, police provided to the defense something called an "imaged copy" of the Lorex footage.  Freel Declaration at para. 5.  The "imaged copy" was useless and contained no viewable video footage at all.  Freel Declaration at para. 5.

D.     Mr. Bowman was replaced by attorney Mark Geragos.  Declaration of Mark Geragos ("Geragos Declaration") at para. 1, attached as Exhibit E.  Mr. Geragos was aware of Mr. Bowman's attempts to see the Lorex footage.  Geragos Declaration at para. 13.  He was also aware that the "imaged copy" was useless and contained no video footage at all.  Geragos Declaration at para. 13; Declaration of Pat Harris ("Harris Declaration") at para. 5-6, attached as Exhibit F.

E.     Because the defense did not have a viewable copy of the actual Lorex footage -- but only Agent Sunseri's descriptions -- Mr. Geragos had co-counsel Pat Harris go to the Palo Alto Police Department to view the footage under the auspices of Agent Sunseri.  Geragos Declaration at para. 15; Harris Declaration at para. 5.  Mr. Harris was specifically looking for video footage showing that Mr. Zumot was at the café before 6:47:38 when the fire engines passed.  Harris Declaration at para. 5.  Agent Sunseri showed him still interiors of the café; nothing Sunseri showed Mr. Harris was different from any of the information Sunseri had conveyed in his February and April 2010 police reports.  *Ibid.*  Mr. Harris was not shown any footage of Mr. Zumot in the café prior to 6:47:38.  Harris Declaration at para. 7-8.  Mr. Harris was not shown any footage showing Mr. Zumot in the café at 6:41, 6:45 or 6:47 prior to the fire engines passing.  Harris

1   Declaration at para. 7-10.  Mr. Geragos did not see any such footage either.

2   Geragos Declaration at para. 14-15.

3

4   F.   Defense counsel did not make a tactical decision not to show the actual

5        Lorex footage of 6:47:12, 6:45 or 6:41.  Geragos Declaration at para. 12.

6        He was unaware of any such footage; he did not get a copy of the actual

7        Lorex footage prior to trial.  When he attempted to have the actual footage

8        viewed at police headquarters under the auspices of Agent Sunseri, the

9        defense was not shown any footage inconsistent with Agent Sunseri's

10       reports of February 10 and April 7.  Geragos Declaration at para. 13-15;

11       Harris Declaration at para. 5-10.

12

13  G.   The state provided to defense counsel a DVD containing what Agent

14       Sunseri said was a video recording of "relevant portions" of the Lorex

15       footage.  Geragos Declaration at para. 15; *see* Exhibit B at 3 (police

16       recorded 'relevant portions' of the video footage on DVDs).

17

18  H.   This DVD contains several hours of irrelevant footage, as well as footage

19       showing Mr. Zumot in the café at 6:47:12, 6:45 and 6:41.  Whitt

20       Declaration at para. 6.

21

22  I.   Defense counsel did not view the DVD, assuming "relevant portions" of the

23       footage provided on a DVD prepared by Agent Sunseri would not

24       *contradict* what Sunseri wrote in his police report (that Mr. Zumot did not

25       arrive until 6:47:38), but would simply *confirm* it.  Accordingly, counsel

26       tried to examine the actual footage itself.  Geragos Declaration at para. 15.

27

28  J.   Until the post-conviction investigation in this case, defense counsel were

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.                    26

unaware there was Lorex video footage showing Mr. Zumot was inside the café before the fire engines passed at 6:47:38.  Geragos Declaration at para. 14; Harris Declaration at para. 10.  They made no tactical decision not to use the actual Lorex footage and would have used it had they been aware of it.  Geragos Declaration at paras. 14-15; Harris Declaration at paras. 8-10.

K.    Defense counsel's position as to the August 24 call was that Mr. Zumot never made the threat.  *See* RT 2585.  Counsel introduced Ms. Schipsi's sworn recantation that the threat was from Mr. Zumot.  16 RT 1786-1787. He introduced Mr. Zumot's own testimony that he never made the threat. 18 RT 1954.

L.    Defense counsel had no tactical reason and made no tactical decision not to present telephone records confirming that Mr. Zumot never made the August 24 call.

M.    Defense counsel had no tactical reason and made no tactical decision not to present telephone records confirming that only six weeks before the victim was killed, someone other than Mr. Zumot threatened to kill her.

N.    Absent defense counsel's failure to present the Lorex evidence and the documentary evidence regarding the August 24, 2009 call, it is reasonably probable the jury would have returned a more favorable verdict, either an acquittal or a hung jury.

O.    This claim has been presented to the state superior court, state court of appeal and the state supreme court.  *See In re Bulos Zumot*, BB943863, Order of November 22, 2016, attached as Exhibit CC; *In re Bulos Zumot*,

H044302, Petition for Writ of Habeas Corpus, attached as Exhibit QQ; *In re Bulos Zumot*, S245050, Petition for Writ of Habeas Corpus, attached as Exhibit VV.

X.

**Cumulative Error**

Petitioner's judgment of conviction has been unlawfully and unconstitutionally imposed in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Even if none of the errors specified above alone requires a new trial, the combination of those errors require relief. Petitioner hereby reincorporates the facts and claims in all prior paragraphs and all factual allegations in the attached Memorandum of Points and Authorities filed in support of this petition. This claim has been presented to the state superior court, state court of appeal and the state supreme court.  *See In re Bulos Zumot*, H040124, Petition for Writ of Habeas Corpus, attached as Exhibit TT; *In re Bulos Zumot*, H044302, Petition for Writ of Habeas Corpus, attached as Exhibit QQ; *In re Bulos Zumot*, S245050, Petition for Writ of Habeas Corpus, attached as Exhibit VV.

TIMELINESS ALLEGATIONS

XI.

This petition is timely pursuant to 28 U.S.C. § 2244(d) which set forth a one-year statute of limitations for prisoners in state custody to file for relief in federal court.  The following facts now known to petitioner support this claim:

A.    The state appellate court issued its opinion in this case on December 12,

2013.  *People v. Zumot,* 2013 Cal. App. Unpub. LEXIS 1971 (2013).  The
state supreme court denied review on March 19, 2014.  *People v. Zumot*,
S215836, Order of March 19, 2014, attached as Exhibit SS.  The case
became final, and the one-year statute set forth in 28 U.S.C. § 2244 (d)(1)
began to run, on June 17, 2014, the date the 90 time period for seeking
certiorari expired.

B.    Pursuant to 28 U.S.C. § 2244(d)(2), however, the one-year statute was
immediately tolled the day it began.  While petitioner's appeal was still
pending in the state appellate court, petitioner filed a timely "application for
State post-conviction . . . review" pursuant to 28 U.S.C. § 2244(d)(2) with
the appellate court.  *In re Bulos Zumot*, H040124, Petition for Writ of
Habeas Corpus, attached as Exhibit TT.  This tolled the statute of
limitations pursuant to § 2244 (d)(2).

C.     On December 12, 2013 -- the same day it decided the appeal -- the state
appellate court issued an Order to Show Cause in connection with the then-
pending state petition and remanded the case to the Superior Court for
resolution.  *In re Bulos Zumot*, H040124, Order to Show Cause, attached as
Exhibit UU.

D.    After soliciting a full round of pleadings, the Superior Court held an
evidentiary hearing in 2016 and issued an opinion denying relief on
November 22, 2016.  *In re Bulos Zumot*, BB943863, Order of November
22, 2016, attached as Exhibit CC.

E.    In accord with California law, petitioner timely filed a new Petition for Writ
of Habeas Corpus with the Court of Appeal within 60 days, filing on

January 19, 2017.  *In re Bulos Zumot*, H044302, Petition for Writ of Habeas Corpus, attached as Exhibit QQ.  The Court of Appeal summarily denied that petition on August 31, 2017.  *In re Bulos Zumot*, H044302, Order of August 31, 2017, attached as Exhibit RR.

F.  In accord with California law, petitioner timely filed a new Petition for Writ of Habeas Corpus with the Supreme Court within 60 days, filing on October 25, 2017.  *In re Bulos Zumot*, S245050, Petition for Writ of Habeas Corpus, attached as Exhibit VV.  The Supreme Court summarily denied that petition on March 14, 2018.  *In re Bulos Zumot*, S245050*, Order of March 14, 2018, attached as Exhibit WW.

G.  At that point petitioner no longer had a petition for post-conviction pending in state court and the one-year statute began to run.  Petitioner had until March 14, 2019 within which to file a Petition for Writ of Habeas Corpus;

H.  The current Petition for Writ of Habeas Corpus is being filed within this one-year period.

WHEREFORE, petitioner prays that this Court:

1.  Take judicial notice of all pleadings and filings in both *People v. Zumot*, BB943863, *People v. Zumot*, H037652, *In Re Bulos Zumot*, BB943863, *In re Bulos Zumot*, H040124, *In re Bulos Zumot*, H044302 and *In re Bulos Zumot*, S245050;

2.  After full consideration of the issues raised in the petition, issue an Order to Show Cause to the state;

3.    To assist the Court in determining if any material disputes of fact remain which require an evidentiary hearing, require the state file an Answer which admits or denies the individual factual allegations of the Petition;

4.    After consideration of the issues, vacate the judgment and sentence imposed upon petitioner or, in the alternative,

5.    Depending on whether the state disputes any material facts in its Answer, permit discovery and an evidentiary hearing at which petitioner may offer proof concerning the allegations in this petition; and

6.    Grant such other and further relief as may be appropriate.

DATED:  March 12, 2019              Respectfully submitted,


CLIFF GARDNER
LAZULI WHITT

 /s/ Cliff Gardner
By Cliff Gardner
Attorney for Petitioner

1

VERIFICATION

2

3        I, Cliff Gardner, declare that I am an attorney for petitioner Bulos Zumot.  I make

4   this verification for petitioner because of his absence from the county where I have my

5   office.  I have read the attached Petition for Writ of Habeas Corpus and Memorandum of

6   Points and Authorities in Support Thereof and believe the matters stated therein to be

7   true.  On that basis, I allege they are true.

8

9        I declare under penalty of perjury that the foregoing is true and correct.

10

11       Executed this 12th day of March, 2019, at Berkeley, California.

12

13                                      /s/ Cliff Gardner
                                       Cliff Gardner
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLIFF GARDNER
State Bar # 93782
LAZULI WHITT
State Bar # 221353
1448 San Pablo Ave.
Berkeley, CA 94702
510-524-1093
casetris@aol.com

Attorneys for Petitioner
Bulos Zumot

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BULOS ZUMOT,                              )          No.:
                                          )
                                          )
                 Petitioner,              )
         v.                               )
                                          )
DEAN BORDERS, in his capacity             )
as Warden of the California Institution   )
for Men,                                  )
                                          )
                 Respondent.              )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

OF PETITION FOR WRIT OF HABEAS CORPUS

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    Introduction: The Time Of The Fire And The State And Defense Theories
          Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    The Evidence At Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         1.    The evening of October 14, 2009 and early morning hours of
              October 15, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         2.    Mr. Zumot's whereabouts throughout the day of October 15 and
              at the time of the crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

         3.    The state destroys Mr. Zumot's alibi, and shows him to be a liar,
              with testimony from police officers and video footage about when
              he arrived at the cafe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         4.    The state presents evidence that only weeks before Ms. Schipsi
              was killed, Mr. Zumot telephoned her and threatened to kill her . . 17

         5.    The absence of physical evidence tying Mr. Zumot to either Ms.
              Schipsi's death or the burning of the cottage . . . . . . . . . . . . . . . . 22

         6.    The deleted texts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    C.    Post-conviction Investigation Shows That The State Presented False
          Evidence And Argument About Both The Video Footage And The
          August 24 Threat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

         1.    The discovery provided to defense counsel prior to trial regarding
              the video footage, the evidence the prosecutor introduced at trial
              and the arguments the prosecutor presented at trial were all false . 28

         2.    The time it takes to drive from the cottage to the café . . . . . . . . . 35

         3.    The evidence the prosecutor introduced about the August 24
              threat to kill, and the repeated arguments the prosecutor made in
              reliance on that evidence, were all false . . . . . . . . . . . . . . . . . . . . 37

    D.    In Its Return Before The Superior Court, The State Admits Presenting
          False Evidence   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    E.    The Evidentiary Hearing And The State-Court Decision  . . . . . . . . . . . . 42

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

I.   THE STATE'S PRESENTATION OF FALSE EVIDENCE AND
     ARGUMENT ABOUT THE LOREX FOOTAGE AND THE AUGUST 24
     DEATH THREAT REQUIRES RELIEF .............................. 46

     A.   The Relevant Facts .......................................... 46

     B.   Because Mr. Zumot Relied Entirely On An Alibi Defense, And That
          Defense Was Based On His Own Testimony And Credibility, The
          State's Presentation Of False Evidence Directly Undercutting Both The
          Alibi And His Credibility Requires Relief ...................... 48

     C.   28 U.S.C. § 2254(d) Does Not Bar Relief Because The State Court
          Applied A Legal Standard Directly Contrary To Supreme Court
          Precedent, Ignored Critical Facts Which Were Plainly Relevant To
          The Constitutional Issue And Relied On Facts Completely Irrelevant
          To The Issues ............................................... 53

          1.   The statutory framework ................................ 53

          2.   The state habeas court's finding that "the prosecution did not
               present false testimony" is not entitled to deference because the
               state court ignored critical facts, ignored the state's concessions
               and relied on facts which simply do not relate to the claim ...... 56

          3.   The state habeas court's alternate finding that the false evidence
               was not material is not entitled to deference because the state
               court applied a legal standard squarely contrary to Supreme Court
               precedent ............................................... 61

II.  DEFENSE COUNSEL'S FAILURE TO EXPOSE FALSE EVIDENCE
     WHICH DIRECTLY UNDERCUT BOTH PETITIONER'S ALIBI AND HIS
     CREDIBILITY REQUIRES RELIEF ................................ 64

     A.   Introduction ............................................... 64

     B.   Defense Counsel Rendered Ineffective Assistance Of Counsel In Failing
          To Expose The False Evidence In Connection With Both The Lorex
          Video Footage And The August 24 Threat ....................... 64

          1.   Counsel's failure to expose the truth about the video footage or
               the August 24 threat fell below an objective standard of care .... 65

          2.   Counsel's failure to expose the false evidence undermines
               confidence in the outcome of trial ........................ 67

     C.   Section 2254(d) Does Not Bar Relief On This Claim Because The
          State Habeas Court Ignored Key Facts ......................... 68

III. THE PETITION IS TIMELY FILE BECAUSE IT WAS FILED WITHIN
     THE ONE-YEAR STATUTE OF LIMITATIONS SET FORTH IN 28 U.S.C.
     § 2244. ..................................................... 74

CONCLUSION ...................................................... 76

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alcorta v. Texas*, 355 U.S. 28 (1957)  . . . . . . . . . . . . . . . . . . . . .  49

*Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) . . . . . . . . . . .  67

*Bowen v. Roe*, 188 F.3d 1157 (9th Cir. 1990)  . . . . . . . . . . . . . . .  74

*Bradley v. Duncan*, 315 F.3d 1091 (9th Cir. 2002)  . . . . . . . . .  55, 69

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)  . . . . . . . . . . . . . . .  49

*Campbell v. Reardon*, 780 F.3d 752 (7th Cir. 2015)  . . . . . . . . . . .  67

*Cannedy v. Adams*, 706 F.3d 1148 (9th Cir. 2013)  . . . . . . . . . . . .  54

*Chaffer v. Prosper*, 542 F.3d 662 (9th Cir. 2008)  . . . . . . . . . . . . .  74

*Chambers v. Armontrout*, 907 F.2d 825 (8th Cir. 1990)  . . . . . . . .  67

*Clinksdale v. Carter*, 375 F.3d 430 (6th Cir. 2004)  . . . . . . . . . . . .  67

*Crisp v. Duckworth*, 743 F.2d 580 (1984) . . . . . . . . . . . . . . . . . . .  67

*Daniel v. Palmer*, 499 Fed.Appx. 400 (6th Cir. 2012) . . . . . . . . . .  67

*Diaz v. Lewis*, 715 Fede.Appx. 608 (9th Cir. 2017) . . . . . . . . . . . .  54

*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) . . . . . . . . . . . . . . . . .  62

*Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005)  . . . . . . . . . . . . . . .  66

*Early v. Packer*, 537 U.S. 3 (2002)  . . . . . . . . . . . . . . . . . . . . . . . .  55

*Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011)  . . . . . . . . . . . . . .  67

*Eze v. Senkowski*, 321 F.3d 110 (2nd Cir. 2003)  . . . . . . . . . . . . . .  67

*Giglio v. United States*, 405 U.S. 150 (1972)  . . . . . . . . . . . . . . . .  48

*Goodrum v. Tampkins*, 2018 WL 1071710 (S.D. Cal. 2018)  . . . .  63

*Greene v. Lambert*, 288 F.3d 1081 (9th Cir. 2002)  . . . . . . . . . . . .  55

*Hall v. Director of Corrections*, 343 F.3d 976 (9th Cir. 2003)  . . .  49

*Hamilton v. Adams*, 533 Fed.Appx. 802 . . . . . . . . . . . . . . . . . . . .  54

*Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990) . . . . . . . . . . . . . . . . .  67

*Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999) . . . . . . . . . . . . . . . .  66

*Hash v. Johnson*, 845 F.Supp.2d 711 (W.D. Va. 2012) . . . . . . . .  67

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) . . . . . . . . . .  49, 52, 63

*Hernandez v. Lewis*, 2018 WL 1870449 (E.D. Cal. 2018) . . . . . .  63

*Hoover v. Newland*, 307 Fed.Appx. 56 . . . . . . . . . . . . . . . . . . . . .  49

*Jeffries v. Wood*, 114 F.3d 1484 (9th Cir. 1997) . . . . . . . . . . . . . .  55

*Lancaster v. Adams*, 324 F.3d 423 (6th Cir. 2010) . . . . . . . . . . . .  55

*Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010) . . . . . . . . . . . . . . .  48

*Miller v. Pate*, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . .  49

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . .  48, 49

*Nulph v. Cook*, 333 F.3d 1052 (9th Cir. 2003) . . . . . . . . . .  56, 58, 60

*Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001) . . . . . . . . . . . . . . .  67

*Penry v. Johnson*, 532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . .  55

*Phillips v. Ornoski*, 673 F.3d 1168 (9th Cir. 2012) . . . . . . . . . . . .  49

*Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002) . . . . . . . .  56, 58, 60

*Porter v. McCollum*, 558 U.S. 30 (2009) . . . . . . . . . . . . . . . . . . .  69

*Quintana v. Cate*, 88 F.Supp.3d 1102 (C.D. Cal. 2015) . . . . . . . .  54

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . .  69

*Schultz v. Page*, 313 F.3d 1010 (7th Cir. 2002) . . . . . . . . . . . . . .  55

*Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004) . . . . . . . . . . . . . . .  67

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . .  64

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) . . . . . . . . . . . passim

*Thomas v. Lockhart*, 738 F.2d 304 (8th Cir. 1984) . . . . . . . . . . . .  67

*Torres v. Long*, 527 Fed.Appx. 652 (9th Cir. 2013) . . . . . . . . . . . .  74

*United States v. Agurs*, 427 U.S. 97 (1976) . . . . . . . . . . .  48, 52, 62

*Warburton v. Walker*, 548 F.Supp.2d 835 (C.D. Cal. 2008) . . . . .  74

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . passim

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . .  55, 69

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.                                    iv

## STATE CASES

*People v. Proctor*, 4 Cal.4th 499 (Cal. 1992) . . . . . . . . . . . . . . . .  62

*In re Richards*, 63 Cal.4th 291 (Cal. 2016)   . . . . . . . . . . . . . . . .  62

## FEDERAL STATUTES

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48, 53

28 U.S.C. § 2244 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

## STATE STATUTES

Penal Code section 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

## MISCELLANEOUS

*People v. Zumot,* 2013 Cal. App. Unpub. LEXIS 1973 (2013) .  4, 74

**INTRODUCTION**

Petitioner Bulos Zumot was charged with murder in the death of Jennifer Schipsi. He waived his *Miranda* rights prior to trial and told police that he had an alibi: at the time of the crime, he was in the café he owned and ran on University Avenue in Palo Alto.  He waived his Fifth Amendment privilege against self-incrimination at trial and testified, telling jurors of his alibi.  He also denied threatening to kill Ms. Schipsi.

As more fully discussed below, however, the state destroyed petitioner's alibi.  The state introduced police testimony about (and video footage from) the café surveillance system.  According to police and the prosecutor this footage showed that Mr. Zumot did not -- in the prosecutor's own words -- "enter[] his café" until 6:47:38.  As explained below, given the location of the café, if the prosecutor's evidence and argument was true -- that is, if Mr. Zumot indeed did not enter his café until 6:47:38 -- then the prosecutor was right: Mr. Zumot had no alibi and he had lied to the jury.

The state also introduced testimony from three witnesses that on August 24, 2009 -- only seven weeks before the murder -- Mr. Zumot telephoned the victim and explicitly threatened to kill her.  In urging jurors to find Mr. Zumot guilty, the prosecutor referenced this threat 11 times in his closing argument.  Here too, if the prosecutor's evidence as to the August 24 threat was true, Mr. Zumot had yet again simply lied to the jury.

As discussed in Argument I below, the record now shows the state presented false evidence with respect to both the video footage from the surveillance system and the August 24 call.  In state post-conviction pleadings the state conceded that (1) the prosecutor's evidence and argument as to the video footage were both false and (2) the prosecutor's evidence and argument about the August 24 call were both false.  In fact, (1) the video footage shows Mr. Zumot *was* inside the café prior to 6:47:38 just as he

testified and (2) telephone records from a Mr. Roy Endemann, and admissions he made to police, show that Mr. Zumot did not make the August 24 call, just as he testified.  In both areas, the prosecutor's evidence and argument to the contrary were false.

Defense counsel could have exposed the falsity of the state's evidence at trial.  To his credit, as discussed in Argument II, trial counsel has conceded he had no tactical reason for failing to expose the state's evidence as false.  He was simply unaware of the video, documentary and testimonial evidence which would have exposed the state's falsehoods.  Counsel forthrightly admits that had he been aware of this evidence he would certainly have used it.

As discussed below, and as might be expected where a defendant testifies and denies the crime, petitioner's alibi defense and his credibility were key to the case.  Put simply, if jurors found Mr. Zumot was telling the truth, they could not convict.  However, on this record it is hard to imagine how even one juror could have found Mr. Zumot credible in light of the state's presentation of video evidence -- and the August 24 threat -- showing that he was a liar.

At the end of the day, the melancholy truth of this case is that although not a single member of the jury could have known this, the only accurate testimony about the café and the August 24 threat came from petitioner.  On this record, the state's presentation of false evidence about Mr. Zumot's alibi and his credibility, combined with the false attribution to him of an explicit threat to kill the victim, requires a new and fair trial regardless of whether the case is examined through the lens of a false evidence claim or a claim of ineffective assistance of counsel.  And while the state habeas court's contrary conclusion would normally be entitled to deference under provisions of the Antiterrorism and Effective Death Penalty Act of 1996, specifically 28 U.S.C. § 2254 (d), no such deference is warranted here because the state habeas court ignored facts critical to

1    resolution of petitioner's constitutional claims as well as the state's own concessions, it

2    relied on facts which were demonstrably wrong and it applied a standard of materiality

3    that the Ninth Circuit has already held contrary to Supreme Court precedent.  The natural

4    result of this perfect storm of errors was that the state court reached the remarkable

5    conclusion that "the prosecution did not present false testimony."  Because this finding

6    represents an entirely unreasonable determination of the facts, deference is not required.

7    Relief is proper.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROCEDURAL STATEMENT

On July 22, 2010, the Santa Clara County district attorney filed a two-count information against appellant Bulos Zumot.  2 CT 393.  Count one charged an October 15, 2009 murder in violation of Penal Code section 187.  2 CT 393.  Count two charged an October 15, 2009 arson in violation of section 451(b).  2 CT 393.  Mr. Zumot pled not guilty.  2 CT 397.

Opening statements began on January 3, 2011.  2 CT 554.  The state rested on February 1, 2011.  3 CT 614.  The defense rested on February 8, 2011 and closing arguments occurred later that day.  3 CT 633-634.  The jury began deliberations the next day.  3 CT 689.  On February 10, 2011, the jury found Mr. Zumot guilty as charged.  3 CT 691-692.

The trial court imposed sentence on October 28, 2011.  3 CT 753.  The court imposed a 25 year-to-life term for the count one murder conviction.  3 CT 754.  The court added an eight year upper term for the count two arson charge, and ran the two terms consecutive.  3 CT 753, 756.

Mr. Zumot filed a timely notice of appeal.  3 CT 761.  On December 12, 2013, the California Court of Appeal, Sixth Appellate District affirmed the conviction and sentence. *See People v. Zumot*, 2013 Cal. App. Unpub. LEXIS 1971 (2013).  Mr. Zumot timely filed a Petition for Review in the California Supreme Court which was denied on March 19, 2014.

On September 10, 2013 -- while petitioner's appeal was still pending with the state appellate court -- petitioner timely filed a Petition for Writ of Habeas Corpus with the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

appellate court. *In re Bulos Zumot*, H040124, Petition for Writ of Habeas Corpus, attached as Exhibit TT. The state court issued an Order to Show Cause returnable before the Santa Clara County Superior Court. *In re Bulos Zumot*, H040124, Order of December 12, 2013, attached Exhibit UU. After briefing by both parties and an evidentiary hearing, the Superior Court denied relief on November 22, 2016. *In re Bulos Zumot*, BB943863, Order of November 22, 2016, attached as Exhibit CC.

Petitioner sought relief from the state appellate court, timely filing a new Petition for Writ of Habeas Corpus raising the same claims on January 19, 2017. *In re Bulos Zumot*, H044302, Petition for Writ of Habeas Corpus, attached as Exhibit QQ. The state court summarily denied this petition on August 31, 2017. *In re Bulos Zumot*, H044302, Order of August 31, 2017, attached as Exhibit RR.

Petitioner then sought relief from the state supreme court, timely filing a Petition for Writ of Habeas in the California Supreme Court raising these same claims on October 25, 2017. *In re Bulos Zumot*, S245050, Petition for Writ of Habeas Corpus, attached as Exhibit VV. On March 14, 2018, the California Supreme Court denied that petition. *In re Bulos Zumot*, S245050, Order of March 14, 2018, attached as Exhibit WW.

This Petition for Writ of Habeas Corpus follows.

1

STATEMENT OF FACTS

2

3     A.     Introduction: The Time Of The Fire And The State And Defense Theories
             Of The Case.

4

5          On the evening of October 15, 2009, Daren Beaumont was driving down Addison

6   Avenue, in Palo Alto, California when he saw smoke pouring from the eaves of a small

7   cottage.  2 RT 219-220.  He recalled calling 911 at 6:39; according to the state's fire

8   expert Barbara Maxwell, the fire department received the 911 call at 6:40 p.m..  2 RT

9   219-220; 3 RT 294.  The first fire engine arrived at the cottage at 6:47 p.m..  3 RT 294.

10

11         Firefighters found the body of Jennifer Schipsi inside the cottage, lying on a bed in

12  the bedroom.  2 RT 201.  There was a red melted gas container lying on the bed near her

13  body.  2 RT 171; 9 RT 1004.  Ms. Schipsi had been strangled before the fire started.  3

14  RT 381.  The state was unable to determine the exact time of death.  3 RT 385-386, 396.

15

16         Neither the cause nor time of the fire was really in dispute at trial.  Ms. Maxwell

17  determined that the fire was intentionally set.  3 RT 272.  She believed someone poured

18  gas from the gas can onto the bed and lit the gas with a lighter or a match.  3 RT 287-288.

19  Based on the physical evidence at the scene and when the fire was reported, the fire was

20  set between 6:35 p.m. and 6:40 p.m. and burned "fast and hot."  3 RT 204, 294.

21

22         Other evidence corroborated Ms. Maxwell's testimony as to the time of the fire.

23  John Eckland lived in the main house at 969 Addison Avenue and rented the smaller

24  cottage to Mr. Zumot and Ms. Schipsi.  7 RT 680.  Mr. Eckland was having his weekly

25  dinner with his elderly father that night; he left to pick up his father "[p]recisely at 6:25."

26  7 RT 692.  Because his father was 91 years old, Mr. Eckland picked him up "at the same

27  time virtually every single time" for these weekly dinners.  7 RT 716.  It takes five

28

minutes to get to his father's home and five minutes to return; he got back to his house at 6:35.  7 RT 692, 717.  He walked passed the cottage at 6:35 and "everything looked fine." 7 RT 694, 717-718.  He did not see Mr. Zumot's car in the area either when he left at 6:25 or when he returned at 6:35.  7 RT 717.  Around 6:40 p.m. someone knocked on his door to tell him the cottage was on fire.  7 RT 694.

Eden Salomon had also arrived at Mr. Eckland's for dinner that evening.  7 RT 655.  She arrived at 6:25.  7 RT 655.  Because she had lived in Addison Avenue cottage for 13 years, the cottage was "sentimental" to her and so she always "paid attention" to it when she arrived for dinner.  7 RT 678.  At 6:25 nothing looked amiss.  7 RT 678.

Police investigation focused on the usual suspect -- the boyfriend.  Ms. Schipsi and Bulos Zumot had dated off and on since October 2007.  18 RT 1924-1925.  At the time of her death, they were living together in the cottage at 969 Addison Avenue.  20 RT 2033. Mr. Zumot owned (and worked at) a café in Palo Alto.  4 RT 407-408.

The state focused on Mr. Zumot because he and Ms. Schipsi had had a volatile relationship.  The state's theory of the crime itself was simple: Mr. Zumot killed Ms. Schipsi, set the fire at 969 Addison and then drove to his café, where the café's video surveillance footage showed him entering the café at 6:47:38-39.  To support its position that Ms. Schipsi and Mr. Zumot had a volatile relationship, the state introduced dramatic testimony that on August 24 -- only weeks before Ms. Schipsi was murdered -- Mr. Zumot telephoned her and threatened to kill her.

The defense was also simple: alibi.  As Mr. Zumot told police, and as he later testified to the jury, he was innocent.  He was in San Jose on the late afternoon of October 15 and drove directly to his Palo Alto café.  He called an employee of the café at 6:39 as he (Mr. Zumot) was looking for parking outside the café, and entered the café moments

later.  Accordingly, he could not have set the fire at Addison Avenue.  He told police about the telephone call and the video surveillance system at the café (known as a Lorex system), both of which would prove his innocence.  And he did not threaten to kill Ms. Schipsi.

Police seized the Lorex system.  At trial, the state presented testimony from police officers -- which petitioner did not dispute -- that the time stamps on the Lorex system's video footage were off by one hour and seven minutes.  13 RT 1407-1412.

Beyond this fact, however, the jury trying to decide whether Mr. Zumot was telling the truth about his whereabouts did not have the full story, or anything close.  Instead, the jury heard evidence and arguments which were demonstrably false.  The state destroyed Mr. Zumot's alibi (and the credibility of his contrary testimony to the jury) by presenting testimony from police officers that video footage from the surveillance system showed Mr. Zumot did not arrive at the café until sometime after 6:47:38 that afternoon, which left him sufficient time to set the fire and drive to the café.  The state also introduced that video footage.  The prosecutor relied on that footage in closing argument.  The state destroyed Mr. Zumot's testimony denying the August 24 threat by introducing testimony from three witnesses, including a police officer, that Ms. Schipsi had told all of them about the threat.  But as discussed below, the state's evidence and argument in both areas was false.

In section B of this statement of facts, petitioner will detail the evidence that was introduced at trial, including the state's evidence about the video footage and the August 24 threat.  In section C, he will discuss the new evidence establishing the falsity of the trial evidence.  In section D he will discuss the prosecution's concessions made in state court post-conviction proceedings.  And in section E he will discuss the state-court evidentiary hearing and the state habeas court's anomalous conclusion that "the

Case 3:19-cv-01319-WHO   Document 1   Filed 03/12/19   Page 51 of 119

prosecution did not present false testimony."

As discussed more fully below, although the claims have been pled as both false evidence and ineffective assistance of counsel, it does not matter whether the prosecution is at fault for presenting false evidence or whether the fault is defense counsel's for failing to expose the falsity of this evidence.  What matters here is that the 12 jurors deciding whether Mr. Zumot should be believed, or whether he was instead guilty of murder, were presented with and urged to rely on patently false evidence about his alibi, his credibility and whether he actually threatened to kill the victim only weeks before she was murdered.[2]

B.      The Evidence At Trial.

Because Mr. Zumot presented an alibi defense, and testified to that defense at trial, the jury had but one simple question to answer: was Mr. Zumot credible?  Obviously, if jurors believed the state's theory that he telephoned Ms. Schipsi and threatened to kill her in late August, and then strangled her on October 15 and tried to burn the cottage down, they would convict of murder.  Just as obvious, however, is that if jurors found Mr. Zumot credible, believing his alibi and his denial that he threatened to kill Ms. Schipsi, they would acquit.  Here is the evidence the jury was presented with.

---

[2]      As noted, the parties agreed the Lorex video time stamp was off by one hour and seven minutes.  13 RT 1407-1412.  For the sake of clarity, further references in this brief to the time of the Lorex video footage will be to the corrected time -- that is, to the time on the Lorex plus one hour and seven minutes.  For example, when petitioner refers to Lorex footage which the Lorex time stamp on the video shows at 5:40 p.m., the corrected (and accurate) time of such footage would be 6:47 p.m. (adding the one hour and seven minutes).  In this brief, all times for the Lorex footage are to the corrected (and accurate) times of the footage.

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.                    9

1          1.     The evening of October 14, 2009 and early morning hours of
                  October 15, 2009.

October 14th was Mr. Zumot's birthday.   4 RT 436.  Ms. Schipsi had organized a
birthday party for him at an Arabic restaurant in Sunnyvale.  4 RT 436-437.  At trial,
prosecution witness Victor Chaalan described the events of that night and the early
morning hours of October 15, 2009.  4 RT 436.  Around 7 p.m. on October 14, Chaalan
drove Ms. Schipsi and Mr. Zumot to the party.  4 RT 437.  There were twelve to fifteen
guests at the party and Chaalan described it as "fun," with a lot of food.  4 RT 438.

When it was time to pay the bill, Mr. Zumot said that Ms. Schipsi and he would
pay the bill.  4 RT 440.  Chaalan ended up giving money to another guest who wanted
everyone to chip in for the bill.  4 RT 439-440.  After the party, the guests planned to
meet at Mr. Zumot's café.  4 RT 439.  On the ride there, Mr. Zumot and Ms. Schipsi
argued over whether Ms. Schipsi had taken any money from guests for the bill.  4 RT 442.
When Ms. Schipsi said no, Mr. Zumot accused her of lying and she started to cry.  4 RT
444.  When they arrived at the café, Chaalan and Mr. Zumot went inside and Ms. Schipsi
stayed outside.  4 RT 446.  They checked on her later but she told them to go back inside.
4 RT 449.  Although they had all been friends for many years, this was the first time
Chaalan had seen them argue.  4 RT 491.  Instead, Chaalan testified that Mr. Zumot
"treated [Ms. Schipsi] well."  4 RT 491.

Sometime before midnight, Ms. Schipsi decided to walk home.  8 RT 859.  During
the walk -- and then back at the cottage -- Mr. Zumot and she exchanged a series of text
messages.  8 RT 859-870.  In these messages, Ms. Schipsi told Mr. Zumot not to come
home that night.  8 RT 859.  She told him that she had been followed down University
Avenue, "harassed" and had broken the heel off her shoe.  8 RT 861.  Ms. Schipsi berated
Mr. Zumot, calling him a "fag," "little pussy bitch," "limp dick," and told him to "go fuck

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.                                    10

his cousin."  8 RT 762-764.  She also demanded that Mr. Zumot give her a "11,200 check" by tomorrow or she would take legal action.  8 RT 870.  Mr. Zumot responded by saying "thankx," "you need to relax," and "okay."  8 RT 863-865.[3]

Chaalan recalled that Mr. Zumot told him that Ms. Schipsi had been followed home by a white truck and had broken the heel off her shoe.  4 RT 485-486.  He described Mr. Zumot as "concerned."  4 RT 486.  Chaalan and Mr. Zumot drove back to the cottage Mr. Zumot shared with Ms. Schipsi.  4 RT 456.  When they arrived, Ms. Schipsi was already in the bedroom with the door closed.  4 RT 460-461.  Chaalan recalled that Mr. Zumot said "hi hun" and asked whether she wanted to join them to smoke from the hookah.  4 RT 460-461.  Ms. Schipsi declined, saying she was tired and thanked Chaalan for driving that night.  4 RT 461.  After Chaalan left, he received a text from Mr. Zumot saying "we are okay."  4 RT 466.  According to Mr. Zumot, he and Ms. Schipsi smoked a hookah together, ate birthday cake and talked.  20 RT 1996.  At 3:42 a.m., Chaalan received another text from Mr. Zumot referring to his earlier argument with Ms. Schipsi and stating "she is cool now and honestly.  She has the cleanest heart . . . I love her."  4 RT 467.  Mr. Zumot and Ms. Schipsi then made love.  16 RT 1741-1742.  This was later confirmed by Detective Sunseri who found a video on Ms. Schipsi's phone of them having sex at 3:52 a.m. on October 15, 2009.  16 RT 1742.  According to Mr. Zumot, they went to bed around 4:20 a.m..  20 RT 1996.

---

[3]        The state introduced a copy of a check dated July 22, 2009 from Ms. Schipsi made out to Mr. Zumot for $10,000.  16 RT 1713.  In the inscription section, she had written "loan."  16 RT 1713.  At trial Mr. Zumot presented evidence to show that he owed no such debt and in fact had over $87,000 in his bank account at the time.  20 RT 2059, 2061.

1

2.      Mr. Zumot's whereabouts throughout the day of October 15 and at the time of the crime.

2

3

        At trial, Mr. Zumot provided detailed testimony about his whereabouts on the

4

morning and afternoon of October 15, 2009.  20 RT 1997-2005.  He left the house that

5

morning several times to run errands; when he returned, Ms. Schipsi was still in bed.  20

6

RT 2000, 2002.  In the early afternoon, Mr. Zumot testified that he went to the Palo Alto

7

police station to pick up a report.  20 RT 2003.  Agent Sunseri confirmed this by

8

examining police video footage.  16 RT 1709.  After that, Mr. Zumot said he went to a

9

warehouse to pick up items for the café.  20 RT 2004.  This was confirmed as well.  17

10

RT 1896-1897.  Later, Mr. Zumot testified that he went to a restaurant supply store in San

11

Jose.  20 RT 2005.  Police detective Reifschneider confirmed this by examining video

12

footage from the store.  13 RT 1506.

13

14

        Mr. Zumot also testified to the his whereabouts in the late afternoon and early

15

evening, when the fire was started.  After leaving the restaurant supply store, Mr. Zumot

16

headed to a domestic violence class he was attending in San Jose, arriving early for class

17

and leaving San Jose after the class at 5:55.  20 RT 2005, 2007.[4]  Police confirmed this

18

with Fernando Alcobo, who taught the domestic violence class, and confirmed that when

19

he arrived to teach the class at 3:40 p.m. Mr. Zumot was already there waiting outside.  12

20

RT 1246-1247, 1350.  Alcobo believed that he excused the class at 5:55 p.m. that evening

21

but may have let it out a bit earlier at 5:45 p.m..  12 RT 1349.  When Alcobo was

22

interviewed two days later, he described Mr. Zumot's demeanor on the 15th as "in good

23

spirits" and said that he did not say or do anything "unusual."  13 RT 1529.

24

25

26

        [4]      Mr. Zumot pleaded guilty to making harassing phones calls to Ms. Schipsi in March 2008.  18 RT 1930-1931.  He received three years probation and had to take 52 domestic violence classes.  18 RT 1930-1931.  This was his 47th class and he had not missed a single one.  20 RT 2007-2008.

27

28

Mr. Zumot testified that he drove from class to the café. 20 RT 2012. As he looked for parking near the café, he unplugged his cell phone that was charging and noted the time of 6:32 p.m.. 20 RT 2013. He drove around for five or six minutes looking for parking. 20 RT 2013. When he found a spot, he called Jehad, an employee at the café, told him that he was parking and to make him a tea and hookah. 20 RT 2013-2014. It was 6:39 p.m.. 20 RT 2014.

Mr. Zumot entered the café from the Ramona Street entrance. 20 RT 2015. He went upstairs to his office, checked email, and then went downstairs. 20 RT 2015. He then heard a fire truck passing by and walked outside to see it. 20 RT 2015. Mr. Zumot came back inside for his tea and hookah. 20 RT 2015. His landlord John Eckland called a few minutes later to tell him that his house was on fire. 20 RT 2015-1016. Mr. Zumot dropped the phone and drove to the scene. 20 RT 2016.

Ahmed Alaghabash worked for Mr. Zumot at the café. 17 RT 1849. Ahmed confirmed that Mr. Zumot arrived at the café sometime between 6:30 and 6:40 p.m.. 17 RT 1851. He also confirmed that after 6:00 p.m. the only entrance open into the café is the Ramona Street entrance. 17 RT 1855. Ahmed recalled that Mr. Zumot called before he arrived and spoke to Jehad asking them to prepare a tea and hookah for him. 17 RT 1854, 1861. The fire truck raced by the café maybe ten minutes after Mr. Zumot had arrived. 17 RT 1852. Ahmed described Mr. Zumot as "like always" and "acting normal." 17 RT 1853.

The only conflicting evidence regarding Mr. Zumot's whereabouts that early evening came from Monterey County Sheriff Joseph Martinez who was a friend of Mr. Zumot. 4 RT 405. They met in 2007 and Martinez went into business with Mr. Zumot, investing between $70,000 and $80,000 into Da Hookah Spot. 4 RT 407-408. Martinez also knew Ms. Schipsi and described Mr. Zumot and Ms. Schipsi as "inseparable," noting

that they would spend time together at the gym, go to dinner and have tea.  4 RT 407.

Martinez explained that Mr. Zumot would "clear his schedule" to spend time with Ms.

Schipsi.  4 RT 408.  He noted that they had problems but that they were typical.  4 RT

409.

On October 15, 2009, Mr. Zumot called Martinez to tell him that his (Mr.

Zumot's) house was on fire.  4 RT 418.  He sounded "scared and panicked."  4 RT 418.

He explained that he had last seen Ms. Schipsi at 11:30 a.m. and had spent the afternoon

going to the Restaurant Depot, his domestic violence class in San Jose, and then to his

café.  4 RT 419.  The next day, Martinez spoke with Mr. Zumot again.  4 RT 423.

According to Martinez, Mr. Zumot now said that after his domestic violence class he had

stopped at the cottage and seen Ms. Schipsi sleeping before he continued on to the café.  4

RT 423.

Mr. Zumot explained that this was not an accurate recollection of the conversation.

He told Martinez that he had seen Ms. Schipsi that morning, had left and returned and she

was alive, and then continued on to run some errands and go to class.  20 RT 2053.  He

did not tell Martinez that he returned to the cottage after his class and before going to the

café.  20 RT 2053.

> 3.    The state destroys Mr. Zumot's alibi, and shows him to be a liar,
> with testimony from police officers and video footage about when he
> arrived at the cafe.

As noted, John Ecklund did not see any fire in the cottage when he passed at 6:25

and 6:35.  7 RT 692-694, 716.  He did not see Mr. Zumot's car in the area, nor was the

cottage on fire.  7 RT 716-718.  Edie Solomon walked past the cottage at 6:25 and it was

not on fire.  7 RT 655, 678.  The 911 call reporting the fire was received at 6:40.  3 RT

294.  And fire expert Barbara Maxwell testified the first started sometime between 6:35

1

and 6:40.  3 RT 204, 294.

2

3    The state's theory was that Mr. Zumot killed Ms. Schipsi sometime in the morning

4    or early afternoon on October 15, 2009.  He then returned to set fire to the cottage -- with

5    Ms. Schipsi's body inside -- around 6:35 to 6:40 p.m..  Of course, to accomplish this, Mr.

6    Zumot had to (1) drive from his San Jose class to Palo Alto after class ended at 5:45 or

7    5:55 p.m. (2) set the fire at 6:35 or 6:40 and (3) drive to his café where witnesses saw him

8    as the fire trucks passed.  As discussed above, however, Mr. Zumot testified under oath

9    that he arrived at the café just before 6:40 p.m..  20 RT 2014.  And his employee Ahmed

10   Alaghabash confirmed this timing.  17 RT 1851.  If this timing was correct, and the fire

11   started between 6:35 and 6:40 p.m. as the state's fire investigator Barbara Maxwell

12   believed, then Mr. Zumot could *not* have started it.  3 RT 294.  Detective Sunseri himself

13   agreed there was "no way to get from Addison [to the café] park your car, and get inside

14   in . . . three minutes."  16 RT 1808-1809.  Indeed, it had taken Sunseri as long as seven

15   minutes to get between the cottage and the café.  16 RT 1807.  This left two main

16   possibilities.  Either Mr. Zumot was lying, or he was innocent.

17

18   The state's theory, of course, was that Mr. Zumot was lying when he told police he

19   arrived at the café at 6:40.  The prosecutor was very much aware of the importance of

20   showing when Mr. Zumot arrived at the café.  Thus, he told jurors that the Lorex footage

21   from October 15 would show that Mr. Zumot was lying; in fact, it would not show

22   defendant arriving at the café until 6:47, after a fire engine responding to the fire passed

23   on University Avenue:

24

25         "Surveillance video puts the defendant walking into his café at about 6:47
          p.m."  2 RT 141.

26

27

28   The prosecutor repeated the point moments later for emphasis:

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.                              15

"At the defendant's café, there is surveillance video. . . .  At 6:47, before the defendant has even walked into the café, you can see the red lights of an emergency vehicle going eastbound on University Avenue towards Addison.  It's only then that the defendant enters his café, at 6:47 p.m."  2 RT 142-143.

The prosecutor's promise about what the evidence would show was entirely correct.  Agent Sunseri testified that the Lorex video showed the fire engine passing at 6:47:29 "and then, right after that" Mr. Zumot arriving at the café.  15 RT 1711-1712, 1727.  Detective Quisenberry did the same, telling jurors that "we see the defendant enter" the café at 6:47 and later reitererated that "the first time that you see" Mr. Zumot in the café is at 6:47:35, *after* the fire engine had already passed the café.  13 RT 1420-1421, 1427-1432.  The prosecutor also showed the jury the footage of Mr. Zumot entering the café at 6:47:38.  13 RT 1420-1421.

This, of course, was roughly seven minutes *later* than Mr. Zumot and Ahmed Alaghabash testified that Mr. Zumot arrived at the café.  (17 RT 1851; 20 RT 2044.)  And under this scenario, there was time for Mr. Zumot to set the fire at 6:35 to 6:40 and still get to the café by 6:47.  In other words, if this testimony and video footage was the truth, any alibi claim that Mr. Zumot arrived at the café prior to 6:47 was a lie.[5]

In closing argument the prosecutor relied on the testimony about the Lorex footage offered by Sunseri and Quisenberry and the Lorex footage itself.  He told jurors that Mr.

---

[5]    Attached as Exhibit Q is a DVD containing a copy of the Lorex video footage which the jury saw showing Mr. Zumot entering the café sometime after 6:47:29 when the fire engines passed.  This video clip shows two people coming into the café. Mr. Zumot is the first of these two.  If the video clip is paused when Mr. Zumot first enters the café, and is near the red wall seen in the video, it appears he is wearing a red t-shirt.  Exhibit Q at 6:47:33-34.  But that is an optical illusion caused by a combination of the light reflecting off the red wall and the quality of the video itself.  Seconds later, as Mr. Zumot walks down the hallway away from the red wall, it is apparent that he is wearing a gray sweatshirt.  Exhibit Q at 6:47:38.

Zumot had *not* arrived at the café until *after* the fire engine passed.  Just as in his opening

statement, the prosecutor was clear and to the point:

> "And its only after the fire truck arrives that the defendant's seen on tape . . . ."  RT 2626.

The prosecutor urged jurors not to believe Mr. Alaghabash's testimony (that Mr.

Zumot had arrived at 6:40) precisely because the Lorex footage showed Mr. Zumot did

not arrive at the café until after the fire truck passed.  22 RT 2549.  After all, as the

prosecutor succinctly told the jury:

> "Well, we saw the video."  22 RT 2549.

4.   **The state presents evidence that only weeks before Ms. Schipsi was killed, Mr. Zumot telephoned her and threatened to kill her.**

As noted above, the state introduced testimony from Agent Sunseri and Officer

Quisenberry, along with footage from the video system, which would directly rebut Mr.

Zumot's testimony that he arrived at the café at 6:40.  But this is not the only evidence the

state offered which, if true, showed Mr. Zumot was lying to the jury.  The state also

introduced evidence from three witnesses that on August 24, 2009 -- only weeks before

Ms. Schipsi was killed -- Mr. Zumot called her and threatened to kill her.

The state first called police Officer Moore to testify.  16 RT 1766.  Moore testified

that at 1:30 on the afternoon of August 24, 2009, she (Moore) and Officer Monroe

responded to Ms. Schipsi's home after Ms. Schipsi had called police.  16 RT 1766.  Ms.

Schipsi told Moore that petitioner "had called her and had threatened her life over the

phone."  16 RT 1767.  The call was "earlier that day."  16 RT 1769.  Ms. Schipsi told

Moore that he called her a "bitch" and "said that he was going to kill her."  16 RT 1767-

1768.  She obtained an emergency protective order against Mr. Zumot.  17 RT 1776-1777.

But the prosecutor went further, and had Officer Moore talk about how the call affected Ms. Schipsi.  According to Moore, Ms. Schipsi was "very scared."  16 RT 1767.  She "wasn't crying but she was teary."  16 RT 1767.  Moore recalled that she was "scared . . . just very nervous in her mannerisms and in her speech."  16 RT 1768.  She was in "fear[] for her life."  16 RT 1769.

The state also called Leslie Mills to testify about this threat.  Mills owned the building in which Mr. Zumot's café was located.  16 RT 1778.  Although Mills could not recall the exact date Ms. Schipsi had called her, she did recall that (1) it was in August, (2) it was a Monday and (3) police were present with Ms. Schipsi at the time.  16 RT 1781, 1783-1784.  Mills told the jury that Schipsi said that Mr. Zumot had called her and threatened "he would kill [her] and burn [her] house down."  16 RT 1781.  In a subsequent sworn declaration, Ms. Schipsi recalled the call came from a blocked number.  16 RT 1786.[6]

Finally, the state called Heather Winters to testify about the August threat.  15 RT

---

[6]      As noted, Mills did not recall the actual date of the call she received form Ms. Schipsi, only that it was a Monday in August and police were at Ms. Schipsi's house at the time of the call.  16 RT 1781-1784.  It so happens that August 24, 2009 was indeed a Monday.  And the state presented no evidence that police responded to Ms. Schipsi's home on any other Monday in August 2009.

1640. Ms. Winters also told the jury that Ms. Schipsi telephoned her in August 2009 and said that petitioner threatened to kill her.  15 RT 1642.[7]

Mr. Zumot testified and denied making the August 24, 2009 threat to kill. 18 RT 1954.  Yet again, however, if the state's evidence was truthful, any claim that Mr. Zumot did not threaten to kill Ms. Schipsi was nothing more than a lie.

At trial, Mr. Zumot introduced evidence that several weeks after making the allegation, Ms. Schipsi recanted.  16 RT 1786-1787.  In response, the prosecutor called domestic violence expert Richard Ferry who explained the concept of recantation, telling the jury that in nearly 75% of all domestic violence cases, the victim will withdraw an accusation that has been made.  12 RT 1332-1333.

The prosecutor apparently believed this expert testimony was effective in rebutting the recantation evidence; in closing argument the prosecutor relied on the testimony of Moore, Winters and Mills in urging jurors to convict of murder, in part, because "there's only one person who had the motive, the opportunity, the desire, and, in fact, told [Ms. Schipsi] not seven weeks before he killed her that he was going to kill her and he was going to burn her house down."  22 RT 2535.  He later returned to this call, reminding the jury that Mr. Zumot threatened to kill Ms. Schipsi during the August 24 call.  22 RT 2543.  In fact, the expert testimony was so effective the prosecutor relied on the threat 11

_____

[7]     Post-conviction investigation revealed that Ms. Winters's telephone number was (650) 796-0612.  Owner Information, attached as Exhibit LL to this Petition.  Ms. Schipsi's August 24 call to Ms. Winters appears on Ms. Schipsi's telephone records as a 22 minute, 19 second call placed by Ms. Schipsi at 5:23 p.m. on August 24, 2009. Exhibit W at p. 7.  A recording of this call was disclosed by the state in discovery prior to trial as DM-90.  Ms. Schipsi reported to Ms. Winters that petitioner said "I'm going to fucking kill you" and "fucking bitch, you're dead" and then he "hung up on me."  A true and accurate transcript of this portion of the telephone call between Ms. Schipsi and Ms. Winters is attached as Exhibit MM to this Petition.

separate times in his closing argument.  22 RT 2535, 2542, 2543, 2558, 2560, 2561, 2562, 2602, 2627.  Under the prosecutor's theory, Mr. Zumot's testimony denying the call was simply another lie, another example of why he should not be believed.

But the prosecutor went even further.  He skewered the defense for suggesting that Ms. Schipsi, Leslie Mills and Heather Winters were lying about the August 24 death threat.  22 RT 2534, 2542, 2543, 2560.  The prosecutor criticized the defense for even suggesting that Ms. Schipsi had made up the allegation:

> "[B]lame the victim, she's a liar."  22 RT 2543.

The prosecutor took a similar approach to Ms. Mills and Ms. Winters.  Yet again he ridiculed the defense for suggesting that Mr. Zumot did not make the August 24 threat:

> "Leslie Mills apparently is a liar as well . . . ."  22 RT 2542.

> "Heather Winters, she's a liar" too.  22 RT 2543.

To be sure, evidence of the August 24 threat was not the only evidence about the history between Mr. Zumot and Ms. Schipsi.  But it is fair to say that the balance of the evidence was a mixed bag.

On the one hand, their good friend Chaalan had never seen them argue before October 15.  4 RT 491.  Similarly, Ms. Schipsi's good friend Nora Hanafy, testified that Ms. Schipsi never mentioned that there was any violence in her relationship with Mr. Zumot.  13 RT 1397.  Nor had she ever seen any injuries.  13 RT 1397.  Moreover, Ms. Schipsi had a history of making false reports to police, involving both defendant and others.  In August 2009, Ms. Schipsi called police to report a hit and run.  14 RT 1567.

Ms. Schipsi reported that after an argument, Mr. Zumot crashed his car into her parked car. 14 RT 1567. Officer Craig Lee investigated, located Mr. Zumot's car and found no damage consistent with a hit and run of Ms. Schipsi's vehicle. 14 RT 1568. Lee concluded Ms. Schipsi's claim was "unfounded." 14 RT 1568.

Similarly, on September 24, 2009, Ms. Schipsi called police to report a threatening phone call from Hisham Ghanma. 17 RT 1826. Ms. Schipsi told police that it came from a blocked number and when she answered Ghanma said "I'll fuck you up if [you] show up to court with Bulos." 17 RT 1826. Ms. Schipsi was sure it was Ghanma as she had spoken with him several times and recognized his voice. 17 RT 1826. When police investigated, they determined Ghanma was "innocent." 17 RT 1826. He had been at work all day and video showed he had not made any phone calls. 17 RT 1826, 1829.

San Jose police officer Millard Hampton testified that on March 17, 2008, Ms. Schipsi reported she had been "assaulted, that her vehicle had been damaged and . . . she had been harassed by [her] boyfriend [Mr. Zumot] who she had recently broke up with." 13 RT 1475. Ms. Schipsi explained that she and Mr. Zumot had a fight and as she was leaving, Mr. Zumot kicked the grill of her Mercedes and kicked the door and dented it. 13 RT 1476. The harassment consisted of text messages where Mr. Zumot called her a "cancer," and told her that he needed to get her out of his life "at any price." 13 RT 1479. Ms. Schipsi also reported that several days before, on March 14, 2008, she had seen Mr. Zumot at the Starbucks and he had spit in her face and yelled at her. 13 RT 1480. Despite the claimed assault, Hampton did not see any injuries, he *not* follow up in anyway, did *not* send a report to the District Attorney's Office and did *not* recommend filing domestic violence charges. 13 RT 1475, 1484-1485.

Craig Robertson also testified for the state. Robertson knew Ms. Schipsi well; she was his neighbor for some time, a friend, and his realtor. 13 RT 1488. Robertson

testified that once in late 2007 or early 2008 he was going to his apartment and Ms. Schipsi and Mr. Zumot were also in the hallway.  13 RT 1497.  Robertson heard a slap and looked to see Ms. Schipsi holding her face.  13 RT 1491.  Despite Robertson's close relationship with Ms. Schipsi he did not confront Mr. Zumot at the time nor call police. 13 RT 1497.

At trial, Mr. Zumot explained that despite their rocky relationship he loved Ms. Schipsi very much and did not kill her.  18 RT 1924-1925.  Indeed, they had even discussed getting married.  20 RT 2044-2045.  Mr. Zumot had planned to ask Ms. Schipsi to marry him that very weekend.  20 RT 2039.  They were taking a trip with some friends to Palm Desert and he was going to surprise her.  20 RT 2023, 2039-2040.  Mr. Zumot had told Ms. Schipsi's mother and his good friend Joseph Martinez about the possible engagement.  20 RT 2050-2052; *See* Trial Exhibits CCCC and DDDD.

A text message from Ms. Schipsi confirmed they had plans to go to Palm Desert that weekend.  8 RT 861-864.  Mr. Zumot had also applied for a travel permit which had to be signed by his probation officer.  22 RT 2042.  At trial, Mr Zumot introduced the travel permit and airline reservations into evidence.  22 RT 2042-2043; Trial Exhibits NNN and AAAA.  On the issue of whether he committed this crime, Mr. Zumot was clear: "I'm innocent.  I did not kill Jennifer Schipsi and I did not burn the house."  18 RT 1924.

> 5.    The absence of physical evidence tying Mr. Zumot to either Ms. Schipsi's death or the burning of the cottage.

Despite the fact that Mr. Zumot was identified as the primary suspect within hours of the crime, there was no physical evidence to support the theory that he committed either murder or arson.  Nothing of evidentiary value was found in Mr. Zumot's cars.  13

RT 1444-1451.  Nor his businesses.  9 RT 944.  Nor the cottage where the fire occurred.
14 RT 1550-1551.  Nor was anything of evidentiary value found on his person.  16 RT
1739.

Indeed, as noted above, on the night of Ms. Schipsi's death, Mr. Zumot agreed to
give police the clothing he was wearing that day for testing and let police photograph his
body.  14 RT 1552.  At trial, crime scene investigator Kara Salazar explained that
generally if someone is fighting off an attacker, there will be defensive wounds on the
perpetrator.  14 RT 1553.  Those wounds might include cuts, scrapes, or other injuries.
14 RT 1553.  Salazar found "no marks" on Mr. Zumot's body.  14 RT 1554.  Detective
Sunseri also noted that he had not seen a "single . . . scratch . . . or mark" on Mr. Zumot.
16 RT 1739.  Thus, there were no defensive wounds; nothing on his hands and arms,
nothing on his neck, nothing on his body at all.  14 RT 1553-1554.

This was especially telling in light of the fact that Ms. Schipsi was described by
her friend Victor Chaalan as "very athletic" and someone who worked out a lot.  4 RT
496.  Moreover, as noted above, detective Sunseri described Ms. Schipsi's position on the
bed as "consistent . . . with someone who [was] in a struggle and then had fallen back."
16 RT 1737.  Finally, Sunseri noted that Ms. Schipsi's fingernails were "longer."  16 RT
1738.  Nevertheless, Mr. Zumot showed no signs at all of having been in a physical
struggle.  14 RT 1554; 16 RT 1739.

Santa Clara County Fire Department Chief Dennis Johnson brought his dog Rosie
to work on the case.  3 RT 310.  Rosie was trained to detect accelerants like gasoline in
arson investigations.  3 RT 310-311, 324.  Rosie was taken to the cottage, to Da Hookah
Spot and to search Mr. Zumot's two vehicles.  3 RT 322-323.  Rosie did not detect any
accelerant at Da Hookah Spot.  3 RT 322-323.  Nor did she detect any accelerant on the
interior of the silver Land Rover that Mr. Zumot had been driving on the day of the fire.

3 RT 321-322.[8]

Next, Rosie was shown clothes and shoes collected from Mr. Zumot on the day of the fire. 3 RT 335-336. There was no indication that Mr. Zumot had changed clothes between the time the fire would need to have been set -- around 6:35 to 6:40 p.m. -- and when he was taken to the police station later that evening. 14 RT 1358, 1552. Although -- according to Johnson -- Rosie alerted on Mr. Zumot's left shoe, the waist area of his pants, and his sweatshirt, the subsequent forensic laboratory report contradicted the dog evidence in almost every way; all the clothing collected from Mr. Zumot on the evening of the fire came back "negative . . .[for] ignitable liquids." 3 RT 285, 335-226, 344-345. The state's forensic chemist Katherine Hutches confirmed she found no "ignitable liquid" on Mr. Zumot's clothing from the day. 9 RT 1037, 1043. There was none on his sweatshirt, jeans or socks. 9 RT 1037, 1043; 10 RT 1054, 1056. And fire inspector Barbara Maxwell confirmed that dogs such as Rosie can produce a false positive and that a laboratory should "verify all" K-9 positive alerts. 3 RT 276.[9]

Hutches did find traces of gasoline on both of Mr. Zumot's shoes. 10 RT 1053. Hutches explained, however, that petroleum products may be used in manufacturing

---

[8]     Rosie did alert on the floorboard of Mr. Zumot's other car; a black Land Rover. 3 RT 339. But the Land Rover was in the repair shop on the date of the crime. 4 RT 470-471. Detective Sunseri testified that on October 14, 2009, an insurance agent had been out to the repair shop to inspect the car and recorded the mileage. 16 RT 1734-1735. The car had the same mileage when the police picked up the car after October 15, 2009. 16 RT 1734-1735. Sunseri was "convinced" that Mr. Zumot was not driving the black SUV and was instead driving his silver SUV. 16 RT 1736. As noted above, Rosie did not alert on the interior of the silver SUV nor did the laboratory detect any ignitable liquid from the foot mats which were inside it. 16 RT 1735.

[9]     Johnson explained that his dog Rosie had been trained to alert on .08 or .05 microliters of accelerant, amounts that could not be detected under laboratory testing. Johnson provided no documentation to support this claim. 3 RT 346-348.

shoes.  10 RT 1053.  Moreover, sometimes gasoline is used to clean off adhesives that are left on shoes during shipment to protect against insects.  10 RT 1053.  Finally, Hutches explained that it is also possible that gasoline can be detected on shoes because someone has stepped in gasoline when they fill up their gas tank at the gas station.  10 RT 1068.

And although the state theorized that Mr. Zumot purchased a gas can, filled it and then lit the cottage on fire, police found no evidence that Mr. Zumot ever purchased a gas can.  8 RT 1003.  Detective Cornelius Maloney explained that six or seven detectives had visited "dozens and dozens" of gas stations in the area trying to locate where the gas can was purchased and if anyone had seen Mr. Zumot purchasing gas.  8 RT 1002.  Although they continued this search for "several weeks," the detectives found no evidence linking Mr. Zumot with the type of gas can used in the fire or showing that he purchased any type of gas canister at all.  8 RT 1002-1003.  Police also searched Mr. Zumot's credit card, debit and financial records for any evidence of a gas canister purchase.  9 RT 1006.  There was none.  9 RT 1006.  Detective Sunseri admitted that -- even up until the time of trial -- detectives were still looking for any evidence to show Mr. Zumot purchased a gas can prior to Ms. Schipsi's death.  17 RT 1839.  Nothing was found.  17 RT 1839.

The only physical evidence potentially connecting Mr. Zumot with the fire was his fingerprint found on the piece of foil placed on the stove burner.  2 RT 194.  Of course, Mr. Zumot also lived at the cottage and as state's witness Victor Chaalan would explain in the early morning hours of October 15, 2009, he and Mr. Zumot prepared and shared a hookah pipe in Mr. Zumot's livingroom.  4 RT 487-488.  According to Chaalan, to prepare the hookah, Mr. Zumot put a piece of foil on the stove burner where he heats the charcoal for the hookah so that the ash did not fall into the stove.  4 RT 487-488.

Perhaps recognizing the lack of physical evidence connecting Mr. Zumot to the crime, the state called Susie Scholpp.  Ms. Scholpp told police after the fire she saw

nothing unusual; three months later, after seeing petitioner's picture in the newspaper, she recalled him speeding away from the fire at 6:20 p.m. in a dark SUV.  6 RT 565-570, 575. But in light of the state's own evidence, Schollp's testimony was deeply suspect.

The state's own evidence showed (and the prosecutor conceded) Mr. Zumot was *not* driving a dark car that night, he was driving a silver car.  16 RT 1734-1735; 22 RT 2614.  The state's own cell- phone evidence showed (and the prosecutor again conceded) that at 6:16 petitioner was four miles away from the cottage.  22 RT 2548-2549.  Thus, not only did Scholpp identify the wrong car, but to accept Scholpp's testimony, jurors would have to find that in the span of four minutes, petitioner (1) drove four miles through the streets of Palo Alto to the cottage, (2) parked his car and entered the cottage, (3) set the fire, (4) ran back to his car and (5) drove towards the café in time for Scholpp to see him fleeing towards the café several blocks away at 6:20.  And assuming Mr. Zumot made these Herculean efforts and accomplished all of this -- setting the fire before 6:20 -- it would not explain why (1) John Ecklund did not see any fire in the cottage when he passed at 6:25 and 6:35, (2) Eden Solomon did not see any fire at 6:25 and (3) fire expert Maxwell believed the fire started between 6:35 and 6:40.  3 RT 294; 7 RT 655, 678, 692, 694, 717-718.  Assuming the accuracy of Scholpp's testimony, the absence of observed fire at least 10 to 15 minutes after the fire was set (according to Scholpp's timeline) would be especially puzzling the testimony of responding Fire Captain Carter French that the fire burned "hot and fast."  1 RT 204.  Put more simply, Scholpp had Mr. Zumot driving the wrong car, in the wrong direction at the wrong time.

6.    The deleted texts.

As noted above, the state presented evidence of texts Mr. Zumot exchanged with Ms. Schipsi late on October 14 and early on October 15.  Ms. Schipsi called Mr. Zumot a "fag," "little pussy bitch," "limp dick," and told him to "go fuck his cousin" and

demanded Mr. Zumot give her a "11,200 check." 8 RT 762-764, 870, 880. Mr. Zumot

texted back "thankx," "you need to relax," and "okay." 8 RT 863-865. The state also

presented evidence to show that these text messages were deleted from both Mr. Zumot

and Ms. Schipsi's phones. 8 RT 762-880. From this evidence, the prosecutor argued that

Mr. Zumot had deleted the messages from both phones and was "trying to . . . destroy

evidence . . . [and this shows a] consciousness of guilt." 22 RT 2617.


The consciousness of guilt argument was puzzling. On the night of the fire, Mr.

Zumot spoke freely with Detective Aaron Sunseri for several hours. 16 RT 1720, 1722.

Mr. Zumot admitted that he had deleted text messages on his phone. 16 RT 1719. He

candidly admitted that Ms. Schipsi was angry with him and had demanded that he pay her

some money she claimed he owed. 16 RT 1720. [10]

---

[10]     The state called Jim Cook to prove Mr. Zumot took Ms. Schipsi's phone
after killing her on October 15, 2009. Cook analyzed cell tower data for Mr. Zumot and
Ms. Schipsi's phones. In his opinion, the cell tower data indicated where the *receiver's*
telephone was. 11 RT 1185-1187. Based on the cell tower data, Cook concluded the two
phones were in the same location and traveling together from 2:56 p.m. through 7:45 p.m.
on October 15, 2009. 11 RT 1185-1187. The prosecutor relied on Cook's testimony to
argue that Mr. Zumot killed Ms. Schipsi and had her cell phone with him as he traveled to
his domestic violence class in San Jose and back again. 2 RT 138-141.

But Cook's methodology was exposed on cross-examination. If as Cook
believed the cell tower data really did reveal where the *receiver's* cell phone was -- as
opposed to revealing where the *caller* was -- then on the morning of September 12, 2009
Ms. Schipsi's telephone records showed she was in San Jose at 9:02 a.m. but in Lahaina,
Hawaii only seven minutes later. 12 RT 1253-1254. On September 9, 2009 these records
showed her in Palo Alto at 6:42 a.m. and in Lahaina, Hawaii less than two hours later. 12
RT 1251-1253. Defense counsel took Mr. Cook through an entire series of similar
geographically impossible situations dictated by Cook's obviously flawed understanding
of the AT&T records -- some requiring her to travel more than 20 miles in the space of a
few seconds. 12 RT 1255-1312.

The defense then called an expert who explained what the records really
meant. 19 RT 1908. ATT radio frequency engineer and engineering manager Lawrence

---

*Zumot v. Borders*, Petition for Writ of Habeas

C.    Post-conviction Investigation Shows That The State Presented False Evidence And Argument About Both The Video Footage And The August 24 Threat.

1.    The discovery provided to defense counsel prior to trial regarding the video footage, the evidence the prosecutor introduced at trial and the arguments the prosecutor presented at trial were all false.

The state provided discovery prior to trial. This discovery, shows that police were very much aware of the importance of knowing exactly when Mr. Zumot arrived at the café.

Among the discovery provided to the defense was a February 10, 2010 report from Agent Sunseri of the Palo Alto Police Department. This report summarized Agent Sunseri's review of video footage on the Lorex surveillance system which police seized from the café. Police Report of February 10, 2010, attached as Exhibit A. In this report, Agent Sunseri prepared a "table [to] show the times on 10-15-09 that Zumot is captured on camera." For the relevant time period (between 6:00 and 7:00 on the evening of October 15) Agent Sunseri reported that the Lorex footage showed the following: (1) at 6:01 a café employee arrives, (2) at 6:27 a second employee arrives, (3) at 6:47:29, "an emergency vehicle is seen through the front window of the café going eastbound on University Ave." and (4) at 6:47:38 Mr. Zumot "enters café from Ramona St. Entrance, sits down to tea and hookah." *Ibid.*

---

Velasquez explained that Cook was dead wrong: when an ATT customer calls another ATT customer and it goes to voice mail, the site tower listed on both customers' records is for the location of the caller only. 18 RT 1912-1914. Thus, the calls from Mr. Zumot to Ms. Schipsi -- which went to voicemail -- between the hours of 2:56 pm and 7:45 p.m. show Mr. Zumot's site tower location on both records *not* because the phones were together in Mr. Zumot's possession (as the state theorized), but because Mr. Zumot (an ATT customer) was calling Ms. Schipsi (another ATT customer) and the calls went directly to voice mail. 18 RT 1912-1914. The state did not rebut this evidence.

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.          28

This was not the only report which the state provided about what police saw on the Lorex footage. Several months later, in a March 16, 2010 report Agent Sunseri again discussed his review of the Lorex video footage. Sunseri explained that he had "reviewed surveillance footage on a Lorex brand digital surveillance system that was seized from suspect Zumot's café." Police Report of March 16, 2010, attached as Exhibit B. In lockstep accord with his prior police report, Sunseri reported that Mr. Zumot did not arrive in the café until "nine seconds" after the fire engines pass. *Ibid*.

Opening statements began on January 3, 2011. As noted above, and in accord with the discovery that had been provided to the defense, the prosecutor (1) twice told jurors the Lorex video footage would not show defendant arriving at the café until 6:47, after a fire engine responding to the fire passed on University Avenue, (2) called Agent Sunseri to testify that Mr. Zumot did not arrive at the café until after the fire engine passed at 6:47, (3) called detective Quisenberry to testify that the first time Mr. Zumot was seen at the café was after 6:47 after the fire engine passed (4) showed footage of Mr. Zumot arriving at the café after 6:47 and, finally, (5) relied on the testimony about the Lorex footage offered by Sunseri and Quisenberry and the Lorex footage itself, telling jurors Mr. Zumot had *not* arrived at the café until *after* the fire engine passed and they should not believe any contrary testimony because "we saw the video." 2 RT 141, 142-143; 13 RT 1420-1421, 1427-1432; 15 RT 1711-1712, 1727; 22 RT 2549, 2626.[11]

_____

[11]    Attached as Exhibit Q is a DVD containing a copy of the Lorex video footage which the jury saw showing Mr. Zumot entering the café sometime after 6:47:29 when the fire engines passed. This video clip shows two people coming into the café. Mr. Zumot is the first of these two. If the video clip is paused when Mr. Zumot first enters the café, and is near the red wall seen in the video, it appears he is wearing a red t-shirt. Exhibit Q at 6:47:33-34. But that is an optical illusion caused by a combination of the light reflecting off the red wall and the quality of the video itself. Seconds later, as Mr. Zumot walks down the hallway away from the red wall, it is apparent that he is wearing a gray sweatshirt. Exhibit Q at 6:47:38.

Defense counsel too was aware of the importance of when Mr. Zumot arrived at the café.  Accordingly, numerous defense lawyers made efforts prior to trial to examine the Lorex footage.  Unfortunately, they were not successful.  Ultimately, and only after obtaining a court order, post-conviction counsel for Mr. Zumot obtained a copy of the Lorex video raw footage.  This footage shows that the February 2, 2010 and March 16, 2010 police reports provided to the defense in discovery, the testimony given to the jury and the arguments made by the prosecutor were all false.

Mr. Zumot was initially represented by attorney Cameron Bowman.  Amanda Freel worked as an investigator for Mr. Bowman on Mr. Zumot's case.  Realizing the importance of the Lorex video footage, Mr. Bowman made repeated written requests to the prosecution for a copy of the Lorex footage in four separate letters dated October 26, 2009, October 30, 2009, December 11, 2009 and December 21, 2009.  Letters from Cameron Bowman, attached as Exhibit C.  Eventually, police provided to the defense something called an "imaged copy" of the Lorex footage.  Declaration of Amanda Freel ("Freel Declaration") at para. 5, attached as Exhibit D.  It turned out that because of the nature of the Lorex system, the "imaged copy" was useless and contained no viewable video footage at all.  Freel Declaration at para. 5.

Mr. Bowman was replaced by attorney Mark Geragos.  Declaration of Mark Geragos ("Geragos Declaration") at para. 1, attached as Exhibit E.  Mr. Geragos was aware of Mr. Bowman's attempts to see the Lorex footage.  Geragos Declaration at para. 13.  He was also aware that the "imaged copy" was useless and contained no video footage at all.  Geragos Declaration at para. 13; Declaration of Pat Harris ("Harris Declaration") at para. 5-6, attached as Exhibit F.

Because the defense did not have a viewable copy of the actual Lorex footage -- but only Agent Sunseri's descriptions -- Mr. Geragos had co-counsel Pat Harris go to the

Palo Alto Police Department to view the footage under the auspices of Agent Sunseri. Geragos Declaration at para. 15; Harris Declaration at para. 5.  Mr. Harris was specifically looking for video footage showing that Mr. Zumot was at the café before 6:47:38 when the fire engines passed.  Harris Declaration at para. 5.  Agent Sunseri showed him still interiors of the café; nothing Sunseri showed Mr. Harris was different from any of the information Sunseri had conveyed in his prior two 2010 police reports. *Ibid*.  Mr. Harris was not shown any footage of Mr. Zumot in the café prior to 6:47:38. Harris Declaration at para. 7-8.  Specifically, he was not shown any footage showing Mr Zumot in the café at 6:41, 6:45 or 6:47 prior to the fire engines passing.  Harris Declaration at para. 7-10.  Mr. Geragos did not see any such footage either.  Geragos Declaration at para. 14-15.

The Lorex machine itself was introduced (and admitted) at trial as exhibit 117.  13 RT 1407l; 22 RT 2661.  After Mr. Zumot was convicted, post-conviction counsel sought to examine it since it was an exhibit at trial.  The exhibit was stored with the police department; the state refused to permit any subsequent examination of the Lorex without a court order.  E-mail of 9/11/12 from Agent Sunseri, attached as Exhibit G; Confirming Letter of September 23, 2012, attached as Exhibit H; Letter from prosecutor Gillingham of October 3, 2012, attached as Exhibit I.

Post-conviction counsel obtained a court order.  Application to Permit Appellate Counsel to View Entire Record on Appeal, Including Exhibit 117, attached as Exhibit J. With the court order in hand, counsel and an expert examined the Lorex machine at Palo Alto police headquarters on Tuesday, February 4, 2013.  Declaration of David Notowitz ("Notowitz Declaration") attached as Exhibit K at para. 6.  Police were present for the entirety of this examination.  Notowitz Declaration at para. 6.  Mr. Notowitz made a copy of the Lorex footage using a USB flash drive.  Notowitz Declaration at para. 6.

The Lorex footage copied by Mr. Notowitz contains footage from eight cameras over a three and half hour period. Notowitz Declaration at para 7. The DVDs attached as Exhibits L, N and P contain three distinct portions of this footage. Notowitz Declaration at para. 8; Declaration of Lazuli Whitt ("Whitt Declaration"), attached as Exhibit Z at para. 5.

As noted above, at trial Mr. Zumot said that he was in the café prior to 6:47:38 (when the fire engines passed) and in fact was walking downstairs from his office when he heard the fire engines and walked outside the café to see the fire engines as they passed. 20 RT 2014-2015. The discovery provided by the state, the testimony by Officers Sunseri and Quisenberry, and the prosecutor's opening and closing arguments all stated Mr. Zumot was lying: instead, they each conveyed the state's contrary theory that Mr. Zumot did not enter the café until 6:47:38 *after* the fire engines passed. Exhibits A, B; 2 RT 141, 142-143; 13 RT 1420-1421, 1427-1432; 15 RT 1711-1712, 1727; 22 RT 2549, 2626. The Lorex footage now shows that every one of these representations by police and the prosecutor were false.

Exhibit L is a 17-second clip containing footage from camera four in the café. It shows the interior of the café at 6:47:12 through 6:47:29. Under the state's theory, of course, Mr. Zumot could not possibly be in the café at this time since he did not arrive until 6:47:38. Under the very different defense theory, Mr. Zumot was already in the café at this time.

Exhibit L resolves which of these two contrary theories was correct. *It shows Mr. Zumot and one of his employees -- Ahmed Alaghbash -- already inside the café, coming downstairs from the upstairs of the café and leaving the café by the Ramona street entrance*. Exhibit L; Declaration of Ahmed Alaghbash ("Alaghbash Declaration") attached as Exhibit M at para. 9. This means that Mr. Zumot was already *inside* the café

1   at this time, just as he testified, *before* the fire engine passed.  In other words (1) the
2   state's theory that Mr. Zumot did not enter the café until *after* the fire engines passed at
3   6:47:38 was *false* and (2) Mr. Zumot's testimony that he heard the fire engines as he was
4   walking downstairs from his office and went outside to see them, was entirely *true*.  20
5   RT 2014-2015.

6

7       Exhibit N is a several minute clip containing footage from camera seven inside the
8   café from 6:43 through 6:48.  It shows both employees of the café, Mr. Alaghbash and
9   Mr. Al-Bataeneh, preparing the café for the evening.  At approximately 6:45:45 Mr.
10  Alaghbash is talking to Mr. Al-Bataeneh who is in the kitchen.  Exhibit N; Alaghbash
11  Declaration at para. 8; Declaration of Jehad Al-Bataenah ("Al-Bataeneh Declaration")
12  attached as Exhibit O, at para. 8.  While this conversation is going on -- at 6:45:49 to
13  6:45:52 -- the Lorex footage shows a third person walking down the hallway of the café
14  towards the stairs that lead to the second floor office.  Exhibit N; Alaghbash Declaration
15  at para. 8; Al-Bataeneh Declaration at para. 8.  Both Mr. Alaghbash and Mr. Al-Bataeneh
16  identify this man as Mr. Zumot.  *Ibid.*[12]

17

18      The presence of a third party in the café at 6:45 or 6:47:12 is nowhere mentioned
19  in the police reports provided to defense counsel as part of discovery.  Exhibits A, B.  It is
20  nowhere mentioned in the testimony of either Sunseri or Quisenberry.  13 RT 1420-1421,
21  1427-1432; 15 RT 1711-1712, 1727.  It is nowhere mentioned in either the opening or
22  closing arguments of the prosecutor.  2 RT 141, 142, 143; 22 RT 2549, 2626.  Instead,
23  police and the prosecutor argued that the jury could reject Mr. Zumot's alibi defense, and
24  find that he was a liar, because he did not arrive at the café until 6:47:38.  The video
25  evidence establishes *to a certainty* that the state's evidence and argument on this point

26  _____

27      [12]    Later on, Exhibit N shows Mr. Zumot and Mr. Alaghbash leaving the café
    at 6:47:12 through 6:47:29.  This is simply another angle of the footage shown in Exhibit
28  L.

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.                  33

were both false.  Contrary to the prosecutor's position at trial, the video footage was entirely consistent with Mr. Zumot's alibi.[13]

Because the video evidence shows that Mr. Zumot was indeed in the café prior to 6:47:38, the question arises as to when he arrived.  After all, Mr. Zumot could not just spontaneously appear in the café out of thin air.  He had to actually walk into the café at some point in time.  But when?

Because the prosecutor presented false evidence and argument that Mr. Zumot arrived at the café 6:47:38, he did not present a theory on this to the jury.  In contrast, Mr. Zumot *did* present a theory to the jury.  As noted above, Mr. Zumot told the jury that he spoke with employee Jehad Al-Bataeneh at 6:39 as he (Mr. Zumot) was looking for parking and entered the café within a minute or so after finding a parking spot.  20 RT 2013-2015.

Exhibit P is a five second clip containing footage from camera seven at 6:41.  It shows a man coming into the café from the Ramona Street entrance.  As Agent Sunseri himself recognized in his February 10, 2010 police report, both of the café's two employees (Mr. Alaghbash and Mr. Al-Bataenah) had already arrived in the café by 6:41, one at 6:01 and one at 6:27.  Exhibit A at 8.  Both Mr. Alaghbash and Mr. Al-Bataenah

_____

[13]     Contemporaneous press accounts of the video footage shown that day establish that the jury did not see any footage showing that Mr. Zumot was in the café prior to 6:47:38.  Exhibit HH.  Similarly, two lay witnesses who were in court that day agreed that the footage showing Mr. Zumot inside the café prior to 6:47:38 was not shown to the jury.  Declaration of Kholoud Diggs ("Diggs Declaration") attached to this Petition as Exhibit II; Declaration of David Zoumot ("David Zoumot Declaration") attached to this Petition as Exhibit JJ.  Finally, trial counsel too has made clear this footage was not shown to the jury.  Supplemental Declaration of Mark Geragos ("Supplemental Geragos Declaration") attached to this Petition as Exhibit PP at paras. 7, 8.

have identified the man who enters at 6:41 as Mr. Zumot.  Alaghbash Declaration at paras. 6-7; Supplemental Alaghbash Declaration at para. 3; Al-Bataeneh Declaration at paras. 6-7, Supplemental Al-Bataenah Declaration at para. 4.[14]

       2.     The time it takes to drive from the cottage to the café.

The video evidence shows that the state presented false evidence and argument as to exactly when Mr. Zumot arrived in the café.  The state's argument that he did not arrive until 6:47:38 was false.  Assessing the import of that false evidence depends not only on when Mr. Zumot actually arrived at the café, but on how long it takes to get from the cottage to the café.  Evidence presented by the state itself at trial resolves this latter question.

As Officer Quisenberry and Agent Sunseri each noted, the Lorex footage shows a fire engine with sirens blaring passed by the café at 6:47:29.  13 RT 1426-1427; 17 RT 1727.  Prosecution witness Audrey Bates -- the 911 dispatcher -- testified that (1) fire

---

[14]    As noted above, the footage in Exhibit Q -- shown to the jury at trial -- shows Mr. Zumot walking in the café at 6:47:38.  Although by the end of this clip it is clear Mr. Zumot is wearing a grey sweatshirt, when Exhibit Q is paused at the 6:47:33-34 mark -- just after Mr. Zumot has walked into the café and while he is in the hallway -- it appears he is wearing a short sleeved red t-shirt.  Exhibit Q at 6:47:33-34.  According to video expert David Notowitz, this is simply an illusion; he explains that Mr. Zumot's gray long-sleeved sweatshirt appears to be red and short-sleeved when in the hallway because of the red wall in the café hallway, the way the light is reflecting off the red wall, and because of the poor quality of the image provided by this type of camera system.  Notowitz Declaration at para. 9; Supplemental Notowitz Declaration at paras. 2, 3.  In fact, the illusion appears at numerous other times in the footage.  Notowitz Declaration at para. 10.

But the illusion is significant.  The fact of the matter is that in the 6:41 clip Exhibit P, the man walking through the hallway (identified as Mr. Zumot by both Mr. Alaghbash and Mr. Bataenah) appears to be wearing the identical red, short-sleeved shirt Mr. Zumot appears to be wearing in this same location at 6:47:33-34 of Exhibit Q.

engine number 6 was the only responding engine to come down University Avenue and (2) this engine arrived at the cottage at 6:55:18.  7 RT 737.  Thus, it took a fire engine *with sirens blaring* eight minutes to get from the café to the cottage.

Post-conviction investigation confirms this figure.  In an interview with Mr. Alaghbash on the night of the crime, police learned that after Mr. Zumot received the 6:50 call from Mr. Eckland about the fire, he ran out of the café.  Police Report of Officer Bullerjahn, attached as Exhibit R.  Because Mr. Zumot left his cell phone in the café, Mr. Alaghbash ran after him and saw he was parked in the parking lot across the street from the café on Ramona.  *Ibid*.  Mr. Zumot has now had several investigators independently perform test runs to determine how long it takes to get from the Addison Avenue cottage to the University Avenue café at approximately 6:35 on a weekday evening, park and walk to the café.  The investigators' findings are right in line with the time it took the fire engine to get from the café to the cottage on the very night of the fire.

In fact, Mr. Zumot has had four different investigators make a total of 11 trips from the cottage to the café at the relevant time period during the day.  The average time to drive from the cottage to the café is just shy of 8 minutes.  Declaration of Joe Parisi ("Parisi Declaration") at para. 4, attached as Exhibit S [2 trips]; Declaration of Alec Weldon ("Weldon Declaration") at para 3, attached as Exhibit T [3 trips]; Freel Declaration at para. 3 [3 trips]; Declaration of Jonathan Robinson ("Robinson Declaration") at para. 3, attached as Exhibit U [3 trips].  Mr. Zumot has had four investigators make a total of ten trips to determine the average time to find parking near the café in either the Ramona street lot or close by and walk from the parking lot to the café.  The average time is 5 minutes.  Parisi Declaration at para. 4 [1 trip]; Weldon Declaration at para. 3 [3 trips]; Freel Declaration at para. 3 [3 trips]; Robinson

Declaration at para. 3 [3 trips].[15]

        3.      The evidence the prosecutor introduced about the August 24 threat to kill, and the repeated arguments the prosecutor made in reliance on that evidence, were all false.

       The Lorex evidence was not the only false testimony introduced by the prosecutor. As noted above, the prosecutor called thee witnesses to testify to a stark threat Mr. Zumot made to Ms. Schipsi only weeks before Ms. Schipsi was killed. According to these witnesses, Mr. Zumot telephoned Ms. Schipsi on August 24, 2009 and threatened to kill her. The evidence the state introduced about this threat was explicit; Mr. Zumot threatened "to kill her and called her a bitch" and "a whore," he said "she was dead." 16 RT 1767-1768.

       After Mr. Zumot was convicted, post-conviction counsel obtained police reports regarding the August 24 incident. Two points are now apparent from the contemporaneous police report prepared by Officer Monroe (who responded to the August 24 incident with Officer Moore). According to the report, Ms. Schipsi said (1)

---

    [15]    Mr. Zumot told police prior to trial, and told the jury at trial, that he left his San Jose domestic violence class around 5:55 on the evening of October 15 and drove straight to the café where he then spend 5-6 minutes looking for parking. 20 RT 2005, 2007, 2012-2013. The state argued that he left earlier, between 5:46 and 5:50. As noted above, Mr. Zumot also testified that he found parking at 6:39 p.m. (when he spoke with Mr. Al-Bataeneh) and entered the café a few moments later. 20 RT 2012-2014.

    Mr. Zumot has had four investigators make test runs to determine how long it takes to get from the San Jose location to the café at approximately 5:50 to 6:00 p.m. on a weekday evening. The average time based on 10 test runs was 46 minutes. Parisi Declaration at para. 2 [2 runs]; Weldon Declaration at para. 2 [2 runs]; Freel Declaration at para. 2 [3 runs]; Robinson Declaration at para. 2 [3 runs]. These test drives show that even if Mr. Zumot left between 5:46 and 5:50 (as the state theorized), he could have driven directly from San Jose to the café (arriving 46 minutes later between 6:32 and 6:36), looked for and found parking at 6:39, and parked and entered the café.

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.           37

the telephone call occurred at 12:50 that afternoon, and (2) the threatening telephone call came into Ms. Schipsi's cell phone.  (Police Report of August 24, 2009, attached as Exhibit V at p. 4.)  Given that police arrived at 1:30 -- only 40 minutes after the alleged phone call -- it seems that Ms. Schipsi's memory would certainly have been fresh on these points.

But Ms. Schipsi's memory of when the alleged call came in was actually even fresher than that.  The fact of the matter is that prior to trial, the state itself obtained records for Ms. Schipsi's cell phone -- (650) 319-5044.  These records show that Mr. Schipsi called Palo Alto police at (650) 504-4015 at exactly 12:51 p.m. on August 24, 2009 -- only one minute after the alleged threatening call came in.  Telephone Records of Jennifer Schipsi for August 24, 2009, attached as Exhibit W; Parisi Declaration at para. 4.

On August 24, 2009, Mr. Zumot had two cell numbers: (650) 575-2872, the same number he had in October 2009 and (408) 665-6944.  12 RT 1307; Call Detail of Bulos Zumot of October 14, 2009 and October 15, 2009, attached as Exhibit X; Police Report of August 24, 2009, attached as Exhibit V.  Exhibit W -- the cell phone records of Ms. Schipsi in the state's possession at the time of trial -- establish (1) Ms. Schipsi *did* in fact receive a call at 12:50 p.m., (2) the call she received at 12:50 was *not* from either of Mr. Zumot's telephone numbers but from (831) 207-3669 and (3) there are *no calls at all* on August 24, 2009 from Mr. Zumot's numbers.  *See* Exhibit W.

The question then arises, of course, as to who made the 12:50 call from (831) 207-3669 which Ms. Schipsi reported to police at 12:51?  This question too is resolved by evidence in the state's possession prior to trial.  It turns out the state subpoened the telephone records for this number as well beginning on July 15, 2009, learning that it belonged to someone named Roy Endemann.  Telephone Records of Roy Endemann for August 24, 2009, attached as Exhibit Y at p. 2.  Mr. Endemann had known Ms. Schipsi

for many years.  15 RT 1613.  Mr. Endemann's cell phone records confirm that it was he who made the call to Jennifer Schipsi at 12:50 on August 24, 2009.  Exhibit Y at p. 3.

But they show substantially more than this.  They show that at 12:50 on the afternoon of August 24, Mr. Endemann not only called Ms. Schipsi, but he dialed "67" before dialing her number.  Exhibit Y at p. 3.  According to cell phone expert Robert Aguero, this is the way callers block or restrict their number from appearing on the screen of the person they are calling.  Declaration of Robert Aguero ("Aguero Declaration") attached as Exhibit AA at para. 5.  And this information is especially important here; under oath, Ms. Schipsi recalled that the threat "came from a restricted telephone number . . . ."  16 RT 1786.  This matches up *exactly* with the fact that Roy Endemann called her at 12:50 and blocked his number by dialing "67."  This evidence shows that the 12:50 call came *not* from Mr. Zumot, but from Roy Endemann.[16]

But Mr. Endemann's records show even more than this.  From July 15, 2009 (the first day for which police subpoened Mr. Endemann's records) through the end of August, 2009.  Mr. Endemann called Ms. Schipsi an astonishing *283* separate occasions, including hang-ups.  Declaration of Cliff Gardner ("Gardner Declaration") attached as Exhibit BB, at para. 3.  Of these 283 calls, *only one call to Ms. Schipsi was ever blocked* -- the 12:50 p.m. call on August 24 call in which Mr. Endemann threatened to kill Ms. Schipsi and burn down her house.  Gardner Declaration at para. 3.

When presented with this evidence during state post-conviction proceedings in

---

[16]     Cell phone expert Aguero also makes clear that even when a caller uses "67" to block a number from appearing on the call recipient's screen, the number will still show up on subpoened  telephone records themselves.  Aguero Declaration at para. 6. That is why the number appears in the subpoened records here, even though Mr. Endemann used "67" to block his number from appearing on Ms. Schipsi's screen.

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.                                   39

2013 the state sent Agent Sunseri to locate and interview Mr. Endemann.  During that

tape-recorded interview, Mr. Endemann (1) admitted making the August 24, 2009

telephone call, (2) said it was done at Ms. Schipsi's request, and (3) said he used a

blocked number as part of an effort orchestrated by Ms. Schipsi to allow her to blame

petitioner for the call.  Endemann Interview attached as Exhibit KK.[17]

Mr. Endemann was candid; he did not deny making the August 24 call, explaining

it was part of a scheme by Ms. Schipsi to mislead people into thinking Mr. Zumot was

harassing her:

> "Jennifer was trying to file a… like an emergency order stay away order,
> and he had already been around that time calling a lot- calling her a lot. And
> so she was having me call from a blocked number so then it looked like she
> had more blocked calls." Endemann Interview at p. 3.

Endemann made clear that Ms. Schipsi had asked him to make blocked calls to her

---

[17]      The state did not disclose a tape recording of this interview, a transcript of
the interview or a police report memorializing this interview when it occurred.  Instead,
***one month after it interviewed Endemann***, the state filed a written opposition to the
pending habeas petition in the Court of Appeal and -- ***despite knowing that Endemann
had admitted making the call*** -- the state urged the state court to deny relief alleging (1)
petitioner could have borrowed Endemann's phone to make the call and (2) Endemann
had not admitted making the call:

> "Even assuming petitioner's factual allegations are true, at most, they
> establish the threatening phone call was made from Roy's phone, not that
> petitioner did not make the call.  Petitioner does not allege and presents no
> evidence that Roy had exclusive use of or access to his phone at 12:50 p.m.
> on August 24, 2009.  Petitioner does not even present a hearsay assertion
> that Roy admitted making the call, much less a declaration from Roy." *In
> re Zumot*, H040124, Informal Opposition to Petition for Writ of Habeas
> Corpus, at p. 11, attached as Exhibit YY.

The state did not disclose the Endemann interview until May of 2014, seven
months after it occurred.

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.                                   40

that could be falsely attributed to petitioner so she could get a "stay away order."
Endemann Interview at p. 3.  Endemann admits that at Ms. Schipsi's request, he "called
her from a private number for the purposes of making it look like she was getting
harassing phone calls from Paul . . . ."  Endemann Interview at p. 5.

        **D.**      **In Its Return Before The Superior Court The State Admits Presenting False Evidence.**

As noted above, the state appellate court issued an Order to Show Cause returnable
in the superior court.  In briefing filed in the superior court, the state admitted numerous
factual allegations with respect to both the Lorex video footage and the August 24 call.

With respect to the Lorex footage, and although the trial prosecutor had told jurors
the video footage showed that Mr. Zumot did not enter the café until 6:47:38, the state
now admitted the video footage, attached as Exhibits L and N to the Petition showed Mr.
Zumot was inside the café *prior* to 6:47:38.  Specifically, the state admitted that Exhibit L
contained Lorex video footage showing petitioner inside the café at 6:47:16, "before the
clip shown at trial."  *In re Bulos Zumot*, BB943863, Return to Petition for Writ of Habeas
Corpus ("Return") at 41 attached as Exhibit DD.  The state admitted that Exhibit N
contained Lorex video footage showing petitioner in the café at 6:45, which is also prior
to "the clip shown at trial."  Return 41.  The state admitted that this new footage meant
petitioner had arrived at the café "earlier than discussed at trial."  Return 78.[18]

With respect to the August 24 threatening call, the state did *not* dispute petitioner's
telephone records showing that (1) the "threatening" call about which Ms. Schipsi told
Officer Moore came in at 12:50 p.m., (2) the 12:50 call came from a blocked number, (3)

---

[18]     The person which the state has conceded is petitioner in Exhibit L at
6:47:16 actually first appears in Exhibit L at 6:47:12.  *See* Exhibit L.

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.          41

the only person who called Ms. Schipsi at 12:50 on August 24 was Roy Endemann and (4) telephone records show Endemann blocked his number on the 12:50 call.  Return 44-45.  And based on Agent Sunseri's October 2013 Roy Endemann interview, the state did not dispute that Mr. Endemann made the 12:50 call, made it from a blocked number, and did so in order for Ms. Schipsi to fake a threat from Mr. Zumot.  Moreover the state conceded that the prosecutor relied on this threat at least 11 times in his closing argument.  Return 18-20.

E.      The Evidentiary Hearing And The State-Court Decision..

The state habeas court held an evidentiary hearing.  *People v. Zumot*, BB943863, Reporter's Transcript of Evidentiary Hearing, May 20, 2016, ("EH") attached as Exhibit NN to this Petition.  In light of the state's concessions, both parties agreed there was no need for testimony regarding the August 24 call.  EH 6.  Instead, the trial court would assess the false evidence claim as to the August 24 call on the record before it, including the trial record as well as the numerous declarations and exhibits submitted by Mr. Zumot in support of his earlier Petition.  EH 1-6.  Similarly, as to the ineffective assistance of counsel claim, the trial court did not need to hear testimony and would assess the claim on the trial record as well as the declarations from trial counsel and exhibits submitted by Mr. Zumot.  EH 2-3.

The focus of testimony at the evidentiary hearing was on the Lorex video footage.  EH 7.  In light of the state's concession that both the 6:47:12 and the 6:45 footage showed Mr. Zumot inside the café, the more specific focus of the hearing was on the 6:41 footage.  EH 7, 10.

David Notowitz -- the forensic video expert who had submitted a declaration in support of the Petition -- testified on Mr. Zumot's behalf.  EH 14-15.  Mr. Notowitz

explained that there were "jumps" the Lorex footage where the motion-activated Lorex did not start recording in time to catch some motions.  EH 21-27.  He also explained the optical illusion in which people shown on the video footage walking in front of the red wall by the Ramona street entrance to the café would appear to be wearing a short-sleeved red t-shirt in the Lorex footage even though they were not.  EH 28-29.  He used the video footage at 6:47:33-34 as an example; Mr. Zumot's gray long-sleeved sweatshirt appeared to be red and short-sleeved when in the hallway because of the red wall, but seconds later accurate video footage shows that he is wearing a grey long sleeved sweatshirt.  EH 29-31.  Mr. Notowitz used various video clips and stills from the Lorex to support his testimony.  EH 31-33.  Mr. Notowitz concluded that the short-sleeved red t-shirt phenomenon may well have occurred in the 6:41 footage, thus the fact that it looked like the man was wearing a short-sleeved red t-shirt was not conclusive; he may have been wearing a long sleeved gray sweatshirt.  EH 57-60.[19]

In addition to Mr. Notowitz, Mr. Jehad Al-Bataeneh and Ahmad Alaghbash also testified on behalf of Mr. Zumot.  Both testified in accord with their declarations discussed above.  Mr. Al-Bataeneh testified that the only people in the café that evening were himself, another employee Mr. Alaghbash and Mr. Zumot.  EH 74-75.  Mr. Al-Bataeneh confirmed that the man who entered the café at 6:41 p.m. was not him or Ahmad and so it "had to be [Mr. Zumot] because that looks pretty much the way he . . . walks."  EH 75.  Mr. Alaghbash confirmed that the man who entered the café at 6:41 that

---

[19]     The state's theory was that the man at 6:41 was Ahmed Alaghbash.  Earlier footage showed that Mr. Alaghbash was wearing a blue shirt.  Exhibit N.  Thus, the state's theory also depended on the very same red-shirt phenomenon Mr. Notowitz testified about.  Accordingly the state did not dispute the red shirt phenomenon.  To the contrary, in its post-hearing briefing the state "acknowledge[d] that something that is likely related to the lighting, the light fixture or bulb, the red wall and/or the quality of the Lorex video *does* create the perception that Mr. Alaghbash's blue shirt . . . is brown or red when he walks across the hallway near the red wall."  *In re Bulos Zumot*, BB943863, Respondent's Pre-Evidentiary Hearing Brief at 7.

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.                    43

evening was Mr. Zumot because of "the way that person was walking, I know that . . . movement, the hand, the arm movement . . . ."  EH 88.

The state habeas court issued a written opinion denying relief on November 22, 2016.  As discussed above, at trial the prosecutor introduced evidence and argument that the Lorex video footage showed Mr. Zumot did not enter the café until 6:47:38.  In state post-conviction briefing the state conceded this was false, admitting that video footage showed Mr. Zumot was already in the café both at 6:47:12 and 6:45.  Return 41.  Nevertheless, ignoring both the 6:47:12 and 6:45 footage (and the related concessions from the prosecution), the state habeas court concluded that "the prosecution did not present false testimony concerning the video."  Exhibit CC at 3.  The court explained this conclusion by noting that the "prosecutor presented no evidence of when the petitioner *entered* the café.  He presented evidence when the petitioner was seen on the video *inside* the café."  Exhibit CC at 3, emphasis in original.  The court went on to find that any false evidence as to when petitioner arrived at the café was not material because (1)  in connection with the 6:41 footage, despite the testimony of Mr. Alaghbash and Al-Bataeenah "no reasonable juror could conclude the petitioner is the person in the video at 6:41" and (2) the trial testimony of Susie Scholpp "support[ed] an inference the fire was started by petitioner earlier than the . . . 6:35 to 6:40 time frame testified to by the investigator."  Exhibit CC at 2-3.

With respect to the August 24 threat, the trial court again ignored both the evidence and the state's concessions, ruling that "the prosecution did not present false evidence concerning the August 24 call."  Exhibit CC at 4.  The court explained this by noting that jurors heard defense testimony that Ms. Schipsi had "recanted her statement to police that [Mr. Zumot] made the August 24 call."  *Id*. at p. 4.  The court went on to offer the remarkable observation that any false evidence as to the August 24 was not material because, in fact, there were "detrimental inferences" which jurors could have found had

they known that "Endemann [rather than petitioner] made the call on August 24." Exhibit CC at 4.  Apparently these inferences were more detrimental than jurors hearing false evidence that only weeks before Ms. Schipsi was killed, Mr. Zumot called her a "bitch" and a "whore' and said he was going to kill her, a threat the prosecutor would rely on 11 times in his closing argument.

As to the ineffective assistance of counsel claim, the trial court wrote but one sentence: "His claims of Ineffective Assistance of Counsel also fail." *Id*. at 4.  There was no discussion of counsel's performance and no discussion of prejudice. *Ibid*.

1

2                                ARGUMENT

3

4   I.    THE STATE'S PRESENTATION OF FALSE EVIDENCE AND ARGUMENT
          ABOUT THE LOREX FOOTAGE AND THE AUGUST 24 DEATH THREAT
5         REQUIRES RELIEF.

6         A.    The Relevant Facts.

7

8         In light of the extensive discussion of the false evidence set forth above, there is no

9   need to review that evidence in detail here.  Suffice it to say here, this case was a

10  whodunit.  The jury deciding the identity issue at the heart of this case had to decide two

11  critical factual questions: (1) did the time Mr. Zumot arrived at the café raise a reasonable

12  doubt that he was the killer and (2) did Mr. Zumot in fact threaten to kill Ms. Schipsi on

13  August 24, 2009, only weeks before she was murdered?

14

15        With respect to Mr. Zumot's arrival at the café, the jury was choosing between the

16  state's version of events (he arrived at 6:47:38) and the defense version (he arrived well

17  before 6:47:38, but sometime after 6:39).  With respect to the August 24 threat, the jury's

18  choice was even simpler: either Mr. Zumot made the threat or he did not.  Because Mr.

19  Zumot testified in both areas, the jury's assessment of his credibility would be central to

20  the jury's resolution of these two questions.

21

22        But in resolving the two factual questions presented by the record, it is now clear

23  that fundamentally false evidence was presented to the jury.  The jury was told that video

24  footage from the Lorex unequivocally showed petitioner was a liar.  The jury saw a video

25  clip of Mr. Zumot walking into the café at 6:47:38.  13 RT 1420-1421.  It heard testimony

26  from Officer Quisenberry that Mr. Zumot entered the café at 6:47:38.  13 RT 1420-1421.

27  It heard testimony from Agent Sunseri that Mr. Zumot cannot be seen in the café video

28  footage prior to that time.  15 RT 1727.  And it heard the prosecutor argue that this is

*Zumot v. Borders*, Petition for Writ of Habeas
Corpus.                            46

when Mr. Zumot arrived.  2 RT 141, 143; 22 RT 2626.  In closing argument the prosecutor repeatedly referenced the video footage, adding that Mr. Zumot had no alibi. 22 RT 2544, 2549, 2617, 2626.

All that was false -- the state has now conceded that Mr. Zumot *was* in the café prior to 6:47:38.  He was inside the café at 6:47:12.  He was inside the café at 6:45.  And since he was inside the café at these times, these concessions necessarily mean that he must have arrived sometime *before* then.  Put another way, had the jury heard the truth it could not have relied on the 6:47:38 video footage to find that Mr. Zumot was a liar. Instead, the actual video footage was entirely consistent with his trial testimony about when arrived.

But as discussed above, the false evidence did not stop there.  The prosecutor presented powerful evidence from Officer Moore, Leslie Mills and Heather Winters about the August 24 death threat.  Taken together, Ms. Schipsi explained to these witnesses that on August 24, 2009 Mr. Zumot telephoned her from a blocked number at 12:50 in the afternoon, called her a "bitch" and a "whore" and threatened to kill her.  15 RT 1642; 16 RT 1767-1768, 1778-1781,  1786.  As noted above, and for sound tactical reasons, the prosecutor referenced this specific death threat 11 times in closing arguments.  22 RT 2535, 2542, 2543, 2558, 256,0, 2561, 2562, 2602, 2627.

It is now clear -- and the state has conceded -- that all this was false as well.  In fact, Ms. Schipsi lied to Officer Moore, she lied to Leslie Mills and she lied to Heather Winters.  Telephone records -- and admissions from Roy Endemann -- show that the 12:50 call came from Roy Endemann, it came from a blocked number and the call was made at Ms. Schipsi's request.  Yet again, had the jury heard the truth it could not have found either that Mr. Zumot made the August 24 threat or that he lied about it in his testimony.  Here too the truth would have directly supported Mr. Zumot's credibility.

The main question here is not whether false evidence and argument went to the jury.  It plainly did.  The question is whether relief is required.  It is to that question petitioner now turns; as discussed in Argument I-B below, viewed as a straightforward case involving the presentation of false evidence, federal law requires a grant of relief. And as discussed in Argument I-C below, the state court's astonishing conclusion that "the prosecution did not present false testimony" is not entitled to any deference under 28 U.S.C. § 2254(d) because it was "contrary to . . . clearly established Federal law" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

> B.   Because Mr. Zumot Relied Entirely On An Alibi Defense, And That Defense Was Based On His Own Testimony And Credibility, The State's Presentation Of False Evidence Directly Undercutting Both The Alibi And His Credibility Requires Relief.

The Due Process Clause prevents the prosecution in a criminal case from introducing false evidence and imposes a duty on the prosecution to correct false testimony when it has been introduced.  *United States v. Agurs*, 427 U.S. 97, 103 (1976). *See also Napue v. Illinois*, 360 U.S. 264, 269 (1959).  The prosecution's obligation to correct false testimony applies whether the prosecutor affirmatively elicits the false evidence on direct examination, or simply allows the false evidence to come in during defense counsel's cross-examination.  *See*, *e.g.*, *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, *supra*, 360 U.S. 264.

For sound policy reasons, this obligation to correct false testimony exists even if the prosecutor did not intentionally elicit the false evidence.  As the Supreme Court has noted in this very context, in assessing whether Due Process has been violated, what matters is "the character of the evidence, not the character of the prosecutor."  (*United States v. Agurs*, 427 U. S. at 110.  *Accord Maxwell v. Roe*, 628 F.3d 486, 506 (9th Cir.

2010) (granting relief where false evidence was presented by prosecution, where the evidence was material, even though the prosecution presented the evidence in "good faith"); *Hall v. Director of Corrections*, 343 F.3d 976, 978 (9th Cir. 2003) (same).

With respect to the standard of prejudice, the typical rule in habeas cases is that relief is not required for a constitutional violation unless the error had a "substantial injurious and effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638-639 (1993). But as this Court itself has noted, "[t]he *Brecht* standard is inapplicable to habeas claims involving violation of a prosecutor's duty not to present . . . false evidence . . . . In such a case, the standard on habeas review is whether there is "any reasonable likelihood" that the false evidence could have affected the jury's judgment . . . ." *Hoover v. Carey*, 508 F.Supp.2d 775, 802 (N.D. Cal. 2007), rev'd on other grounds, *Hoover v. Newland*, 307 Fed.Appx. 56 (9th Cir. 2009). *Accord Phillips v. Ornoski*, 673 F.3d 1168, 1189 n.15 (9th Cir. 2012); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005).

The United States Supreme Court has applied this standard of prejudice many times. Where the state presents false evidence which directly supports the state's theory as to the critical disputed issue in the case, relief is required under this standard. *Miller v. Pate*, 386 U.S. 1 (1967). Similarly, where the state presents false evidence which directly supports the credibility of a critical prosecution witness, relief is also be required under this standard. *Napue v. Illinois*, 360 U.S. 264. The converse is also true; where the state presents false evidence which directly undercuts the defense theory as to the critical issue in the case, or the credibility of the testifying defendant, relief is required. *Alcorta v. Texas*, 355 U.S. 28, 32 (1957).

*Alcorta* is a very useful case in applying the standard of prejudice. There, defendant was charged with murdering his wife. Defendant admitted the killing; his

1
2
3
4
5
6

defense was heat of passion.  Defendant testified in support of his defense, telling jurors he killed his wife when he found her kissing her lover, Mr. Castilleja.  355 U.S. at p. 28-29.  At trial, Mr. Castilleja testified that he was a "casual friend" of the victim and had no romantic relationship with her at all.  After defendant was convicted, he sought habeas relief, presenting testimony from Mr. Castilleja that his trial testimony was false and he and the victim had been lovers for some time.  355 U.S. at 30-31.

7
8
9
10
11
12

The Supreme Court granted relief, precisely because the false testimony "tended squarely to refute" the only defense presented -- heat of passion.  355 U.S. 31.  In addition, the Court noted that truthful testimony would have corroborated petitioner's version of events and "might well have" resulted in "petitioner's defense [being] accepted by the jury . . . ."  355 U.S. at 31-32.  The Court reversed defendant's murder conviction.

13
14
15

This case is just like *Alcorta*.  Here too the false evidence undercut both the main defense presented and the credibility of the key defense witness -- defendant himself.

16
17
18
19
20
21
22
23
24
25
26

As discussed in some detail above, the only defense presented at trial was alibi.  The jury heard Mr. Zumot testify (1) he was outside the café parking when he received the 6:39 call from his employee Mr. Al-Bataeneh, (2) he walked in the café immediately after parking and thus was inside the café well before 6:47:38, (3) he was in the café and walked outside when he heard the fire engine pass, (4) he walked back inside the café after the engine passed, and (5) he did not make the August 24 threat to kill Ms. Schipsi.  18 RT 1954; 20 RT 2013-2015.  But the Lorex video evidence presented at trial, the numerous witnesses to the August 24 threat and the prosecutor's arguments in both areas definitively established that Mr. Zumot was lying.  2 RT 141, 143; 13 RT 1420-1421, 1427-1432; 16 RT 1711-1712, 1727, 1767-1770, 1778-1781; 22 RT 2549, 2626.

27
28

Just as in *Alcorta*, however, the truth was very different.  In fact, the actual Lorex

video footage leaves no doubt that the prosecutor's evidence and argument that Mr. Zumot did not enter the café until 6:47:38 was false. Based on the actual footage, and the state's forthright concessions, we know to a 100% certainty that since Mr. Zumot was in the café at 6:45, *he had to arrive sometime before that*. Similarly, the actual telephone records show (1) Mr. Zumot never called Ms. Schipsi *at all* on August 24, (2) Mr. Zumot was telling the truth when he denied making the August 24 threat and (3) the August 24 call was made by Roy Endemann at Ms. Schipsi's request to feign harassment.

If the jury had seen the video footage, a unanimous conviction was most unlikely. After all, on the night of the fire itself a fire engine with sirens blaring took eight minutes to get between the café and cottage. 7 RT 738. This time was confirmed by 10 separate test drives by four different investigators, where the average time to drive from the cottage to the café (without blaring sirens) was also eight minutes and the average time to park and enter the café was 5 minutes, for a total of 13 minutes. Parisi Declaration at para. 4; Weldon Declaration at para. 3; Freel Declaration at para. 3; Robinson Declaration at para. 3. It seems extremely unlikely that even one juror -- much less 12 -- would agree beyond a reasonable doubt that Mr. Zumot could have started the fire between 6:35 and 6:40, traveled the eight minute route to the café, parked, walked to the café and arrived at the café before 6:45. And this is especially true where it is now clear that jurors would not have been able to rely on the state's theory that Mr. Zumot threatened to kill Ms. Schipsi only weeks before she was murdered.[20]

---

[20]  Mr. Zumot's time-line was also supported by the 10 separate runs showing that it takes an average of 46 minutes to get from the San Jose address (where Mr. Zumot said he was) to the café at 5:50 in the evening of a work day. Parisi Declaration at para. 2; Weldon Declaration at para. 2; Freel Declaration at para. 2; Robinson Declaration at para. 2. The San Jose class ended at 5:45. 11 RT 1239. Assuming Mr. Zumot was in his car and driving within five minutes -- anywhere from 5:46 to 5:50 -- this means that on average he would have arrived in the area of the café to look for parking 46 minutes later, between 6:32 and 6:36. This is entirely consistent with the cell phone records confirming his testimony that he was actually parking near the café at 6:39.

As noted above, under federal law relief is required when there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d at 984, citing *United States v. Agurs*, 427 U.S. at 103. Here, the false testimony (1) allowed the state to destroy both the alibi and Mr. Zumot's credibility with video evidence (2) prevented Mr. Zumot from raising a reasonable doubt as to his alibi and (3) allowed jurors to believe that only weeks before she was murdered Mr. Zumot threatened to kill Ms. Schipsi. Relief is required.

To be sure, petitioner recognizes that there might be some cases where the remainder of the evidence is so overwhelming that false evidence as to a tangential point may be deemed immaterial. But this is not such a case. Not only did the false evidence go to defendant's alibi -- his sole defense -- but it directly implicated his credibility as well. And the remaining evidence in this case was marginal at best.

In terms of forensic evidence, Dennis Johnson testified that his dog Rosie alerted on several articles of Mr. Zumot's clothes for the presence of ignitable liquids, but subsequent forensic laboratory testing squarely contradicted Rosie and found *no* such material on Mr. Zumot's clothing from the day. 3 RT 285, 335-336, 344-345; 9 RT 1037, 1043. Moreover, state-fire expert Barbara Maxwell explained that dogs such as Rosie can produce a false positive and that a laboratory should "verify all" K-9 positive alerts. 3 RT 276. In terms of eyewitness testimony, three months after telling police she saw nothing unusual, and after seeing defendant's picture in the newspaper, Susie Scholpp suddenly recalled petitioner speeding *away* from the Addison cottage location at 6:20 p.m. in a dark SUV. 6 RT 565-570, 575. But as the prosecutor conceded, she identified the wrong car, and given the state's own evidence showing that petitioner was four miles away from Palo Alto at 6:16, it was distinctly implausible that in the four minutes from 6:16 to 6:20 he could have driven four miles through Palo Alto streets, arrived home, set the fire, and fled in time to be seen fleeing at 6:20. In terms of the relationship between petitioner the

Ms. Schipsi, although the state certainly presented evidence (and the parties agreed) that Mr. Zumot and Ms. Schipsi quarreled on the night of October 14th, Mr. Zumot testified that they had made up after the fight and detective Sunseri confirmed this, finding a video on Ms. Schipsi's phone of her and Mr. Zumot making love at 3:52 a.m. on October 15, 2009 after they made up.  4 RT 442; 8 RT 762-764, 863-865; 16 RT 1742.

Moreover, the remaining evidence certainly pointed to innocence.  There was no physical evidence linking Mr. Zumot to the crime whatsoever.  9 RT 944; 13 RT 1444-1451; 14 RT 1550-1551; 16 RT 1739.  And the evidence showed that although Ms. Schipsi was very athletic and had long fingernails, and police themselves believed from the physical evidence that she had struggled with her assailant, Mr. Zumot did not have a single scratch or bruise on him when examined on the night of the fire.  4 RT 496; 14 RT 1552-1554; 16 RT 1737-1739.  Nor were there any confessions or admissions on Mr. Zumot's part.  16 RT 1722.  Finally, Mr. Zumot had cooperated with police and steadfastly maintained his innocence at all times.  9 RT 944; 14 RT 1552; 16 RT 1722, 1799; 17 RT 1839.  On this record, the presentation of false evidence as to both petitioner's alibi and the August 24 death threat was plainly material.  Relief is required.

C.     28 U.S.C. § 2254(d) Does Not Bar Relief Because The State Court Applied A Legal Standard Directly Contrary To Supreme Court Precedent, Ignored Critical Facts Which Were Plainly Relevant To The Constitutional Issue And Relied On Facts Completely Irrelevant To The Issues.

1.     The statutory framework.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act, referred to as AEDPA.  28 U.S.C. § 2254(d) of AEDPA reads as follows:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted with respect to

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.

1

2

any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

"(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

"(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

By its own terms, section 2254(d) does not set forth a standard for granting relief in habeas cases. Instead, it provides that where state courts have adjudicated the merits of a federal constitutional claim, relief may not be granted by a federal court unless the case falls into one of the two exceptions set forth in sections 2254(d)(1) or 2254(d)(2).  As applied here, in the language of § 2254(d) itself, the question is whether the state superior court ruling was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[21]

Where a state reviewing court resolves a federal constitutional claim with a written decision, the process of determining if that decision is unreasonable is relatively

_____

[21]      Where (as here) a California habeas petitioner receives a written ruling on the merits from a lower state court, and subsequent summary denials by the state reviewing courts, in assessing application of § 2254(d) the federal court must "'look through' the California Supreme Court's decision to the last reasoned decision . . . ." *Cannedy v. Adams*, 706 F.3d 1148, 1156, 1159 (9th Cir. 2013).  *Accord Diaz v. Lewis*, 715 Fed.Appx. 608, 609 (9th Cir. 2017); *Hamilton v. Adams*, 533 Fed.Appx. 802; *Quintana v. Cate*, 88 F.Supp.3d 1102, 1109 (C.D. Cal. 2015).

Here, the state superior court issued a written decision on November 16, 2016.  Exhibit CC.  Subsequently, the state court of appeal and the California Supreme Court issued summary denials.  Exhibits RR, WW.  Thus, in assessing the application of § 2254(d), this Court must "look through" to the "last reasoned deccision" -- in this case, the state superior court decision.

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.                                54

straightforward.  A state court decision is "contrary to" clearly established Supreme Court precedent "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'"  *Early v. Packer*, 537 U.S. 3, 8 (2002).

But even where the state court applies the proper law, § 2254(d) will not bar relief where the state court decision was unreasonable.  For example, where a state court refuses to consider facts it should consider in deciding a constitutional claim, that decision is unreasonable and section 2254(d) will not bar relief.  *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000).  *Accord Id*. at 416 (O'Connor, J. concurring); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004); *Bradley v. Duncan*, 315 F.3d 1091 (9th Cir. 2002). Where a state court considers facts which are demonstrably wrong, that decision is unreasonable and section 2254(d) will not bar relief.  *Wiggins* v. *Smith*, 539 U.S. 510, 528 (2003).  *Accord Jeffries v. Wood*, 114 F.3d 1484, 1500 (9th Cir. 1997) (en banc). Similarly, where the state court decision relies on facts which have no logical relevance to the constitutional claim being litigated, that decision is objectively unreasonable and § 2254(d) will not bar relief.  *See*, *e.g.*, *Penry v. Johnson*, 532 U.S. 782 (2001) (state court's conclusion that jury's raw power to nullify satisfied Eighth Amendment requirement that jury be permitted to consider mitigating evidence was "illogical" and relief was not barred by AEDPA); *Greene v. Lambert*, 288 F.3d 1081, 1092 (9th Cir. 2002) (AEDPA no barrier to relief where state court rejected petitioner's constitutional claim by relying on facts which "did not bear" on the claim); *Accord Lancaster v. Adams*, 324 F.3d 423 (6th Cir. 2003) (in denying defendant's *Batson* motion, trial court relied on the fact that after the motion had been brought, the prosecutor did not challenge a black juror who was called; held, reliance on this fact was objectively unreasonable because the presence of a black juror does not logically or legally justify the discriminatory striking of others); *Schultz v. Page*, 313 F.3d 1010 (7th Cir. 2002) (in defendant's murder trial, defense counsel asks to have defendant examined to determine sanity at the time of the crime, state court rejects the claim in part by noting that defendant was examined for his

1  competence to stand trial; held, § 2254(d) was no barrier to relief).

2

3      Here, as to the Lorex evidence and the August 24 threat the state habeas court

4  found (1) the state did not present any false evidence and (2) to the extent the state court

5  did present false evidence, it was not material.  Pursuant to the authorities discussed

6  above, however, 28 U.S.C. § 2254(d) is no barrier to relief for two reasons.

7

8      First, as discussed in Argument I-C-2 below, the state court's finding that no false

9  evidence had been presented is not entitled to deference under § 2254(d) because the state

10 court (1) ignored facts which should have been critical in any resolution of this claim, (2)

11 considered facts which were demonstrably wrong and (3) relied on facts that had no

12 bearing on the constitutional claim.  Second, as discussed in Argument I-C-3 below, the

13 state court's finding that in any event the false evidence was not material is not entitled to

14 deference because the state court applied a standard of materiality that is directly contrary

15 to Supreme Court precedent.  Because § 2254(d) does not bar relief as to the false

16 evidence claim, review of that claim is *de novo*.  *See Nulph v. Cook*, 333 F.3d 1052, 1057

17 (9th Cir. 2003) (where § 2254(d) does not bar relief, federal review is *de novo*); *Pirtle v.*

18 *Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (same).

19

20            2.    The state habeas court's finding that "the prosecution did not present
21                  false testimony" is not entitled to deference under section 2254(d)
                    because the state court ignored critical facts, ignored the state's
22                  concessions and relied on facts which simply do not relate to the
                    claim.
23

24     At trial, the prosecutor introduced testimony and argument that Mr. Zumot did not

25 enter the café until 6:47:38.  The attached video footage exhibits show Mr. Zumot did, in

26 fact, enter the café earlier than 6:47:38.  As noted above, the state itself now concedes

27 that the actual Lorex video footage showed Mr. Zumot *was* in the café prior to 6:47:38.

28 Nevertheless the superior court ruled that "the prosecution did not present false testimony

concerning the video." Exhibit CC at p. 3.

The state habeas court sought to explain this anomalous conclusion. It explained there was no falsity because at trial the "prosecutor presented no evidence of when the petitioner *entered* the café. He presented evidence when the petitioner was seen on the video *inside* the café." *Id*. at 3, emphasis in original. With all due respect, this purported distinction entirely ignores the record of what the prosecutor and his witnesses actually said.

In opening statement the prosecutor told the jury the video footage "puts defendant *walking into his café* at about 6:47 p.m." 2 RT 141, emphasis added. Moments later the prosecutor reiterated that the video footage would show that "[a]t 6:47, *before the defendant has even walked into the café*, you can see the red lights of an emergency vehicle going eastbound on University Avenue toward Addison. *It's only then that the defendant enters his café*, at 6:47 p.m." 2 ART 142-143, emphasis added. Contrary to the state habeas court's conclusion, the prosecutor did not tell jurors the video footage would show when Mr. Zumot was in the café, he explicitly told jurors that the Lorex video footage would show when Mr. Zumot "enters his café."

So too did the evidence. The prosecutor introduced Officer Quisenberry's specific testimony that he reviewed the Lorex video, and it showed "the defendant enter[ing]" the café at 6:47:38. 13 RT 1420-1421. And Agent Sunseri told jurors that Mr. Zumot did not appear in the Lorex video until after 6:47:29 when the fire engines passed. 15 RT 1727. In closing argument the prosecutor urged the jury to reject the defense theory as to when petitioner entered the café precisely because "we saw the video." 22 RT 2626.

In short, the prosecutor told jurors the video footage would show when Mr. Zumot "enters his café." He then called police witnesses to testify as to when on the video

"defendant enter[ed]" the café.  The state habeas court's finding that the prosecutor presented no evidence or argument as to "when the petitioner entered the café" simply ignores all these facts above and renders its judgment objectively unreasonable within the meaning of section 2254(d).  As the Ninth Circuit has stated in this exact situation, "[a] rational fact finder might discount [this evidence] or, conceivably, find it incredible, but no rational fact-finder would simply ignore it."  *Taylor*, 366 F.3d at 1006.  That is exactly what happened here.  Section 2254(d) was never intended to insulate such an objectively unreasonable state-court decision from review.  *De novo* review of this claim is proper.  *See Nulph v. Cook*, 333 F.3d at 1057 (where § 2254(d) does not bar relief, federal review is *de novo*); *Pirtle v. Morgan*, 313 F.3d at 1167 (same).  And for all the reasons discussed above, a *de novo* review of this claim shows that false evidence was presented and relief is required.[22]

The state habeas court reached a similarly indefensible conclusion with respect to the August 24 call.  The prosecutor introduced three witnesses -- Officer Moore, Leslie Mills and Heather Winters -- to testify about the telephonic death threat Ms. Schipsi reported from a blocked number on August 24.  The new evidence -- including telephone records and a police interview with Roy Endemann -- shows that Mr. Zumot did not make the August 24 call; instead, the call was made by Roy Endemann.  Despite this evidence

---

[22]    The state habeas court's conclusion that the prosecutor was not introducing evidence and argument about when Mr. Zumot *entered* the café, but simply when he was *seen* in the café ignores not only the actual words the prosecutor and his witnesses used, but common sense as well.  The state court never explains why the prosecutor would present evidence about when Mr. Zumot was seen in the café, if not to prove when he arrived at the café.  After all, the state's theory at trial was that the jury should reject petitioner's alibi because he did not arrive in the café until after the fire engines passed, giving him time to set the fire.  The only way for the prosecution to support that theory was to present evidence about when petitioner *arrived* in the café.  Put another way, the only relevance of when petitioner is *seen* in the café is its bearing on when petitioner arrived at the café.  The state habeas court's suggestion that the prosecutor had some unidentified independent reason to introduce such evidence is simply mystifying.

the state habeas court concluded "the prosecution did not present false evidence concerning the August 24 call." Exhibit CC at 4. In light of the evidence, this conclusion also defies common sense.

The state habeas court reached this result both by ignoring critical facts in connection with the August 24 threat, and relying on facts which had no bearing on the issue at all. The court explained its conclusion that no false evidence was admitted because, in responding to evidence of the threat, the defense introduced evidence that Ms. Schipsi had "recanted her statement to police that [Mr. Zumot] made the August 24 call." Exhibit CC at 4.

As discussed in the Statement of Facts, above, it is true that the defense presented evidence that Ms. Schipsi recanted her allegation. 16 RT 1786-1787. But this has nothing at all to do with whether the state presented false evidence. The prosecutor presented three witnesses to testify to an August 24 death threat by Mr. Zumot. In fact, as the state now concedes, Mr. Zumot made no such threat. The state's evidence was false, plain and simple. The trial court's conclusion that the state's evidence was not false because Mr. Zumot somehow tried to counter it at trial simply makes no sense.

Of course, the fact that Mr. Zumot tried to counter the state's false evidence at trial might be relevant to materiality. After all, a genuinely persuasive demonstration that no threat had ever been made would certainly be relevant to assessing harm from the state's presentation of false evidence as to the threat. But that is not what the trial court here did -- instead, the court relied on this evidence to find that "the prosecution did not present false evidence concerning the August 24 call." Exhibit CC at 4. With all due respect, this is simply a non-sequitor.

The state habeas court added to its analysis the observation that "[e]vidence of the

victim's recantation . . .  was sufficient to prove Petitioner did not make the call." Exhibit CC at 4.  With equal respect, this assertion is remarkable.

After all, the recantation evidence certainly did not prove the point to the prosecutor.  After hearing the defense evidence of recantation, the prosecutor himself did not simply throw up his hands and disregard the death threat evidence.  Instead, the prosecutor called domestic violence expert Richard Ferry to explain the concept of recantation and tell jurors that in nearly 75% of all domestic violence cases, the victim will withdraw an accusation that has been made in order to protect the batterer.  12 RT 1332-1333.  The prosecutor then affirmatively relied on the August 24 threat, urging jurors to convict of murder, in part, because "there's only one person who had the motive, the opportunity, the desire, and, in fact, told [Ms. Schipsi] not seven weeks before he killed her that he was going to kill her . . . ."  22 RT 2535.  He returned to the August 24 threat over and over again throughout his closing argument.  22 RT 2542, 2543, 2558, 2560, 2561, 2562, 2602, 2627.  The prosecutor went even further, skewering the defense for suggesting that Ms. Schipsi, Leslie Mills and Heather Winters were lying about the August 24 death threat.  22 RT 2534, 2542, 2543, 2560.  Yet as we now know, and as the state concedes, *the defense was right all along* -- there never had been an August 24 threat.  Yet again, while a "[a] rational fact finder might discount [this evidence] or, conceivably, find it incredible, but no rational fact-finder would simply ignore it." *Taylor*, 366 F.3d at 1006.

In short, the state court's conclusion that "the prosecution did not present false evidence concerning the August 24 call" not only ignores facts, but relies on facts which have no logical relevance to assessing whether false evidence had actually been presented.  Yet again, § 2254(d) does not bar relief as to this part of the false evidence claim and *de novo* review is proper.  *See Nulph v. Cook*, 333 F.3d at 1057; *Pirtle v. Morgan*, 313 F.3d at 1167.  And for the reasons discussed above, a *de novo* review of this

claim shows that false evidence was presented and relief is required.

3.    The state habeas court's alternate finding that the false evidence was not material is not entitled to deference under section 2254(d) because the state court applied a legal standard squarely contrary to Supreme Court precedent.

The state habeas court alternatively found that any false evidence as to when petitioner arrived at the café was not material for two reasons.  First, focusing on the 6:41 footage, the court concluded that despite the testimony of Mr. Alaghbash and Al-Bataenah "no reasonable juror could conclude the petitioner is the person in the video at 6:41."  Exhibit CC at 2.  Second, the court relied on the trial testimony of Susie Scholpp to "support[] an inference the fire was started by petitioner earlier than the . . . 6:35 to 6:40 time frame testified to by the investigator."  Exhibit CC at 3.

Similarly, as to the August 24 threat, the court found any false evidence not material because, in the court's view, defendant actually benefitted from the false evidence.  There were, the court explained, "detrimental inferences" which jurors could have drawn had they known that Mr. Zumot did not threaten to kill Ms. Schipsi.  Exhibit CC at 4.

These findings as to materiality are not entitled to deference under § 2254(d).  In making its materiality calculus, the state habeas court was quite clear as to what standard it was applying:

"It is the burden of petitioner to prove that false evidence was presented at trial *and if the true facts were known by the jury there is a reasonable probability the outcome of the trial would have been different.*"

Exhibit CC at 4, emphasis added.  As a review of California law shows, in assessing

materiality here the habeas court was explicitly applied the state's lenient *Watson* test for assessing prejudice from errors of state law.  *See*, *e.g.*, *People v. Proctor*, 4 Cal.4th 499, 537–538 (Cal. 1992) (under the *Watson* test for assessing prejudice from state-law errors, reversal is not required where absent the error "[i]t is not reasonably probable the outcome of the trial would have been different.").  Indeed, the state supreme court has recently made clear that California courts assessing whether false evidence is material must apply the *Watson* test for prejudice and decide "if there is a reasonable probability that, had it not been introduced, the result would have been different."  *In re Richards*, 63 Cal.4th 291, 312-313 (Cal. 2016).  That is exactly what the state habeas court did here.

But as the Ninth Circuit Court of Appeals has explicitly held, a state court's application of this state-law standard to a false evidence claim is contrary to Supreme Court precedent.  *Dow v. Virga*, 729 F.3d 1041, 1049 (9th Cir. 2013).  Indeed, *Dow* is identical to this case.

There the state presented false evidence at defendant's trial for robbery.  The state court upheld defendant's conviction "concluding that [defendant] had not shown that it was 'reasonably probable that a result more favorable to the defendant would have occurred' absent the misconduct."  729 F.3d at 1046.  The Ninth Circuit concluded that application of this state-law test for error to assess materiality in a Due Process false-evidence claim was contrary to Supreme Court precedent.  729 F.3d at 1047.  Under Supreme Court law, false evidence requires reversal when "there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury."  *Id*. at 1048, citing *United States v. Agurs*, 427 U.S. at 103.  In applying the state-law *Watson* test to measure materiality -- looking to see if "the result *would* have been different" -- the state court applied "a standard that is more difficult for the defendant to meet than the standard applied by the Supreme Court."  *Id*. at 1049.  Because the state court measured materiality using an incorrect legal standard, the decision was not entitled to deference

and *de novo* review was required.  *Id.* at 1049.  *Accord Hernandez v. Lewis*, 2018 WL 1870449 at * 31-35  (E.D. Cal. 2018) (state court found false evidence not material by applying the state's *Watson* test and finding that there was no "reasonable probability that the result would have been different" and that "petitioner has not shown that this evidence would have changed the outcome of his trial;" held, state court applied a standard that was "contrary to" Supreme Court precedent, § 2254(d) did not bar relief and *de novo* review was required); *Goodrum v. Tampkins*, 2018 WL 1071710 at * 6 (S.D. Cal. 2018) (same).

Here, in assessing materiality the state habeas court applied the identical standard applied by the state court in *Dow* (as well as *Hernandez* and *Lewis*).  In applying *Watson*, and just like *Dow* and *Hernandez*, the state habeas court here looked to see if absent the false evidence it was reasonably probable "the outcome of the trial would have been different."  Pursuant to *Dow* and *Hernandez*, because the state habeas court applied a rule contrary to Supreme Court precedent, the court's materiality findings are not entitled to deference and *de novo* review is proper.  And for all these reasons set forth above, a *de novo* application of the Supreme Court's materiality standard shows that given the importance of the false evidence presented in this case, and the prosecutor's reliance on that evidence in opening statements, presentation of evidence and closing argument, there is certainly a "reasonable likelihood" that the false evidence could have affected the judgment of at least one juror.  *Hayes v. Brown*, 399 F.3d at 984.  Relief is required.[23]

---

[23]   Because the state court's materiality standard was contrary to Supreme Court precedent, and *de novo* review is therefore required, there is no need to dwell on whether *de novo* review would also have been proper because the state court ignored key facts or made any unreasonable determinations of fact in relying on such evidence as the discredited testimony of Susie Scholpp, the rebutted testimony regarding the Rosie's K-9 alert or Jim Cook's debunked "expert" testimony about the cell phones.  Exhibit CC at 3-4.

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.                           63

II.   DEFENSE COUNSEL'S FAILURE TO EXPOSE FALSE EVIDENCE WHICH DIRECTLY UNDERCUT BOTH PETITIONER'S ALIBI AND HIS CREDIBILITY REQUIRES RELIEF.

A.   Introduction.

Even if the state's presentation of false evidence did not violate the Fifth and Fourteenth Amendments, relief would still be required here.  Defense counsel failed to expose the false evidence in connection with either the Lorex video footage or the August 24 death threat.  As discussed in Argument II-B below, counsel's failure not only fell below the standard of care required by the Sixth Amendment, but it undermines confidence in the outcome of trial.  And as discussed in Argument II-C, the state habeas court's rejection of this claim is not entitled to deference under § 2254(d) because the state court once again ignored the key facts relevant to this claim.  Relief is required.

B.   Defense Counsel Rendered Ineffective Assistance Of Counsel In Failing To Expose The False Evidence In Connection With Both The Lorex Video Footage And The August 24 Threat.

The Sixth Amendment gives defendants in criminal cases a right to the effective assistance of counsel.  A "convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The defendant must first show that counsel's representation fell below an objective standard of reasonableness.  466 U.S. at 688.  A reviewing court will not find counsel's performance defective where the challenged conduct was the result of an informed and reasonable tactical choice rather than of neglect.  466 U.S. at 689.  The defendant must then show that counsel's error "undermine[s] confidence in the outcome" of trial.  466 U.S. at 694.  Where a single juror could reasonably have reached a different result absent counsel's error prejudice has been shown.  *See Wiggins v. Smith*, 539 U.S. at 537.

Thus, there are two questions in connection with assessing whether relief is required for ineffective assistance.  First, did counsel's failure to expose the false evidence fall below an objective standard of reasonableness?  Second, if so, could at least one juror have reasonably reached a different result had he or she heard the truth"  Because the answer to both questions is yes, relief is required.

       1.      Counsel's failure to expose the truth about the video footage or the August 24 threat fell below an objective standard of care.

As to the Lorex footage, defense counsel has forthrightly conceded that he did not make a tactical decision not to show the actual Lorex footage.  Geragos Declaration at para. 12.  He was unaware of any such footage; he did not get a copy of the actual Lorex footage prior to trial and when he attempted to have the actual footage viewed at police headquarters under the auspices of Agent Sunseri, the defense was not shown any footage inconsistent with Agent Sunseri's two police reports of 2010.  Geragos Declaration at para. 13-15; Harris Declaration at para. 5-10.

To his credit, defense counsel has also conceded that although the state did not provide a copy of the actual Lorex footage, it provided what Agent Sunseri said was a DVD of "relevant portions" of the Lorex footage.  Geragos Declaration at para. 15; *See* Exhibit B.  In addition to containing several hours of irrelevant footage, this DVD also contains footage showing Mr. Zumot in the café at 6:47:12 and 6:45.  Whitt Declaration at para. 6.  It is apparent that in deciding not to review this DVD, trial counsel assumed that the "relevant portions" of the footage provided on a DVD prepared by Agent Sunseri would not *contradict* what Sunseri wrote in his police report (that Mr. Zumot did not arrive until 6:47:38), but would simply *confirm* it.  Defense counsel explains that this assumption is why -- instead of relying on the DVD Sunseri provided -- he tried to examine the actual footage itself.  Geragos Declaration at para. 15.  But the bottom line as

to the Lorex footage remains that until the post-conviction investigation in this case, Mr. Zumot's trial lawyers were unaware there was Lorex video footage showing Mr. Zumot was inside the café before the fire engines passed at 6:47:38. Geragos Declaration at para. 14; Harris Declaration at para. 10. They made no tactical decision not to use the actual Lorex footage and would have used it had they been aware of it. Geragos Declaration at paras. 14-15; Harris Declaration at paras. 8-10.

As to the August 24 call, the record shows that defense counsel's position was that Mr. Zumot never made the threat. *See* RT 2585. He introduced Mr. Zumot's own testimony that he never made the threat. 18 RT 1954. Counsel has admitted that he had no tactical reason not to present telephone records confirming that -- in fact -- Mr. Zumot never made the August 24 call. Supplemental Declaration of Mark Geragos ("Supplemental Geragos Declaration") attached at the Petition as Exhibit PP at para. 10.

In short, there was no tactical reason for failing to present (1) Lorex video footage confirming Mr. Zumot's alibi and credibility, (2) Ms. Schipsi's telephone records of August 24 showing that Mr. Zumot never called her that day or (3) Mr. Endemann's telephone records showing that he *did* call her at exactly 12:50 and blocked his number. This evidence would have directly supported the very theory which defense counsel presented to the jury.

Given these facts, there should be no real dispute about the performance prong aspect of *Strickland*. The Supreme Court has recognized that where a criminal defense lawyer pursues a certain theory of defense, the lawyer's failure to present readily available evidence supporting that precise defense is unreasonable. *See*, *e.g.*, *Wiggins v. Smith*, 539 U.S. at 526. Not surprisingly, circuit courts throughout the country -- including the Ninth Circuit -- have reached the same conclusion. *See, e.g., Hart v. Gomez*, 174 F.3d 1067, 1071 (9th Cir. 1999); *Dugas v. Coplan*, 428 F.3d 317, 328-329

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.                    66

(1st Cir. 2005); *Clinksdale v. Carter*, 375 F.3d 430-435 (6th Cir. 2004); *Soffar v. Dretke*, 368 F.3d 441, 473 (5th Cir. 2004); *Eze v. Senkowski*, 321 F.3d 110, 126-130 (2nd Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210, 219 (2nd Cir. 2001); *Chambers v. Armontrout,* 907 F.2d 825, 828-830 (8th Cir. 1990); *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990).  It was unreasonable for counsel to fail to review records and expose the falsity of the state's evidence in precise accord with the theory defense counsel himself was putting forth.[24]

2.     Counsel's failure to expose the false evidence undermines confidence in the outcome of trial.

In addition to the performance prong of a *Strickland* inquiry, in order to prove ineffective assistance of counsel a defendant must also establish prejudice.  As noted above, this requires petitioner to prove that at least one juror could reasonably have reached a different result absent counsel's deficient performance.  *Wiggins v. Smith*, 539

---

[24]     As to the Lorex evidence, it appears defense counsel was relying on information provided by the state in discovery.  Thus, the Lorex evidence disclosed to the defense in discovery -- the two 2010 police reports -- stated that the Lorex footage showed Mr. Zumot did *not* arrive at the café until 6:47:38.  It appears defense counsel relied on the accuracy of these representations -- he did not examine the DVD provided by Sunseri nor did he seek a court order to review the actual footage when the initial review at police headquarters did not reveal anything useful.  Because the information provided in discovery was false, however, reliance on this information had serious repercussions.  And as case law from across the country has long made clear, *Strickland* does not permit a defense lawyer to simply rely on the state's representations as to critical alibi evidence.  *See Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) (unreasonable for criminal defense lawyer to forego investigation based on "the investigative work of the State")  *Accord Campbell v. Reardon*, 780 F.3d 752, 768 (7th Cir. 2015) ("*Strickland* typically demands that counsel go beyond discovery provided by the State and conduct her own pretrial investigation."); *Daniel v. Palmer*, 499 Fed.Appx. 400, 407-410 (6th Cir. 2012); *Elmore v. Ozmint*, 661 F.3d 783, 853 (4th Cir. 2011); *Crisp v. Duckworth*, 743 F.2d 580, 584 (7th Cir. 1984) ("We do not agree that police statements can generally serve as an adequate substitute for a personal interview."); *Thomas v. Lockhart*, 738 F.2d 304, 408 (8th Cir. 1984); *Hash v. Johnson*, 845 F.Supp.2d 711, 741 (W.D. Va. 2012).

U.S. at 537.

For many of the same reasons addressed in connection with the false evidence claim, relief is also required here under *Strickland*. If the jury had seen the video footage from the café, and the telephone records regarding the August 24 call, a unanimous conviction was most unlikely. After all, (1) Mr. Zumot's alibi and credibility would not have destroyed by video evidence and (2) the threat to kill Ms. Schipsi would have been traced *not* to Mr. Zumot, but to someone else entirely, someone who was asked to call from a blocked number by Ms. Schipsi to facilitate her false police report that Mr. Zumot threatened to kill her. In turn, counsel could have used this evidence -- showing that Ms. Schipsi was fabricating evidence of domestic violence -- to undercut the balance of the state's domestic violence evidence based on self-reporting by Ms. Schipsi. In light of all these facts, and for purposes of the *Strickland* inquiry, had the entire jury been presented with this evidence "there is a reasonable probability that at least one juror would have" voted to acquit. *Wiggins v. Smith*, 539 U.S. at 537. Thus, even if the proscription on false evidence contained in the Due Process Clause does not apply to this case, relief is still required.

> **C.**     **Section 2254(d) Does Not Bar Relief On This Claim Because The State Habeas Court Ignored Key Facts.**

In its November 22, 2016 ruling the state superior court denied relief on petitioner's *Strickland* claim in a single sentence, concluding that "[h]is claims of Ineffective Assistance of Counsel also fail." Exhibit CC at 5. Pursuant to AEDPA this ruling by the state habeas court is entitled to deference unless it is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" within the meaning of § 2254(d)(1) and

1

2

3

4

5

(d)(2).  As discussed in Argument I-C, above, however, where a state court resolving a federal constitutional claim refuses to consider facts it should consider in deciding a constitutional claim, that decision is unreasonable and § 2254(d) will not bar relief. *Williams*, 529 U.S. at 397-398.  *Accord Id* at 416 (O'Connor, J. concurring); *Taylor*, 366 F.3d at 1001; *Bradley*, 315 F.3d 1091.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Here, the state habeas court did not discuss or even mention either of the two *Strickland* prongs (performance and prejudice) it was supposed to evaluate in assessing a claim that trial counsel provided ineffective assistance of counsel.  Exhibit CC at 5.  With respect to the performance prong, there are only two possibilities.  Either the state habeas court *did* adjudicate the merits or it did *not*.  If the court did not adjudicate the merits of the performance prong, then 28 U.S.C. § 2254(d) does not apply to this inquiry and *de novo* review is required.  *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (state court facing ineffective assistance of counsel claim did not resolve performance prong but rejected the claim based on lack of prejudice; held, "because the state court did not decide the performance prong] we review this element . . . de novo."]; *Wiggins v. Smith*, 539 U.S. at 534; *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (state court facing ineffective assistance of counsel claim did not resolve prejudice prong but rejected the claim by finding counsel's performance adequate; held, "[b]ecause the state courts found the representation adequate, they never reached the issue of prejudice . . . and so we examine this element . . . de novo.")  And for the reasons set forth above, a *de novo* review the evidence shows that counsel's performance fell below the standard of care required by the Sixth Amendment.

24

25

26

27

28

Alternatively, the state habeas court *did* adjudicate the merits of the performance prong inquiry.  But in doing so as to the Lorex video footage, the state court ignored a number of key undisputed facts about counsel's representation including: (1) defense counsel never obtained a copy of the actual Lorex footage, (2) defense counsel did not

*Zumot v. Borders*, Petition for Writ of Habeas Corpus.                                    69

view a copy of the Lorex footage provided by the state prior to trial which showed Mr. Zumot in the café at 6:47:12 and 6:45 and before the fire engines passed at 6:47:38, and (3) defense counsel conceded that he did not make a tactical decision not to show the actual Lorex footage and would have used it had he been aware of it.  Similarly, as to the August 24 call, the state court ignored: (1) the position that defense counsel himself advanced to the jury was that Mr. Zumot never made the August 24 threat, (2) counsel introduced Mr. Zumot's own testimony that he never made the threat, and (3) counsel conceded he had no tactical reason for failing to investigate and present telephone records proving counsel's own position: that Mr. Zumot never made the August 24 call.  Once again as the Ninth Circuit concluded in *Taylor* "[a] rational fact finder might discount [these facts] or, conceivably, find [them] incredible, but no rational fact-finder would simply ignore [them]."  366 F.3d at 1006.  But that is exactly what the state habeas court did -- it ignored every one of these facts.  To the extent the state court made a ruling as to performance, it is not entitled to deference.[25]

Although the state habeas court say a word about the prejudice prong, it seems fair to assume that the court would have found any error harmless for the same reasons it articulated in connection with the materiality inquiry set forth in connection with the false evidence claim.  But any such finding would also not be entitled to deference under § 2254(d).

---

[25]     At another point in is ruling the state habeas court noted that "the reason defense counsel did not review the records and present proof the call was from Endemann's phone is not known."  Exhibit CC at 4.  This observation also ignores the record.  Defense counsel explained that he "did not make some kind of  decision not to present this evidence" and had he known "the state was presenting false evidence and argument to the jury regarding the August 24, 2009 threat I would have done what I could to expose the truth to the jury."  Exhibit PP at para. 9-10.  Put another way, counsel simply made a mistake.

Indeed, the state habeas court's discussion is once again most notable for the evidence the court simply ignored.  For example, the court relied on the trial testimony of Susie Scholpp who "'was 100% certain' she saw petitioner driving from the area of the cottage towards the café at approximately 6:20 p.m."  Exhibit CC at 3.  Petitioner has discussed Ms. Scholpp's testimony above.  Suffice it to say here that the only way to rely on Scholpp's testimony is to ignore: (1) the state's own recognition that she identified the wrong car, (2) the state's own evidence that Mr. Zumot was four miles away from the cottage at 6:16 p.m., driving from the class he took in San Jose, and so would have only four minutes to drive four miles, start a fire and flee to be seen at 6:20 driving away from the cottage, and (3) the fact that the fire captain said the fire burned fast and hot yet there was no fire when witnesses passed the cottage 15 minutes after it had to be set according to Scholpp.  Yet again the state court simply ignored all these facts.  "A rational fact finder might discount [this evidence] or, conceivably, find it incredible, but no rational fact-finder would simply ignore it."  *Taylor*, 366 F.3d at 1006.

The state court's reliance on the alert by "Rosie the dog" suffers from the identical infirmity.  Exhibit CC at 4.  While it is true that Rosie alerted to accelerants on some of Mr. Zumot's clothing, the court simply ignored: (1) the testimony of state fire expert Barbara Maxwell that dogs such as Rosie can produce a false positive and that a laboratory should "verify all" K-9 positive alerts and (2) when Mr. Zumot's clothing was tested for the presence of ignitable liquids the lab squarely contradicted Rosie and found *no* such material on Mr. Zumot's clothing from the day.  3 RT 276, 285, 335-336, 344-345; 9 RT 1037, 1043.

But the state habeas court did not just ignore evidence.  It relied at least in part on the precise evidence which had been proven false.  Thus, the state habeas court relied on the fact that Mr. Zumot told Ms. Schipsi she "was dead."  Exhibit CC at 3.  It relied on the fact the Mr. Zumot was purportedly "obsess[ed] with committing the perfect crime."

Exhibit CC at 3.  Remarkably enough, however, these facts both come directly from Ms. Schipsi's August 24 report to Officer Monroe about the death threat -- a report the state now concedes was false.  Exhibit V at 4 ["Schipsi told me at approximately 1250 hours Zumot called her cell phone [and said] . . . 'you're dead.' . . . Schipsi said Zumot . . . has stated before how he would plan the 'perfect murder.'"].  Finding counsel's failure to correct false evidence harmless by accepting the truth of the very evidence conceded to be false is kafkaesque.

The state court added an observation that as to the August 24 threat, rather than correct the false testimony about the August 24 threat, it was "better to leave the jury with a negative impression of the victim for having recanted her declaration."  The observation is breathtaking.

The state charged defendant with murder.  It introduced testimony from three witnesses that weeks before the victim was killed, Mr. Zumot called her on the telephone, called her a "bitch" and a "whore" and threatened to kill her.  The prosecutor then relied on that evidence throughout his closing argument in urging jurors to convict. Nevertheless, the state habeas court's view was that rather that expose the truth -- not only that Mr. Zumot had never made any such threat but that Ms. Schipsi herself cooked up the threat to make it look like she was being harassed -- it was better for defense counsel to simply "leave the jury with a negative impression of the victim for having recanted."  The idea that it was somehow better to have jurors falsely believe Mr. Zumot threatened to kill Ms. Schipsi so that they would have "a negative impression" of her for recanting is beyond understanding.

That is especially so here.  Had defense exposed the lie he would have proven to the 12 jurors deciding if Mr. Zumot killed Ms. Schipsi that (1) Mr. Zumot had *not* in fact threatened to kill her shortly before the murder and (2) the state was seeking to convict

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

him based on false evidence.  Moreover, in connection with the state habeas court's apparent concern about ensuring jurors had a "negative impression of the victim," this course of action would not only have exposed the truth about the threat, but jurors could just as easily reached "a negative impression of the victim" for trying to falsely implicate Mr. Zumot.  The state court's finding in this regard is the very definition of an unreasonable determination of fact.

For all these reasons, to the extent the state habeas court found that defense counsel's failures were not prejudicial, that finding is not entitled to deference under § 2254(d) and *de novo* review of this inquiry is required.  And for the reasons detailed above, under *de novo* review it is plain that one or more jurors could reasonably have reach a different result absent counsel's errors.  As such, relief is required.

III.   THE PETITION IS TIMELY FILE BECAUSE IT WAS FILED WITHIN THE
       ONE-YEAR STATUTE OF LIMITATIONS SET FORTH IN 28 U.S.C. § 2244.

The current petition is timely.  28 U.S.C. § 2244(d) provides that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  Pursuant to § 2244(d)(1)(A), that one-year period begins to run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."

Section 2244(d)(2) adds a tolling provision.  That section provides that the one-year period is tolled for "the time during which a properly filed application for State post-conviction . . . review is pending . . . ."  In California, tolling also applies to the time between levels of the state court system so long as the petitioner does not take more than 60 days in seeking relief from a higher court.  *Torres v. Long*, 527 Fed.Appx. 652, 654 (9th Cir. 2013); *Chaffer v. Prosper*, 542 F.3d 662, 666 (9th Cir. 2008); *Warburton v. Walker*, 548 F.Supp.2d 835, 839 (C.D.Cal. 2008).

Here, the state appellate court affirmed petitioner's conviction on direct appeal in an opinion dated December 12, 2013.  *People v. Zumot,* 2013 Cal. App. Unpub. LEXIS 1971 (2013).  The state supreme court denied review on direct appeal on March 19, 2014. *People v. Zumot*, S215836, Order of March 14, 2014, attached as Exhibit SS.  The period within which to seek certiorari expired – and the case became final on appeal – 90 days later, on June 17, 2014.  *See Bowen v. Roe*, 188 F.3d 1157 (9th Cir. 1999) (where a habeas petitioner does not seek certiorari on direct review of a state-court judgment, the one-year statute of limitations begins to run on date certiorari could have been sought). Thus, the one-year statute of limitations would normally have begun running on June 17, 2014 and expired one year later, on June 17, 2015.

But during the pendency of his state appeal, petitioner initiated state post-conviction proceedings, timely filing a habeas corpus petition with the state appellate court on September 13, 2013, while the case was still pending on appeal. *In re Bulos Zumot*, H037652, Petition for Writ of Habeas Corpus, attached as Exhibit TT. On the same day the state appellate court affirmed the conviction on appeal, it granted an Order to Show Cause in connection with the habeas petition, remanding the case to the Superior Court for an evidentiary hearing and resolution. *People v. Zumot*, H037652, Order to Show Cause, attached as Exhibit UU.

The Superior Court held an evidentiary hearing over several courts days in 2016, issuing a decision denying relief on November 22, 2016. *In re Bulos Zumot*, BB943863, Order of November 22, 2016, attached as Exhibit CC. Petitioner timely filed a Petition for Writ of Habeas Corpus in the state appellate court less than 60 days later, on January 19, 2017. *In re Bulos Zumot*, H044302, Petition for Writ of Habeas Corpus, attached as Exhibit QQ. The state appellate court summarily denied the petition on August 31, 2017. *In re Bulos Zumot*, H044302, Order of August 31, 2017, attached as Exhibit RR. Petitioner timely filed a new Petition for Writ of Habeas Corpus with the state supreme court less than 60 days later, on October 25, 2017. *In re Bulos Zumot*, S245050, Petition for Writ of Habeas Corpus, attached as Exhibit VV. That petition was summarily denied on March 14, 2018. *In re Bulos Zumot*, S245050, Order of March 14, 2018, attached as Exhibit WW.

In short, although petitioner's one-year statute of limitations began on June 17, 2014, it was tolled that same day because of the pendency of a properly filed state petition for post-conviction review. It remained tolled until March 14, 2018 when the state post-conviction proceedings were no longer pending. Petitioner has, therefore, until March 14, 2019 within which to seek federal relief. This Petition for Writ of habeas Corpus is therefore timely filed.

CONCLUSION

Petitioner told jurors he could not have been the killer because he arrived in his café around 6:40.  At trial, the prosecutor introduced evidence and argument showing that petitioner did not arrive in his café until 6:47:38.  In post-conviction proceedings, the state admitted the actual video footage shows that, just as he testified, petitioner was in the café "before the [video] clip shown at trial" and "earlier than discussed at trial."  Nevertheless, the state habeas court found "the prosecution did not present false testimony."

Petitioner told the jury he did not threaten to kill Ms. Schipsi on August 24.  At trial, the prosecutor called three witnesses to testify that, in fact, petitioner *did* call Ms. Schipsi on August 24 and threaten to kill her.  In post-conviction proceedings the state admitted that Mr. Zumot never made any such call, and that the entire incident was fabricated by Ms. Schipsi and her longtime friend Roy Endemann.  Nevertheless the state habeas court found that "the prosecution did not present false evidence."

Federal habeas is not dead.  At least not yet.  The state habeas court's findings are not entitled to deference.  Relief is proper.

DATED:    March 12, 2019          Respectfully submitted,

CLIFF GARDNER
LAZULI WHITT


   /s/ Cliff Gardner
By Cliff Gardner
Attorney for Petitioner

CERTIFICATE OF SERVICE

Case Name: Zumot v. Borders

I hereby certify that on March 12, 2019, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

PETITION FOR WRIT OF HABEAS CORPUS, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF AND EXHIBITS IN SUPPORT THEREOF

I certify to my knowledge that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

In addition, upon the party named below by depositing a true copy in a United States mailbox in Berkeley, California, in a sealed envelope, postage prepaid, and addressed as follows:

Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed March 12, 2019, at Berkeley, CA.

                                     /s/Cliff Gardner
                                    Declarant