CLIFF GARDNER
(State Bar # 93782)
LAZULI WHITT
State Bar # 221353
1448 San Pablo Ave.
Berkeley, CA 94702
510-524-1093
Casetris@aol.com

Attorneys for Petitioner
Bulos Zumot

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


BULOS ZUMOT,                                )          No.: 19-cv-01319-WHO
                                            )
                 Petitioner,                )
        v.                                  )
                                            )
DEAN BORDERS, in his capacity as Warden     )
of the California Institute for Men,        )
                                            )
                 Respondent.                )
_____)


TRAVERSE TO ANSWER TO PETITION FOR WRIT OF

HABEAS CORPUS AND MEMORANDUM OF

POINTS AND AUTHORITIES IN SUPPORT THEREOF

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    THE PRESENTATION OF FALSE EVIDENCE ABOUT THE
      VIDEO FOOTAGE AND THE AUGUST 24 DEATH THREAT VIOLATED
      DUE PROCESS AND REQUIRES THAT RELIEF BE GRANTED.  . . . . . . . . . 6

      A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Section 2254(d) Does Not Insulate The State Habeas Court's
            Ruling From De Novo Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    The Presentation Of False Evidence As To The Video Footage
            Violated Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            1.    The evidence was false. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            2.    Because the prosecutor has sworn under oath that he reviewed
                  all the Lorex footage at least 20 times, and because that
                  footage was in his own file, the prosecutor knew or should
                  have known of the falsity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      D.    The Presentation Of False Evidence As To The August 24 Death Threat
            Violated Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            1.    The evidence was false. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            2.    Because it was the prosecutor himself who subpoenaed
                  Endemann's telephone records, and because those records
                  and the relevant police reports were all in the prosecutor's
                  file, he knew or should have known of the falsity. . . . . . . . . . . . . 24

      E.    Because False Evidence About The Video Footage Undercut Both
            Petitioner's Credibility And His Alibi, And Because The Prosecutor
            Made The False Death-Threat Testimony A Central Part Of The State's
            Case, The False Evidence Was Material.  . . . . . . . . . . . . . . . . . . . . . . . . 25

II.   TRIAL COUNSEL'S FAILURE TO EXPOSE THE STATE'S FALSE
      EVIDENCE IN CONNECTION WITH BOTH THE VIDEO EVIDENCE
      DESTROYING PETITIONER'S ALIBI AND CREDIBILITY, AND THE
      AUGUST 24 DEATH THREAT, REQUIRE RELIEF. . . . . . . . . . . . . . . . . . . . . 34

      A.    De Novo Review Is Appropriate.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      B.    Defense Counsel's Failure To Review The Lorex Footage And
            Expose The Truth About The Footage Fell Below The Standard
            Of Care.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.      Defense Counsel's Failure To Review The Telephone Records
        And Expose The Truth About The August 24 Threat Fell Below
        The Standard Of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1

TABLE OF AUTHORITIES

2

**FEDERAL CASES**

3
*Alcorta v. Texas*, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . 14, 16

4
*Andrews v. Davis*, 944 F.3d 1092(9th Cir. 2019) . . . . . . . . . . . 9, 10

5
*Avena v. Chappell*, 932 F.3d 1237(9th Cir. 2019) . . . . . . . . . . . . . 5

6
*Blumberg v. Garcia*, 687 F.Supp.2d 1074 (C.D. Cal. 2010) . . . . . 33

7
*Bradley v. Duncan*, 315 F.3d 1091 (9th Cir. 2002) . . . . . . . . . . . . . 8

8
*Brown v. Borg*, 851 F.2d 1011 (9th Cir. 1991) . . . . . . . . . . . . 16, 33

9
*Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015) . . . . . . . 13

10
*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) . . . . . . . . . . . 11, 16, 33

11
*Employers Insurance of Wausau v. Granite State Insurance*
12
*Co.*, 330 F.3d 1214 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 13

13
*Giglio v. United States*, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . 14

14
*Greene v. Lambert*, 288 F.3d 1081 (9th Cir. 2002) . . . . . . . . . . 9, 36

15
*Hall v. CDCR*, 343 F.3d 976 (9th Cir. 2003) . . . . . . . . . . . . . . . . 14

16
*Harrington v. Richter*, 562 U.S. 86 (2011) . . . . . . . . . . . . . . . . . 36

17
*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) . . . . . . . . . . . . 17, 33

18
*Hernandez v. Lewis*, 2018 WL 1870449 (E.D. Cal. 2018) . . . . . . 13

19
*Johnson v. Williams*, 568 U.S. 289 (2012) . . . . . . . . . . . . 12, 13, 37

20
*Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010) . . . . . . . . . . . . . . . 14

21
*Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013) . . . . . . . . . . . . . . . 8, 35

22
*Miller-El v. Cockrell*, 537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . 5

23
*Miller v. Pate*, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 14, 33

24
*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . 14, 16, 18

25
*New Hampshire v. Maine*, 532 U.S. 742 (2001) . . . . . . . . . . . . . . 38

26
*Penry v. Johnson*, 532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . 10

27
*Phillips v. Ornoski*, 673 F.3d 1168 (9th Cir. 2012) . . . . . . . . . . . 17

28
*Roberts v. McAfee Inc.*, 660 F.3d 1156 (9th Cir. 2011) . . . . . . . . 13

iii

*Russell v. Rolfs*, 893 F.2d 1033 (9th Cir. 1990) . . . . . . . . . . . . . . 38

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) . . . . . . . . . . . passim

*United States v. Agurs*, 427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . 14

*United States v. Kennedy*, 890 F.2d 1056 (9th Cir. 1989) . . . . . . . 28

*Unites States v. Kohring*, 637 F.3d 895 (9th Cir. 2011) . . . . . . . . . 28

*United States v. Zuno-Acre*, 339 F.3d 886 (9th Cir. 2003) . . . . . . . 16

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . 36, 40, 42

*Wilson v. Sellers*, 584 U.S. ___, 138 S.Ct. 1188 (2018) . . . . . 36, 37

## STATE CASES

*People v. Moore*, 2010 WL 4816080, at 7 . . . . . . . . . . . . . . . 12, 13

*People v. Roman*, 2018 WL 10068671, at 16 . . . . . . . . . . . . . . . 12

*People v. Romo*, 2004 WL 2580735, at 31 . . . . . . . . . . . . . . . . . 12

## FEDERAL STATUTES

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## STATE STATUTES

California Penal Code § 1473 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**INTRODUCTION**

On October 15, 2009, the Palo Alto fire department responded to a fire in a cottage on Addison Avenue in Palo Alto. Inside the cottage they found the body of Jennifer Schipsi. Petitioner, who lived with Ms. Schipsi at the cottage, was charged with murder.

Petitioner maintained his innocence from day one. Petitioner testified that at the time of the crime, he was working at his café in Palo Alto. In fact, he told jurors he was already at the café when the fire engine responding to the fire passed. The state prosecutor told jurors in no uncertain terms that petitioner was lying.

Several state witnesses directly supported the state's argument. Officer Sunseri testified that the fire engine passed the café at 6:47:29 "and then right after that you see Mr. Zumot." Similarly, police officer Quisenberry confirmed that on video footage from the café surveillance system "we see defendant enter the café" at 6:47:38, after the fire engine passed. And the prosecutor played video clips purporting to show petitioner entering the café after the fire engine passed, just as his witnesses testified.

This evidence was fatal to petitioner's alibi. There was ample time to commit the crime and get to the café at 6:47:29. Exactly when petitioner arrived at the café would be critical to his defense. This is why prosecutor specifically focused the jury's attention on when "the defendant enters his café." If petitioner did not arrive at the café until after the fire engine passed at 6:47:29 (as both Quisenberry and Sunseri testified and the prosecutor argued), then not only was petitioner lying to the jury, but he had no alibi.

According to the prosecutor, however, this was not petitioner's only lie to the jury. The prosecutor introduced testimony about a telephonic death threat Ms. Schipsi said she received from Mr. Zumot on August 24, 2009 -- only seven weeks before her murder. During his trial testimony, petitioner specifically denied having made any such threat. The prosecutor then relied on this death threat 11 separate times during closing argument in urging jurors to convict of murder, again asking the jury to find petitioner was lying.

The prosecutor's evidence and argument on both these subjects was demonstrably false. After exhausting state remedies, petitioner filed a Petition for Writ of Habeas

Corpus in this Court ("Petition") raising four claims for relief.  First, the state presented false evidence from both Quisenberry and Sunseri, and false argument by the prosecutor, about the video footage.  Second, the state presented false evidence and argument about the August 24 death threat which was so central to the prosecutor's closing argument.  Third, petitioner received ineffective assistance of counsel when his lawyer failed to expose the falsity of the state's evidence on both these points.  Finally, even if the errors were individually insufficient to merit relief, together they required that habeas relief be granted.  This Court ordered the state to file an Answer.  The state has done so.  The Answer, along with the state's contemporaneously filed Memorandum of Points and Authorities, make clear that the material facts which govern petitioner's false evidence claims are by and large not in dispute.

Petitioner will start with the video evidence.  As noted, petitioner contended at trial that he could not have set the fire at the Addison Street cottage because he arrived at the café between 6:40 and 6:41.  20 RT 2013-2015.  Police seized the Lorex video surveillance system from the café and provided to the defense in discovery two patently false reports about that footage.  Petition, Exhibits A and B.  According to both reports, the video footage showed Mr. Zumot did not "enter [the] café" until 6:47:38 -- nine seconds *after* a fire engine raced down University Avenue.  Petition, Exhibit A at 9; Exhibit B at 1.  As also noted above, this timing was fatal to petitioner's alibi.

In accord with these false reports, in opening statements the prosecutor told jurors the video footage would show that "[a]t 6:47, before the defendant has even walked into the café, you can see the red lights of an emergency vehicle going eastbound on University Avenue toward Addison.  It's only then that the defendant enters his café, at 6:47 p.m."  2 ART 142-143.  At trial, and once again in accord with the false reports, the prosecutor introduced Officer Quisenberry's specific testimony that the Lorex video footage showed "the defendant enter[ing]" the café at 6:47:38.  13 RT 1420-1421.  The prosecutor then stood mute when Agent Sunseri later confirmed this, telling jurors that Mr. Zumot did not appear in the Lorex video until after 6:47:29 when the fire engine

passed.  15 RT 1727.  In closing the prosecutor urged jurors to reject the defense theory as to when petitioner arrived at the café because "its only after the fire truck arrives that defendant's (sic) seen on tape" and "we saw the video."  22 RT 2626.

In habeas proceedings, petitioner presented three specific portions of the Lorex footage showing that just as he testified he was inside the café *prior* to the fire engine passing, specifically at 6:47:12, 6:45 and 6:41.  Petition, Exhibits L, N and P.  In state-court proceedings, and again in its Answer in this Court, the state admits (1) Quisenberry testified petitioner entered the café at 6:47:38, (2) Sunseri testified petitioner was not seen on the video footage until shortly after 6:47:29 when the fire truck passed and (3) the prosecutor argued petitioner entered the café after 6:47 when the fire truck passed. Respondent's Memorandum of Points and Authorities in Support of Answer ("Resp. Mem.") at 31-32.  In light of Exhibits L, N and P the state admits that -- in fact -- petitioner *did* enter the café prior to 6:47:29, conceding that petitioner was indeed already in the café at both 6:47:12 and 6:45.  Petition, Exhibit DD at 41-42; Resp. Mem. 42.  The state admits that video footage on Exhibits L, N and P shows Mr. Zumot entering the café "before the [video] clip shown at trial" and "acknowledge[s]" that this means petitioner entered the café "earlier than discussed at trial."  Petition, Exhibit DD at 41, 78.  The only fact the state disputes is whether petitioner was the person shown in the 6:41 footage. Resp. Mem. 42.

As discussed more fully below, in assessing whether false evidence was presented, what the state disputes is far less important than what the state admits.  Since petitioner could not simply have spontaneously appeared in the café, the state's admission that petitioner was in the café at 6:45 means he must have entered the café at some earlier time -- *just as he testified at trial*.  In short, the state's admissions that petitioner *was* in the café prior to 6:47:38 establish that the contrary testimony of both Quisenberry and Sunseri, and the prosecutor's contrary argument, were all false.  Full stop.

In connection with the August 24 death threat, the Answer and supporting memorandum show that the material facts are also undisputed.  At trial, the state

1    introduced evidence from police Officer Moore about a telephonic death threat Ms.

2    Schipsi said she received from petitioner on August 24, 2009 -- only seven weeks before

3    her murder.  16 RT 1766-1769.  Schipsi told Officer Moore the call came in at 12:50 on

4    the afternoon of August 24 and it was from a blocked number.  Petition, Exhibit V at 4;

5    16 RT 1786.  The prosecutor relied on this death threat throughout his closing argument,

6    reminding jurors again and again that petitioner had threatened to kill Ms. Schipsi only

7    seven weeks before she was killed and returning to the threat again and again throughout

8    argument.  22 RT 2535 lines 9-12, 2543, lines 19-27; 22 RT 2535 (lines 15-18), 2542

9    (lines 22-23), 2557 (lines 16-18), 2560 (lines 14-17), 2561 (lines 20-21 and 24-27), 2562

10   (lines 21-23), 2610 (lines 2-4), 2627 (lines 22-25).

11          In habeas proceedings petitioner presented telephone records, transcripts of the

12   state's post-trial interviews with Ms. Schipsi's friend Roy Endemann, and other

13   documents to show: (1) evidence that Ms. Schipsi received a threatening call from

14   petitioner on August 24 was false, (2) the blocked call Ms. Schipsi received at 12:50, and

15   which she claimed was from petitioner, was actually from Mr. Endemann and (3) Mr.

16   Endemann told police after trial that Ms. Schipsi had asked him to call her from a blocked

17   number so she could falsely tell police petitioner had called to threaten her.  Petition,

18   Exhibits W, X, Y, AA, KK, MM.  Given this evidence, in state-court proceedings -- and

19   again in its Answer in this Court -- the state admits (1) "Schipsi reported to Officer

20   Moore that Schipsi received [the August call] at approximately 1250 hours," (2) Schipsi

21   later added the call was from a restricted number, (3) "phone records showed a restricted

22   call on August 24, 2009 at 12:50 from Endemann's phone to Schipsi's phone," (4)

23   "Endemann explained that Schipsi had . . . Endemann call from a blocked number," (5)

24   this blocked call was "for the purposes of making it look like she was getting harassing

25   calls from petitioner."  Petition, Exhibit DD at 44-45; Resp. Mem. 48-49.  In short, the

26   state's admissions show that the state presented false testimony and argument in

27   connection with the August 24 death threat.

28          Notwithstanding all this evidence, the state habeas court ruled there was no false

1   evidence presented as to either the video evidence or the August 24 call and that, in the

2   alternative, any false evidence was not material.  Petition, Exhibit CC.  The habeas court

3   also denied petitioner's related ineffective assistance of counsel claim based on defense

4   counsel's failure to expose the falsehoods.  *Ibid.*

5       In its Answer, the state first argues that these rulings are insulated from de novo

6   review by 28 U.S.C. § 2254(d).  Resp. Mem. 28-30, 72-73.  On the merits, the state

7   correctly notes that a false evidence claim requires petitioner to prove (1) presentation of

8   false evidence or testimony, (2) the prosecutor knew or should have known that the

9   testimony was false and (3) the false testimony was material.  Resp. Mem. 39.  The state

10  argues that (1) trial testimony about the video footage and the August 24 death threat was

11  not false, (2) the prosecutor neither knew nor should have known of the falsity and (3) the

12  false evidence was not material.  Resp. Mem. 39-47 (no false evidence or argument as to

13  video footage); 47-54 (no false evidence as to August 24 call); 54-56 (the prosecutor

14  could not have known the video evidence was false); 56 (the prosecutor could not have

15  known the testimony about the August 24 call was false); 56-71 (any false evidence was

16  not material).  With respect to petitioner's ineffective assistance of counsel claim, the

17  state recognizes that defense counsel had access to the relevant video footage and

18  telephone records that would have enabled him to expose the false evidence, but argues

19  that counsel's failure to do so was not unreasonable and, in any event, any error was

20  harmless because the false evidence was not important.  Resp. Mem. 73-80.

21      This Traverse and supporting memorandum follow.

22                          **SUMMARY OF ARGUMENT**

23      28 U.S.C. § 2254(d) is not the panacea the state thinks it is, and it cannot insulate

24  the state habeas court's anomalous ruling in this case.  "Even in the context of federal

25  habeas, deference does not imply abandonment or abdication of judicial review."

26  *Miller-El v. Cockrell* 537 U.S. 322, 324 (2003).  *Accord Avena v. Chappell*, 932 F.3d

27  1237, 1251(9th Cir. 2019).

28      As an initial matter, the state habeas court's ruling merits no deference under §

1  2254(d) because the court applied a patently incorrect standard of prejudice in assessing

2  the false evidence claims.  But even setting that aside, § 2254(d) deference is not

3  appropriate because the state court ignored critical facts directly relevant to petitioner's

4  false evidence and ineffective assistance claims.  Indeed, although the state disputes

5  whether the habeas court applied an incorrect standard to the federal claims here, it does

6  not dispute (1) that the state court ignored critical facts or (2) in this very situation, §

7  2254(d) is inapplicable.  De novo review is proper.

8        The state's arguments on the merits fare no better.  As also discussed below, the

9  record (including the state's concessions) shows beyond any genuine question that (1) the

10  state relied on false evidence and argument at trial, (2) the prosecutor had the correct

11  evidence in his own files and therefore either knew or should have known of the falsity

12  and (3) given the prosecutor's reliance on the false evidence in urging jurors to convict,

13  the evidence was plainly material.  The record also shows, and defense counsel has

14  forthrightly admitted, that counsel had no tactical reason for failing to investigate these

15  areas and expose the false evidence and arguments.  In short, as discussed below,

16  considering petitioner's claims either singly or in combination, the writ should be granted.

17

**ARGUMENT**

18
19  **I.   THE PRESENTATION OF FALSE EVIDENCE ABOUT THE VIDEO
      FOOTAGE AND THE AUGUST 24 DEATH THREAT VIOLATED DUE
      PROCESS AND REQUIRES THAT RELIEF BE GRANTED**.

20

21        **A.   Introduction.**

22

23        The state argues that § 2254(d) precludes this Court from reviewing petitioner's

24  false evidence claims de novo.  Resp. Mem. 28-30.  Turning to the merits, the state argues

25  that the trial evidence and arguments presented in connection with both the video

26  evidence and the August 24 death threat were not false and, in any event, although the

27  prosecutor had video footage and telephone records showing the falsity of this evidence

28  in his own file, he could not have known of the falsity.  Resp. Mem. 39-56.  Alternatively,

the state argues that any false evidence was immaterial.  Resp. Mem. 56-71.

Petitioner will address each of these arguments.  As discussed in Argument I-B, below, § 2254(d) does not insulate the state habeas court's decision from de novo review.  On the merits, and with respect to the video footage, as discussed in Argument I-C below: (1) video footage shows the state presented false evidence and argument and (2) the trial prosecutor has declared under oath that he viewed the footage more than 20 times, so he should have known of the falsity the state now admits.  With respect to the August 24 call, and as discussed in Argument I-D below: (1) telephone records and other documentary evidence show the state presented false evidence and argument and (2) because the prosecutor himself had subpoenaed these records to see who made the August 24 call, and they were in the prosecutor's own file, he knew or should have known of the falsity.  Finally, as discussed in Argument I-E below, in a case where the entire defense theory was to raise a reasonable doubt by having defendant testify credibly about his alibi, false evidence as to the viability of that alibi and petitioner's credibility, and false evidence that petitioner threatened to kill the victim only seven weeks before her murder, were plainly material.

### B.    Section 2254(d) Does Not Insulate The State Habeas Court's Ruling From De Novo Review.

Petitioner presented his federal claims in a state habeas corpus petition.  The state superior court rejected his false evidence claim in a written opinion, concluding (1) no false evidence about the video footage was presented, (2) no false evidence about the August 24 call was presented and (3) in any event, any false evidence that was presented was not material.  Petition, Exhibit CC at 3, 4.

28 U.S.C. § 2254(d) provides that federal habeas corpus relief may not be granted as to any claim "adjudicated on the merits" in state-court proceedings unless the state decision either (1) was contrary to or unreasonably applied Supreme Court precedent or (2) unreasonably determined facts in light of the evidence presented.  In his Petition petitioner discussed the two separate reasons why § 2254(d) does not apply to the state

1  habeas court's rulings here.  Petitioner's Memorandum of Points and Authorities in

2  Support of Petition ("Pet. Mem.") 53-63.  First, because the state habeas court ignored

3  critical facts which should have been central to the question of whether false evidence

4  was presented, or relied on facts that had no logical relevance to the issue, the state

5  court's factual determination was unreasonable and not entitled to deference under §

6  2254(d).  Pet. Mem. 55-58.  Second, in assessing whether the false evidence was material,

7  the state habeas court applied a standard of prejudice which the Ninth Circuit has already

8  held to be contrary to Supreme Court precedent.  Pet. Mem. 61-63.  Accordingly, §

9  2254(d) does not apply and de novo review is required.  Pet. Mem. 56.  The state

10  disagrees with the second of these two reasons and argues that de novo review is not

11  warranted.  Resp. Mem. 28-30.

12      But the state does not dispute the first reason.  This was wise; where a state court

13  refuses to consider facts it should consider in deciding a constitutional claim, that

14  decision is unreasonable, § 2254(d) will not bar relief and de novo review is proper.

15  *Milke v. Ryan*, 711 F.3d 998, 1008 (9th Cir. 2013) ("[W]e can't accord AEDPA deference

16  when the state court 'has before it, yet apparently ignores,' evidence that is 'highly

17  probative and central to petitioner's claim.'"); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th

18  Cir. 2004) (state court decision involved an  unreasonable determination of facts where

19  the state court ignored "highly probative" evidence which was "central" to petitioner's

20  constitutional claim); *Bradley v. Duncan*, 315 F.3d 1091, 1096-1097 (9th Cir. 2002) (state

21  court decision involved an unreasonable determination of facts where it "overlooked"

22  facts which were critical to petitioner's claim and "turned a blind eye" to others).  Only

23  weeks ago the Ninth Circuit sitting en banc reiterated this precise point in finding that §

24  2254(d) did not bar de novo review because "[t]he California Supreme Court's decision to

25  ignore the compelling testimony these witnesses could have provided was objectively

26  unreasonable."  *Andrews v. Davis*, 944 F.3d 1092, 1112 (9th Cir. 2019).

27      Here, the habeas court ignored critical facts in finding that "the prosecutor

28  presented no evidence of when the petitioner entered the café."  Petition, Exhibit CC at 3.

Traverse and Supporting Memorandum          8

1   In making this finding, the state court did not discuss, or even reference, (1) the

2   prosecutor's argument to jurors that the video footage "puts defendant walking into his

3   café at about 6:47," (2) the prosecutor's argument that the video footage would prove that

4   defendant did not "enter[] his café" until the fire truck passed, (3) Officer Quisenberry's

5   specific testimony under questioning by the prosecutor that he reviewed the video footage

6   and it showed "the defendant enter[ing] the café at 6:47:38," or (4) Agent Sunseri's

7   testimony that petitioner was not seen in the café until after 6:47;29 when the fire engines

8   passed.  As the state's decision not to address this issue strongly suggests, while "[a]

9   rational fact finder might discount [this evidence] or, conceivably, find it incredible, . . .

10  no rational fact-finder would simply ignore it." *Taylor*, 366 F.3d at 1001.  Because that is

11  exactly what the state court did here, de novo review is proper.

12      De novo review is also warranted with respect to the habeas court's conclusion

13  that the state did not present false evidence in connection with the August 24 death threat.

14  Not only does this conclusion ignore the evidence presented and the state's own

15  concessions, but it ignores the habeas court's own findings.  Indeed, the habeas court's

16  ruling is almost incomprehensibly conflicting:

17
18          [The state presented] testimony that petitioner made a death threat to the
            victim in a telephone call on August 24. . . . .   Since trial, further
19          investigation demonstrates the August 24 call was probably made by Roy
            Endemann, in an effort to bolster the victim's request for a restraining order
20          against the petitioner. . . .

21          The court finds the prosecution did not present false evidence concerning
            the August 24 call.  Petition, Exhibit CC at 3.
22

23      There is a stark inconsistency in this ruling.  The habeas court correctly found that

24  (1) the state's trial evidence showed "petitioner made a death threat to the victim in a

25  telephone call on August 24" but, in fact, (2) "further investigation" shows that Roy

26  Endemann made the August 24 call.  These findings -- supported by the evidence -- are

27  utterly irreconcilable with the habeas court's conclusion that "the prosecution did not

28  present false testimony concerning the August 24 call."  If Roy Endemann made the

1   August 24 call, then petitioner did not.  And if petitioner did not make the call, then the

2   state presented false evidence.  It should have been just that simple.

3        The state court sought to explain the apparent inconsistency.  In doing so,

4   however, the state court relied on facts that were simply irrelevant to the claim.  This too

5   renders § 2254(d) inapplicable; where a state court decision relies on facts which have no

6   logical relevance to the constitutional claim being litigated, that decision is objectively

7   unreasonable and § 2254(d) will not bar relief.  *Penry v. Johnson*, 532 U.S. 782 (2001)

8   (state court's conclusion that jury's raw power to nullify satisfied Eighth Amendment

9   requirement that jury be permitted to consider mitigating evidence was "illogical" and §

10  2254(d) did not bar relief); *Greene v. Lambert*, 288 F.3d 1081, 1092 (9th Cir. 2002) (§

11  2254(d) no barrier to relief where state court rejected petitioner's constitutional claim by

12  relying on facts which "did not bear" on the claim).  Yet again, in its recent decision in

13  *Andrews*, the Ninth Circuit reiterated this precise point.  There, petitioner claimed defense

14  counsel was ineffective for failing to discover mitigating evidence which did not require

15  assistance from defendant's family.  The state court rejected this claim, explaining that

16  defendant had asked counsel not to seek assistance from his family.  Because this fact was

17  irrelevant to the claim actually raised, the Court concluded that the state court decision

18  was objectively unreasonable and § 2254(d) did not bar relief.  944 F.3d at 1111-12.

19       Here, the habeas court explained that no false evidence as to the call was presented

20  because at trial, the defense had offered rebuttal evidence that Ms. Schipsi had recanted

21  her allegation.  Petition, Exhibit CC at 4.  But as in *Penry*, *Greene* and *Andrews,* this

22  reasoning is a non-sequitur.  The state presented evidence that petitioner telephoned Ms.

23  Schipsi on August 24 and threatened to kill her.  The state now concedes (and the habeas

24  court itself found) this never happened.  The fact that defense counsel sought to rebut the

25  false evidence has nothing to do with whether the state presented false evidence in the

26  first instance.  As the habeas court itself found, "further investigation" proves the state

27

28

Traverse and Supporting Memorandum            10

1    presented false evidence.[1]

2       Because the state habeas court's conclusions as to falsity were objectively

3 unreasonable, de novo review is warranted.  As such, there is no reason to dwell at any

4 length on whether, as petitioner also discussed in his Petition, de novo review is required

5 for a second reason: the habeas court improperly applied a standard of prejudice squarely

6 contrary to Supreme Court authority.  Suffice it to say that in light of *Dow v. Virga*, 729

7 F.3d 1041 (9th Cir. 2013) the state does not dispute that the state habeas court applied a

8 standard of prejudice contrary to Supreme Court precedent.  Resp. Mem. 28-30.  As *Dow*

9 held, Supreme Court authority requires relief for false evidence if "there is any reasonable

10 likelihood that the false testimony *could* have affected the judgment of the jury."  729

11 F.3d at 1048.  In *Dow* (as here), the state court denied relief by finding there was no

12 "reasonable probability the outcome of the trial *would* have been different."  729 F.3d at

13 1046; Exhibit CC at 4.  *Dow* specifically held that application of a "would have been

14 different" standard to assess prejudice was contrary to Supreme Court precedent and

15 therefore de novo review was proper.  *Id*. at 1049.

16       But the state attempts a clever end-run around *Dow.*  The state accurately notes

17 that in his state petition, petitioner contended that the presentation of false evidence

18 violated both his state and federal rights.  Seizing upon this, the state argues that (1) the

19 fact that the state court applied an incorrect standard shows that it did not address the

20 federal claim, but only the state-law component of petitioner's claim and (2) because the

21 state court did not apply an incorrect standard to the federal claim, its ruling was not

22 contrary to Supreme Court precedent.  Resp. Mem. 28-30.

23

24 _____

25       [1]     This is especially true here, where the prosecutor presented his own rebuttal
26 witness to testify that 75% of recantations are false (12 RT 1332-33) and -- in reliance on
that expert testimony -- urged jurors to ignore the recantation and find that petitioner
27 made the August 24 threat.  22 RT 2535 (lines 9-12 and 15-18), 2542 (lines 22-23), 2543
(lines 19-27), 2557 (lines 16-18), 2560 (lines 14-17), 2561 (lines 20-21 and 24-27), 2562
28 (lines 21-23), 2610 (lines 2-4), 2627 (lines 22-25).

1    The state is too clever by half.   As an initial matter, by its terms § 2254(d) applies

2    only to claims which have been "adjudicated on the merits."  If in fact the state habeas

3    court did not address the federal claim, then § 2254(d) does not apply in the first instance.

4    As useful as this conclusion might be to petitioner, candor requires him to concede

5    that it seems unlikely.  In *Johnson v. Williams*, 568 U.S. 289 (2012) the Court addressed

6    this situation and held that "[w]here a state court rejects a federal claim without expressly

7    addressing that claim, a federal habeas court must presume that the federal claim was

8    addressed on the merits." *Id*. at 301.  The rationale behind this presumption is that often

9    "a line of state precedent is viewed as fully incorporating a related federal constitutional

10   right" and a state court could therefore "regard its discussion of the state precedent as

11   sufficient to cover a claim based on the related federal right." *Id*. at 299-300.

12   Although the state does not discuss it, that is exactly the situation here.  Insofar as

13   the standard of prejudice for false evidence is concerned, California law has long been

14   clear.  The same "would have been different" standard of prejudice used by the habeas

15   court here is routinely used to assess false evidence under both federal and state law.

16   "The use of false evidence to convict a criminal defendant offends due process where

17   such evidence is substantially material or probative; that is, if there is a reasonable

18   probability that, had it not been introduced, *the result would have been different*." *People*

19   *v. Roman*, 2018 WL 10068671, at *16 (2018).  *Accord People v. Romo*, 2004 WL

20   2580735, at *31 (2004) ("The knowing use of false testimony may violate due process

21   [under] *Napue v. Illinois* . . . .  Defendant . . . is not entitled to relief unless the false

22   evidence is shown to be substantially material or probative, I .e., there is a reasonable

23   probability that, had it not been introduced, *the result would have been different*.");

24   *People v. Moore*, 2010 WL 4816080, at *7 ("It is a violation of criminal defendants'

25   federal due process rights for the prosecution to present false testimony against them. . . .

26   [F]alse evidence passes the indicated threshold [of materiality] if there is a 'reasonable

27   probability' that, had it not been introduced, *the result would have been different*."

28

1   *People v. Moore*, 2010 WL 4816080, at \*7 (2010).[2]

2       In short, California state courts routinely apply the "would have been different"

3   standard to claims of false evidence whether raised under state or federal law.  This is

4   exactly the situation in which a federal court should apply *Williams* and presume the state

5   court "regard[ed] its discussion of the state precedent as sufficient to cover a claim based

6   on the related federal right."  568 U.S. at 299-300.  The state's contrary suggestion

7   ignores both the *Williams* presumption and state practice.  As in *Dow*, the state habeas

8   court's reliance on the "would have been different" standard to assess materiality does *not*

9   mean the state court ignored or failed to adjudicate the federal false-evidence claim, it

10  means the state adjudicated the claim by applying a standard contrary to Supreme Court

11  law.  *See Hernandez v. Lewis*, 2018 WL 1870449 at \* 31-35 (E.D.Cal. 2018) (defendant

12  raises false evidence claim under state and federal law, state court rejects the claim citing

13  California Penal Code § 1473 and applying the "would have been different" prejudice

14  standard; held, § 2254(d) does not apply under *Dow*). The state's proffered end run

15  around *Dow* should be rejected.  De novo review is proper.[3]

16

17

18      [2]      Unpublished California Courts of Appeal decisions have no precedential

19  value under California law but may be cited in federal court as a guide to what state law
    is.  *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1223 (9th Cir. 2015); *Roberts v. McAfee,*

20  *Inc.*, 660 F.3d 1156, 1167 (9th Cir. 2011); *Employers Ins. of Wausau v. Granite State Ins.*
    *Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir.2003).

21

22      [3]      The suggestion that the habeas court ignored the federal claim is also
    undercut by the habeas court's own statement that it had "review[ed] the pleadings, files,

23  briefs, evidence and arguments of counsel."  Petition, Exhibit CC at 1.  Petitioner's state-
    court habeas petition discussed his federal claim in detail.  Answer, Exhibit 7 at 11, 36-44

24  (Petition for Writ of Habeas Corpus).  Petitioner cited and discussed numerous false

25  evidence cases under federal law including *Alcorta v. Texas*, 355 U.S. 28 (1957), *Napue*
    *v. Illinois*, 360 U.S. 264 (1959), *Miller v. Pate*, 386 U.S. 1 (1967), *Giglio v. United States,*

26  405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976), *Maxwell v. Roe*, 628

27  F.3d 486 (9th Cir. 2010) and *Hall v. CDCR*, 343 F.3d 976 (9th Cir. 2003),  It is hard to

28  imagine how the state habeas court could have missed the issue as the state now suggests.

**C.     The Presentation Of False Evidence As To The Video Footage Violated Due Process**.

The state notes that petitioner must establish three elements to obtain relief based on the presentation of false evidence: (1) presentation of false evidence, (2) the prosecution knew or should have known that the evidence was false and (3) the false evidence was material.  Resp. Mem. 39.  With respect to the video footage, the state argues that (1) testimony about the video evidence was not false, (2) in any event, the prosecutor neither knew nor should have known of the falsity and (3) the false evidence was not material.  Resp. Mem. 39-47 (no false evidence); 54-56 (no knowledge); 56-71 (not material).  The state's arguments should be rejected.

**1.     The evidence was false**.

As noted above, the material facts are not really in dispute.  The defense was that petitioner could not have set the fire at the Addison Street cottage because he was at his Palo Alto café at the time.  20 RT 2013-2015.  The prosecutor destroyed petitioner's alibi by presenting evidence and argument that petitioner did not enter his café until 6:47:38 -- after the fire engine responding to the fire passed the café.  This time frame gave petitioner sufficient time to set the fire and arrive at the café at 6:47:38.  As the state admits, the prosecutor did not even wait until the presentation of evidence to respond, telling jurors in opening statements that petitioner did not "enter his café" until after the fire engines had passed.  2 ART 142-143.  In no uncertain terms the prosecutor elicited direct examination testimony from Officer Quisenberry that "we see the defendant enter" the café at 6:47:38.  13 RT 1420-1421.  The prosecutor then remained silent when Agent Sunseri --- who had prepared the two police reports which falsely stated petitioner did not enter the café until 6:47:38 -- explicitly agreed with "Quisenberry's analysis," and confirmed that petitioner did not appear in the Lorex video until after 6:47:29 when the fire engine passed.  15 RT 1727.  Evidence showing that, as the state now concedes, petitioner was in the café prior to 6:47:38 inescapably shows that the state presented false evidence and argument at trial.

The state resists this obvious conclusion for five main reasons. First the state notes the focus of the state-court evidentiary hearing was the 6:41 footage and the habeas court found petitioner was not the person who walked into the café at 6:41. Resp. Mem. 40. *Of course the state hearing focused on 6:41*; after all, the state had conceded everything else, admitting not only that petitioner was in the café at 6:47:12 and 6:45 "before the [video] clip shown at trial" but that the video footage showed he entered the café "earlier than discussed at trial." Petition, Exhibit DD at 41, 78. Because of the state's concessions the only question left for resolution was whether he arrived at 6:41.

To be sure, the state court did conclude that it was not petitioner entering the café at 6:41. This conclusion is puzzling. The state's concession that petitioner was already in the café at 6:45 necessarily means he had to arrive earlier to be in the café at 6:45. And for all the state's ardor in defending the conclusion that it was not petitioner who the video shows walking into the café at 6:41, in its entire 83-page memorandum the state does not suggest the video footage shows petitioner entering at any other time. Resp. Mem. 1-83. The fact remains that if petitioner was already in the café at 6:45, he had to have entered sometime earlier.

Petitioner recognizes that this glaring gap in the state's theory is not central to the question of whether false evidence was presented in the first instance. In deciding that predicate question, the state court's conclusion as to the 6:41 footage is irrelevant. The prosecutor's trial thesis was that defendant could indeed have started the fire because the video footage showed he did not enter the café until 6:47:38, after the fire engine had passed. The state now admits this thesis was false -- video footage shows that petitioner *was* already in the café at 6:45. In connection with deciding whether false evidence was presented, the state's admissions (and the video evidence) are directly contrary to the prosecutor's trial evidence and argument. Regardless of whether petitioner arrived at 6:40, 6:41 or 6:42, it is indisputable that the prosecutor's evidence and argument that he did not enter the café until 6:47:38 was false.

Second, although recognizing that the prosecutor argued petitioner "did not enter"

1  the café until 6:47:38, the state claims that false argument from a prosecutor "cannot form

2  the basis of a *Napue* claim." Resp. Mem. 42. The state is wrong; false arguments from

3  prosecutors are not immune from the reach of Due Process. To the contrary, as the Ninth

4  Circuit has repeatedly held, false arguments from a prosecutor do indeed violate *Napue*, at

5  least when combined with the presentation of false evidence. *See Dow*, 729 F.3d at 1045,

6  1049; *Brown v. Borg*, 851 F.2d 1011, 1017 (9th Cir. 1991). Here, as in *Dow* and *Brown*,

7  that is exactly what we have -- the combination of false evidence and argument.[4]

8      Third, the state argues that the testimony from Quisenberry and Sunseri, and the

9  prosecutor's argument, were not really false because they did not address when petitioner

10 *entered* the café, but only when he was *seen* at the café. Resp. Mem. 43, 45. The

11 argument need not long detain the Court; it runs headfirst into the actual language used.

12 The prosecutor asked Officer Quisenberry when petitioner "enter[ed]" the café." 13 RT

13 1420-1421. Agent Sunseri then explicitly agreed with what was called "Quisenberry's

14 analysis," and told jurors that petitioner did not appear on the Lorex video footage until

15 after 6:47:29 when the fire engines passed. 15 RT 1727. And the prosecutor told jurors

16 that "before the defendant has even walked into the café" the fire truck passed outside

17 and, only after the fire truck passed did "the defendant enter[] his café, at 6:47 p.m." 2

18 ART 142-143. These are all plain and obvious references to when defendant first entered

19 the café. The state's suggestion that "no juror could have understood" these references to

20

---

21      [4]      In support of its contrary argument the state cites *Napue*, 360 U.S. at 269
22 and *United States v. Zuno-Acre* 339 F.3d 886, 889 (9th Cir. 2003). Resp. Mem. 42. Both
23 cases hold Due Process does not permit the presentation of false evidence. Petitioner
   agrees. As the holdings in *Dow* and *Brown* make clear, however, Due Process also does
24 not permit prosecutors to make false arguments.

25      This is just common sense. Due Process does not permit witnesses in
26 criminal cases to give a "false impression" of the evidence. *Alcorta*, 355 U.S. at 31. That
   is as it should be. Under the state's thesis, however, although *witnesses* are not permitted
27 to give a false impression of the evidence, *prosecutors* are. Nothing in law or logic
28 commends such an approach.

Traverse and Supporting Memorandum           16

1  "suggest when defendant first entered or arrived" is made not by relying on the actual

2  record, but by ignoring it almost entirely.  Resp. Mem. 43.

3       It also runs head first into the context of what was said.  Prior to trial petitioner

4  told police, and he testified at trial, that he arrived at the café at 6:40-6:41.  20 RT

5  2013-2015.  Thus, the entire purpose of the state's introduction of Lorex video footage at

6  6:47:38 was to prove that petitioner was lying and his alibi was unsupported by the video.

7  Put another way, when petitioner happened to be "seen on the video" at the café was not

8  even remotely germane to the trial; when petitioner "arrived at the café" was critical.  The

9  state's suggestion that the prosecutor was interested in the former but not the latter

10  ignores not only what the prosecutor and his witnesses said but common sense as well.

11       Next, the state argues there can be no finding of false evidence because there was

12  no showing that officers Quisenberry and Sunseri committed perjury and lied about what

13  they saw on the video footage.  Resp. Mem.  45.  This is not the first time the state has

14  presented this same legal argument.  As an en banc panel of the Ninth Circuit concluded

15  in explicitly rejecting the argument, "[t]he State is wrong.  *Napue*, by its terms, addresses

16  the presentation of false evidence, not just subornation of perjury."  *Hayes v. Brown*, 399

17  F.3d 972, 981 (9th Cir. 2005).  *Accord Phillips v. Ornoski*, 673 F.3d 1168, 1183 (9th Cir.

18  2012).  In fact, contrary to the state's suggestion, the fact that a witness may believe he is

19  telling the truth makes the presentation of false evidence worse, not better:

20
21           The fact that the witness is not complicit in the falsehood is what gives the
             false testimony the ring of truth, and makes it all the more likely to affect
             the judgment of the jury. That the witness is unaware of the falsehood of his
22           testimony makes it more dangerous, not less so.  *Hayes*, 399 F.3d at 981.[5]

23
24       Finally, the state argues that no false evidence was presented because, in fact,

25       [5]    The state observes that, at least as to Agent Sunseri, the prosecutor himself

26  did not solicit the false testimony.  Resp. Mem. 44.  But the legal relevance of this

27  observation is not clear since Due Process is violated "when the State, although not

    soliciting false evidence, allows it to go uncorrected when it appears."  *Napue*, 360 U.S.

28  at 269.

1  jurors saw the video footage of petitioner in the café prior to 6:47:38.  Resp. Mem. 46-47.

2  There appear to be two separate components to this short argument.

3          First, the state briefly notes that while the habeas petition was being litigated in

4  state court, the same trial prosecutor who was accused of having presented false evidence

5  disputed petitioner's contention that the favorable video footage was not shown to the

6  jury.  Resp. Mem. 46.  To the extent the state is now arguing that jurors actually saw the

7  6:47:12 and 6:45 footage in open court, this argument ignores that very same prosecutor's

8  closing argument in which he told jurors that "its only after the fire truck arrives that the

9  defendant's seen on tape . . . ."  22 RT 2626.  Obviously if jurors had really been shown

10  footage showing what the state now concedes -- that petitioner was in the café prior to

11  6:47:29 when the fire truck passed -- the prosecutor would never have made this

12  argument.  The state's current position also ignores the state's own concessions that the

13  6:47:12 and 6:45 footage petitioner appended to his Petition: (1) "depicts petitioner at the

14  café . . . before the clip shown at trial," (2) shows petitioner in the café "earlier than

15  believed at the time of trial," and (3) shows petitioner in the café "earlier than discussed

16  at trial."  Answer, Exhibit 12 (State's Return) at 41, 59, 78.  The state cannot shift gears

17  now and credibly maintain now that these concessions were all wrong and that jurors

18  really did see the 6:45 and 6:47:12 footage at trial.

19          Alternatively, the state notes that the jury asked to have the Lorex video footage

20  during deliberations.  Resp. Mem. 46.  The state speculates that jurors may have seen the

21  footage on their own, and, if they did, then all the prosecutor did was "adduce

22  inconsistent evidence."  *Ibid.*

23           The irony of the state's argument should not be lost on the Court.  But first a word

24  about the Lorex video footage itself.  The Lorex system at issue here recorded footage

25  from eight different cameras at various time periods.  13 RT 1424.  Thus, in order to see

26  footage from any one camera at any one time, one would have to know exactly how to use

27  the system to go from camera to camera for any particular time.  13 RT 1425-1426.

28          Here, the state is correct that the entire Lorex video system was introduced into

Traverse and Supporting Memorandum             18

evidence and jurors asked to see it during deliberations.  The record shows that Agent Sunseri showed juror number 1 how to use the Lorex machine.  24 RT 2666-2675.  This was the same Agent Sunseri that had repeatedly viewed the Lorex footage prior to trial and prepared two police reports provided to the defense falsely explaining that the video footage did not show petitioner "enter[ing] the café" until 6:47:38, after the fire engine passed.  Petition, Exhibit A at 9; Exhibit B at 1.

There are only two possible explanations for these police reports.  The best case scenario from the state's perspective is that Agent Sunseri simply did not know how to work the Lorex and so in reviewing the footage prior to trial, he was unable to see the footage from cameras 4 and 7 which the state now concedes shows petitioner in the café before the fire engine passes.  In good faith, Agent Sunseri then prepared his police reports accordingly.  If that is the case, it seems unlikely that jurors shown how to use the Lorex machine by that same Agent Sunseri would somehow see footage he himself did not see.[6]

In short, the state's argument that the prosecution merely "adduced inconsistent evidence" is based on speculation that jurors saw the 6:45 and 6:47:12 footage on their own.  And that speculation rests entirely on a further speculation that based on Agent Sunseri's instructions as to how to use the Lorex system, jurors would see what he himself could not.  Nothing in the record even remotely supports these speculations.

---

[6]     The more nefarious explanation, of course, is that Agent Sunseri *did* know how to work the Lorex machine, *had* seen petitioner on the footage but intentionally prepared false police reports.  This is a much darker scenario; regardless, in this situation it again seems unlikely that Sunseri would have then instructed jurors on how to use the Lorex to discover his falsity.  Petitioner takes no position on which explanation is more likely -- in either case, it is unlikely jurors would have been able to see the footage which was not shown at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**2.    Because the prosecutor has sworn under oath that he reviewed all the Lorex footage at least 20 times, and because that footage was in his own file, the prosecutor knew or should have known of the falsity**.

The state argues that even if false evidence was presented petitioner's conviction must nevertheless stand because the prosecutor neither knew, nor should have known, of the falsity.  Resp. Mem. 54-56.  The state does not deny that at all times the Lorex video footage has been in the prosecution's possession.  The state would be hard-pressed to deny this; when petitioner's post-conviction counsel tried to investigate the issue, the trial prosecutor resolutely refused to provide any footage, requiring petitioner to obtain a court order forcing the prosecutor to provide the footage.  Petition, Exhibit J.  Nor is there any dispute as to whether the prosecutor examined the video footage prior to trial.  The prosecutor himself provided a sworn declaration stating that he had reviewed the Lorex footage "at least 20 times."  Answer, Exhibit 12 (State's Return) at 29.

But despite all this, the state argues the prosecutor could not have known of the falsity because "it is not until roughly 6:47:36 that petitioner appears with any clarity." Resp. Mem. 55.  This is patently false.

The Court itself can examine the footage.  But it is worth noting that after examining at the video footage in state habeas proceedings, the state affirmatively conceded that the footage showed petitioner inside the café prior to 6:47:38, admitting that petitioner was indeed already in the café at both 6:47:12 and 6:45.  Petition, Exhibit DD at 41-42.  The state repeats that concession here.  Resp. Mem. 42.  The state did not admit these important facts because "it is not until roughly 6:47:36 that petitioner appears with any clarity."  The state admitted these facts because (1) as to 6:47:12, the footage clearly and unmistakably shows petitioner in the café and (2) as to 6:45, the state's own theory of the case recognized there were only three people in the café at this time -- defendant and his two employees, Ahmed Alaghbash and Jehad Al-Batawnah – and the 6:42 to 6:45 footage shows all three of them.  Petition, Exhibits L, N.

In short, given the clarity of the 6:47:12 footage, the state's recognition that the

6:45 footage shows petitioner and the prosecutor's admission to viewing the video "more than 20 times," if the prosecutor did not know of the falsity, he certainly should have.

### D. The Presentation Of False Evidence As To The August 24 Death Threat Violated Due Process.

The state makes the same arguments with respect to the August 24 death threat that it made in connection with the video evidence, arguing (1) the testimony about the August 24 threat was not false and (2) in any event, the prosecutor neither knew nor should have known of the falsity. Resp. Mem. 47-54. These arguments must be rejected here as well.

### 1. The evidence was false.

Police Officer Moore, a prosecution witness, testified on direct examination that on the afternoon of August 24, 2009 -- only seven weeks before the murder -- Ms. Schipsi called police to report a threatening call she had received from petitioner. 16 RT 1766-1767. Moore responded to the call, arriving at Schipsi's home at 1:30. 16 RT 1766. Schipsi told Officer Moore that petitioner "had called her and had threatened her life over the phone." 16 RT 1767. Schipsi said the call was "earlier that day" and that petitioner called her a "bitch" and "said that he was going to kill her." 16 RT 1767-1769. The prosecutor then had Officer Moore describe Ms. Schipsi's reaction to this threatening call – Moore said Ms. Schipsi was "very scared," "nervous," and in "fear for her life." 16 RT 1767-1769. Jurors heard that the call came from a blocked number. 16 RT 1786.[7]

As the state now concedes, telephone records and police reports now show that none of this was true. The state admits (1) Schipsi told Moore the threatening call came in at 12:50 that afternoon, (2) the call was from a blocked number, (3) the 12:50 call from a blocked number was not from petitioner, but from Schipsi's friend, Roy Endemann, (4) after trial, Endemann told police that Schipsi had asked him to call her from a blocked

---

[7] In addition to Moore, the prosecutor called Leslie Mills and Heather Winters. Mills testified that Schipsi telephoned her on a Monday in August 2009 -- when police were present at her house – and said that petitioner threatened to kill her. 16 RT 1781-1784. Winters testified that she too spoke with Schipsi in August 2009 and Schipsi said petitioner had threatened to kill her. 16 RT 1642.

number so she could tell police petitioner was making harassing calls to her.  Resp. Mem. 48-49.  These concessions should resolve whether false evidence was presented.

Unfortunately, they do not.  The state resists the obvious, first arguing that "little of the evidence discussed here is 'new' . . . ."  Resp. Mem. 47-48.  The assertion is both legally irrelevant and factually wrong.  As a legal matter, the question is not whether evidence is new, the question is whether the evidence was false.  As to that question the answer is clear.  At trial, the state introduced evidence that petitioner called Schipsi on the afternoon of August 24 and threatened to kill her, seven weeks before she was murdered.  As is now clear, and as the state habeas court actually found, "[s]ince trial, further investigation demonstrates that the August 24 call was probably made by Roy Endemann, in an effort to bolster the victim's request for a restraining order against the petitioner."  Petition, Exhibit CC at 4.  The state presented false evidence.[8]

Alternatively, the state spills a fair amount of ink arguing that the "evidence does not clearly show" that prosecution witnesses Mills and Winters were referencing the August 24 threat.  Resp. Mem. 51-54.  In connection with assessing whether the state presented false evidence, this point too is both legally irrelevant and factually wrong.

Accepting for a moment that the state is right about Mills and Winters -- and that both happened to testify about a different threat received on a different Monday in August 2009 when police happened to be at Ms. Schipsi's home -- this would not alter the fact that the state presented false evidence from Officer Moore about the August 24 threat.

---

[8]     The state's suggestion that there is no new evidence here in connection with the August 24 threat is also wrong.  The records and testimony which definitively establish the falsity of the state's August 24 evidence were not before the jury at all, including: (1) Officer Moore's police report showing that Ms. Schipsi said she received the threatening call at 12:50, (2) Roy Endemann's telephone records showing it was he who made the 12:50 call, (3) Roy Endemann's police interview where he admitted that Ms. Schipsi had asked him to make the call so she could falsely report it to police, (4) Heather Winters' telephone number and (5) the transcript of Ms. Schipsi's call to Heather Winters on August 24.

Moore told jurors Schipsi said she had received the telephonic death threat from petitioner on August 24. No ifs, ands or buts. The evidence shows, the state has conceded and the state habeas court found that this did not happen. So the testimony of Mills and Winters has nothing to do with whether false evidence was presented. It was.

Having said that, the state's suggestion that Mills and Winters were testifying about something other than the August 24 death threat cannot be reconciled with the record. While it is true that Ms. Mills did not recall the actual date of the call she received from Ms. Schipsi, she did recall that (1) it was a Monday, (2) it was in August 2009 and (3) police were at Ms. Schipsi's house at the time of the call. 16 RT 1781-1784. It so happens that August 24, 2009 -- the date of the purported threat -- was indeed a Monday in August. And as Officer Moore's testimony shows, police were present at Ms. Schipsi's home that day. Nothing in the record even remotely suggests there was a separate telephone threat, occurring coincidentally on another Monday in August when, again coincidentally, police just happened to be at Ms. Schipsi's home.

As for Ms. Winters, she told the jury that Ms. Schipsi telephoned her in August 2009 and said that petitioner threatened to kill her. 15 RT 1642. Telephone records show that Ms. Schipsi made the call to Ms. Winters on the same day Schipsi spoke with Mills -- August 24. Petition, Exhibit W at 7; Exhibit LL. A recording of that call shows that Schipsi told Winters petitioner threatened to kill her and called her a bitch. Petition, Exhibit MM. This description of the threat matches almost exactly the description Schipsi gave to Officer Moore in describing the August 24 call; petitioner called her a "bitch" and "said he was going to kill her." 16 RT 1767-1768. The state's suggestion that Mills and Winters were testifying about some other identical threat, on some other Monday in August when police were at Ms. Schipsi's home, is simply unsupportable.[9]

---

[9]     In a footnote, the state references the "murky nature of the August 24 threat." Resp. Mem. 50, n.19. It is not clear what is "murky" about the threat; certainly the August 24 threat certainly did not seem "murky" to the trial prosecutor who told jurors "[t]here's only one person who . . . told her not seven weeks before he killed her

**2.    Because it was the prosecutor himself who subpoenaed Endemann's telephone records, and because those records and the relevant police reports were all in the prosecutor's file, he knew or should have known of the falsity**.

Yet again the state argues that petitioner's conviction must stand even with the false evidence because the prosecutor neither knew, nor should have known, of the falsity. The state does not deny that it was the prosecutor who subpoenaed Endemann's telephone records, and at all points he had those records in his possession. To the contrary, the state admits that the prosecutor provided these telephone records to defense counsel in discovery. Resp. Mem. 48.

The state nevertheless argues that the prosecutor neither knew nor should have known the August 24 evidence was false. But the state studiously avoids asking -- or answering -- the obvious question: why did the prosecutor subpoena Roy Endemann's telephone records for the specific date of August 24, 2009 in the first place?

The answer is just as obvious. Officer Moore's report showed that the threatening call came it at 12:50 on the afternoon of August 24. Petition, Exhibit V at 4. To trace the call, the prosecutor obtained Ms. Schipsi's telephone records which showed that (1) the 12:50 call came from (831) 207-2669 and (2) Ms. Schipsi called police to report the threat at exactly 12:51 p.m. -- only one minute after the alleged threatening call came in. Petition, Exhibit W at 4; Exhibit S at para. 4.

2 + 2 = 4. The prosecutor knew the threat came in at 12:50. He knew it came from (831) 207-3669. The next step was obvious -- subpoena the telephone records for (831) 207-3669 to see who placed the 12:50 call. And that is exactly what he did. When the records for (831) 207-3669 were provided they showed what the state now concedes -- that (831) 207-3669 belonged *not* to petitioner but Roy Endemann. Petition, Exhibit Y.

_____

that he was going to kill her" (22 RT 2535, lines 9-12) and then relied on that same "murky" threat 10 more times throughout closing argument. 22 RT 2535 (lines 15-18), 2542 (lines 22-23), 2543 (lines 19-27), 2557 (lines 16-18), 2560 (lines 14-17), 2561 (lines 20-21 and 24-27), 2562 (lines 21-23), 2610 (lines 2-4), 2627 (lines 22-25).

1   Petitioner does not, of course, know whether the prosecutor ever actually looked at

2   Mr. Endemann's telephone records.  It seems logical to assume he did; after all, why else

3   subpoena those records if not to examine them?  Regardless, given the only reason the

4   prosecutor sought these records -- to see who made the 12:50 call -- if the prosecutor did

5   not actually know his allegations about the August 24 threat were wrong, he certainly

6   should have.  All he had to do was look.

### E.   Because False Evidence About The Video Footage Undercut Both Petitioner's Credibility And His Alibi, And Because The Prosecutor Made The False Death-Threat Testimony A Central Part Of The State's Case, The False Evidence Was Material.

Petitioner's entire defense depended on jurors finding him credible, and having a

reasonable doubt as to his guilt based on his alibi.  Here, the state's false evidence and

argument: (1) allowed the state to destroy both the alibi and petitioner's credibility with

unrebutted video evidence (2) prevented petitioner from raising a reasonable doubt as to

his alibi and (3) allowed jurors to believe that only weeks before Ms. Schipsi was

murdered petitioner threatened to kill her.  Under the facts of this case, the false evidence

was plainly material.

The state disagrees.  According to the state, the false evidence was immaterial

because (1) the video evidence only modified the state's time line by 106 seconds leaving

sufficient time for petitioner to set the fire and arrive at the café, (2) the time the fire was

started was unknown, (3) it only takes four minutes to drive from the cottage to the café,

so petitioner could set the fire and still arrive at the café when he said he did and (4) other

evidence showing petitioner's identity as the killer was "overwhelming."  Resp. Mem. 56-

71.  None of these arguments have merit.

Petitioner will start with the state's "106 second" argument.  The state's math is as

follows; at trial, the state's position was that petitioner did not enter the café until 6:47:36,

whereas the state now recognizes he was already in the café at 6:45:50.  The difference

between the two is 106 seconds.  Thus, the state refers to this 106 second time difference

Traverse and Supporting Memorandum            25

1   over and over again and argues that it was immaterial.  Resp. Mem. 30, 56, 78.[10]

2       But the state has missed a basic point referenced above; jurors presented with

3   *accurate* evidence that petitioner was already in the café at 6:45 would have to decide

4   when petitioner actually arrived at the café, and whether that time raised a reasonable

5   doubt as to whether petitioner committed the crime.  In contrast, a jury presented with

6   *false* evidence that video footage proved petitioner did not enter the café until 6:47:38 did

7   not have to decide when petitioner entered the café at all.  Here, jurors were able to reject

8   petitioner's alibi -- and find that he was lying -- based on the state's presentation of

9   unrebutted video evidence which the state itself now concedes was false.  The state's

10  post-conviction admission that the video footage puts petitioner inside the café prior to

11  the "clip shown at trial" comes too late -- jurors never knew what the state now concedes.

12      In an alternative effort to show immateriality the state attacks the timeline of the

13  fire, arguing the evidence did not establish "a specific time when the fire started."  Resp.

14  Mem. 66-68.  As is typical in arson cases, pinning the start down to the second is simply

15  not possible.  That said, (1) several state witnesses reported passing the cottage at 6:25 to

16  6:35, defendant's car was not in front of the cottage and nothing was amiss, (2) the fire

17  was reported at 6:39 to 6:40 and (3) after examining all the evidence, the state's own fire

18  expert agreed the fire was a fast-developing fire set between 6:35 and 6:40.  1 RT 220; 2

19  RT 294; 7 RT 287, 295-296, 655, 678, 692, 694, 717-718.  The state's speculation that its

20  own eyewitnesses and fire expert are all wrong finds no support in the record.

21      Nor will the record support the state's suggestion that the false video evidence was

22  immaterial because, in fact, it only takes four minutes to travel from the cottage to the

23

24      [10]    In his Petition, petitioner relied on testimony from Officer Quisenberry that
25  petitioner is first seen entering the café at 6:47:38.  13 RT 1426.  The state relies on a
    separate portion of testimony from Officer Quisenberry that the Lorex footage shows
26  petitioner entering the café two seconds earlier at 6:47:36.  13 RT 1430.  It is on this time
    -- 6:47:36 -- that the state bases it's 106 second time frame.  For purposes of this
27  Traverse, the difference between 6:47:38 or 6:37:36 makes no difference to the
28  materiality calculus.

1  café.  Resp. Mem. 69, 71.  The state bases this statement of fact not on any test runs it

2  performed, but on a claim that "[i]t took [Fire] Engine One about four minutes to travel

3  between the fire station [at Alma and Lytton Streets] and the cottage."  Resp. Mem. 69.

4      The state's reliance on Engine One is baffling.  The time it took Engine One to get

5  from the fire station to the cottage is relevant only if Engine One passed the café at some

6  point.  But here, not only was there no evidence showing that Engine One ever passed the

7  café on the way to the cottage, but the record affirmatively shows precisely the opposite.

8  Fire dispatcher Audrey Bates testified that she was "not sure which route [Engine One]

9  would take" (7 RT 742), and -- as the state admits in a footnote -- "Captain Macias [fire

10  caption of Engine Six] testified that the other fire engines *did not pass the hookah [café]*"

11  on University Avenue.  Resp. Mem. 69, fn. 29, emphasis added.  Although the state

12  buries this concession in a footnote, it is fatal to its argument that Engine One passed the

13  café.  In short, the time it took Engine One to arrive sheds no light at all on how long it

14  took to drive from the cottage to the café.

15      In contrast to Engine One, Engine Six started at the Stanford campus at 6:43 p.m.,

16  traveled down University Avenue past the café, and arrived at the cottage at 6:55 p.m..  7

17  RT 738.  There was no dispute that Engine Six drove the route between the café and the

18  cottage; as noted, Engine Six's captain, Captain Macias, testified to it.  14 RT 1603-1604.

19  Since as the state concedes, the record shows the other fire engines "did not pass the

20  hookah café," it follows that Engine Six was the fire engine whose flashing lights can be

21  seen passing the café at 6:47:29.  Thus, with engines blaring, it took eight minutes for

22  Engine Six to get from the café to the cottage where it arrived at 6:55 p.m..  7 RT 738.[11]

23

24      [11]    The state now argues that based on Captain Macias's testimony his fire
25  truck was not the truck seen passing the café at 6:47 on University Avenue.  Resp. Mem.
26  69.  The state notes that at trial, Macias said that his truck passed the café at 6:43.  14 RT
27  1604.  Thus, the state argues it could not have been the truck pictured in the Lorex video
    at 6:47.  Resp. Mem. 69.

28

Traverse and Supporting Memorandum            27

This eight minute figure was confirmed by 10 separate test drives by four different investigators, where the average time to drive from the cottage to the café (without blaring sirens) was eight minutes and the average time to park and enter the café was 5 minutes, for a total of 13 minutes.  Pet. Mem. 26-37, n.15, Pet. Exhibits S-U.  The state argues that "the test drives are irrelevant because the materiality of allegedly false or withheld evidence is made by examination of the *trial record*."  Resp. Mem. 70, emphasis in original.  But this is not the standard for assessing materiality in *Brady* cases.  *See, e.g. United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir 1989) (materiality determined by examining the suppressed evidence in the context of the trial record as well as considering what admissible evidence the suppressed evidence would have lead to); *see also Unites States v. Kohring,* 637 F.3d 895, 903 (9th Cir. 2011).  The state fails to explain why this Court should chart such a starkly different path here and blind itself to obvious steps the defense would have taken had the state not presented the false evidence to begin with.

Finally, the state argues that the false evidence was immaterial because "the evidence of identity was overwhelming."  Resp. Mem. 56.  In making this argument, however, the state does not address any of the basic problems in the case against petitioner.  Police zeroed in on petitioner as a primary suspect within hours of the crime, and searched petitioner, his cars and the café; they found nothing.  9 RT 944; 13 RT 1444-1451; 16 RT 1739.

In fact, what police did find affirmatively suggested petitioner could *not* have been

---

The state's current position is remarkable.  At trial, the prosecutor specifically advised jurors Macias's time-line was wrong.  22 RT 2549.  And Macias being wrong was critical to the state's theory at trial.  After all, if Macias was correct (as the state's post-conviction lawyers now argue), it would mean that (1) the fire truck passed at 6:43 and (2) petitioner was in the café seconds later and (3) the state's evidence and argument that petitioner did not arrive until 6:47:38, more than four minutes later, was yet again patently false.  Moreover, if the state's current theory about Macias is correct, this hardly helps the state's position.  If Engine Six passed by the café at 6:43 then it did not take eight minutes to get to the cottage at 6:55, it took twelve.  7 RT 738.

the killer. Ms. Schipsi, whom witnesses described as athletic, was strangled; based on her position on the bed when police found her, Agent Sunseri believed she had struggled with her attacker. 4 RT 496; 16 RT 1737. Police noted she had long nails, and conceded that if she attempted to fight off her attacker, they would expect to see defensive wounds on the perpetrator, such as cuts or scrapes. 14 RT 1553. When police examined petitioner for such wounds, they found nothing. 14 RT 1552-1554; 16 RT 1739.

Police found a red melted gas container on the bed near Ms. Schipsi's body. 2 RT 171; 9 RT 1004. The state's fire expert believed someone poured gas from the can onto the bed and lit the gas with a lighter or a match. 3 RT 287-288. Police used six or seven detectives to connect petitioner to the purchase of this gas can, or even the purchase of gas -- including a search of his credit and debit card receipts for evidence showing he purchased a gas canister. 8 RT 1002-1003, 1006; 17 RT 1839. They found nothing.

Of the many eyewitnesses who passed by the cottage shortly before the fire started, one was petitioner's landlord, John Ecklund. Ecklund knew petitioner's car and did not see petitioner or his car outside the cottage when he walked by the cottage at both 6:25 and 6:35. 7 RT 692-694, 716. And petitioner's actions were certainly consistent with innocence; he waived his rights, spoke with police and voluntarily gave them the clothes he was wearing that night. 14 RT 1552l 16 RT 1720, 1722.

The state nevertheless argues that evidence of identity was "overwhelming." Because petitioner has already addressed the majority of this evidence in his Petition, his response will be brief. *See* Pet. Mem. 52-53.

The state suggests the clothes petitioner was wearing on the day of the fire showed the presence of gasoline, and this shows he set the fire. Resp. Mem. 60. According to the state "petitioner disputes the prosecutor's suggestion there was gasoline on his clothing . . . but the jury already heard and rejected the arguments he makes here." Resp. Memo. 60. In fact, jurors heard nothing of the sort. Here is what jurors actually heard.

State witness and forensic chemist Katherine Hutches tested petitioner's sweatshirt and found she could *not* "identify an ignitable liquid." 9 RT 1036, 1064-1065. She tested

his jeans and did *not* "note any peaks from what I would expect to see for an ignitable liquid." 9 RT 1042. She tested his socks and "was *not* able to identify an ignitable liquid." 9 RT 1054, 1055-1056. And the official laboratory report confirmed that petitioner's clothing was "negative . . . [for] ignitable liquids." 3 RT 285.

Next, the state relies on the testimony of state expert Jim Cook to argue that "[t]hough Schipsi was apparently never without her phone, cell phone records showed it traveled with petitioner's phone on the afternoon of the murder down the peninsula and back." Resp. Mem. 61. In the state's view, this showed that after killing Ms. Schipsi, petitioner took her phone and had it with him.

In making this argument, the state ignores not only that Mr. Cook's testimony was completely debunked, but that his conclusions were physically impossible. Mr. Cook based his conclusion on his belief that cell tower location records for calls *received* on Ms. Schipsi's AT&T telephone showed the location of *Ms. Schipsi's* telephone. 11 RT 1096, 1185-1187. In contrast, AT&T engineer Lawrence Velasquez explained that because both petitioner and Schipsi were AT&T subscribers, when Ms. Schipsi did not answer her phone, her records recorded the location of the *caller's* phone (in this case Mr. Zumot) not her phone. 18 RT 1912-1914. Thus, the billing records did *not* show that the two phones traveled together between Palo Alto and San Jose. 18 RT 1914.

In other situations, this might simply be characterized as a dispute among experts. But here, there was significantly more. The cross-examination of Mr. Cook as to his understanding of the AT&T records was, in a word, devastating. Mr. Cook admitted that if his view of Ms. Schipsi's telephone records was correct -- that is, they showed the location of Ms. Schipsi's telephone rather than the caller -- then:

- On the morning of September 12, 2009 Ms. Schipsi's was in San Jose at 9:02 a.m. but in Lahaina, Hawaii only seven minutes later. 12 RT 1253-1254.

- On September 9, 2009 Ms. Schipsi was in Palo Alto at 6:42 a.m. and in Lahaina, Hawaii less than two hours later. 12 RT 1251-1253.

- On September 14, 2009 Ms. Schipsi was in Palo Alto at 11:33:06,

but was more than 15 miles away in San Mateo only four seconds later.  12 RT 1255-1257.

- On October 11, 2009, Ms. Schipsi was in Brentwood at 1:13:36, but she was more than 39 miles away in East Palo Alto only four seconds later.  12 RT 1257.

- On September 14, 2009 Ms. Schipsi was in Palo Alto at 8:20, she was in Lahaina, Hawaii 23 minutes later, and she was back in East Palo Alto less than 20 minutes later.  12 RT 1272-1273.

Defense counsel took Mr. Cook through a series of similarly impossible situations dictated by Cook's flawed understanding of the AT&T records.  12 RT 1257-1312.  That the state now relies on Mr. Cook's testimony despite it being exposed as physically impossible speaks volumes about the "overwhelming" case the state now seeks to defend.

Finally, the state argues that the false evidence of the August 24, 2009 telephonic death threat was "immaterial in light of his other threats and long history of domestic abuse and harassment of Schipsi."  Resp. Mem. 57.  The state not only misstates the record, but it misses the significance of the August 24 threat as well.

As an initial matter, the state's suggestion that there were other death threats is false.  Resp. Mem. 50, 58-59.  Significantly, the state provides no record cite to support this assertion.  Resp. Mem. 50, 58-59.  To the extent the state is relying on the testimony from Leslie Mills and Heather Winters to support this factual assertion (Resp. Mem. 58), the state is wrong.  Petitioner has already addressed this assertion, in Argument I-D-1 above at page 23.  As discussed there in some detail, Winters and Mills were testifying about the same August 24 threat, not some other, undefined and undated threat.

To be sure, the state is correct that there was evidence of domestic violence and harassment between petitioner and Ms. Schipsi.  But these incidents -- even if believed entirely -- involved such conduct as spitting at Ms. Schipsi, kicking her car and slapping her.  In contrast, the August 24 incident involved a death threat from the person charged with murdering her only weeks after the threat was made.  The state's patently false evidence did not involve some stray insult, or a minor incident, but a direct threat to kill

made shortly before Ms. Schipsi was killed.[12]

Equally important, the now concededly-false evidence as to the August 24 death threat calls into question the state's reliance on many of these other domestic violence incidents.  The telephone records, police reports and Endemann interview unequivocally show not only that petitioner never made the August 24 threat, but the blocked call Ms. Schipsi received that day was from her friend Roy Endemann, at her own request, for the precise purpose of concocting evidence against petitioner.  As Mr. Endemann admitted:

> Jennifer was trying to file a… like an emergency order stay away order, and he had already been around that time calling a lot - calling her a lot. And so she was having me call from a blocked number so then it looked like she had more blocked calls.

Petition, Exhibit KK at 3.

The new evidence from Roy Endemann places much of the remaining harassment evidence in a dramatically different light.  Just like the August 24, 2009 threat, much of the state's remaining domestic violence evidence depended largely (and sometimes solely) on Ms. Schipsi's own self-reporting about acts of domestic violence.

Much of this evidence is troubling in a way the estate does not discuss.  In August 2009 -- the same month Ms. Schipsi made up the story about a telephonic death threat -- she self-reported to police that Mr. Zumot crashed his car into her parked car.  14 RT 1567.  Police investigated, located Mr. Zumot's car, found no damage consistent with Ms. Schipsi's story and concluded her claim was "unfounded."  14 RT 1568.  In March of 2008, she self-reported to police that petitioner assaulted her.  13 RT 1475-1480.  Police investigated and found no injuries at all to support this allegation.  13 RT 1475, 1485.

Nevertheless the prosecution introduced and relied on these (and other) self-

---

[12] The state correctly notes that petitioner and Ms. Schipsi "had a fight the night before the murder."  Resp. Mem. 59.  But the state fails to mention the couple had made up before the morning because Detective Sunseri found a video on Ms. Schipsi's phone of them making love at 3:52 a.m. on October 15, 2009.  16 RT 1742.

Traverse and Supporting Memorandum          32

reported incidents of domestic violence.  After all, no evidence suggested Ms. Schipsi would simply make up these incidents.  But the Endemann interview casts these and other self-reported incidents in a very different light; it unequivocally shows that Ms. Schipsi was willing to falsely report incidents of abuse to police.  In short, the truth about the August 24 telephone call not only undercuts the state's reliance on that specific death threat, but it undercuts reliance on other incidents of harassment as well.

Significantly, the prosecutor referred to this death threat 11 times during his closing arguments.  Resp. Mem. 56-71; 22 RT 2535 (lines 9-12 and lines 15-18), 2542 (lines 22-23), 2543 (lines 19-27), 2557 (lines 16-18), 2560 (lines 14-17), 2561 (lines 20-21 and lines 24-27), 2562 (lines 21-23), 2610 (lines 2-4), 2627 (lines 22-25).  According to the prosecutor, the death threat from petitioner was evidence the jury could rely on to convict of murder because "there's only one person who had the motive, the opportunity, the desire, and, in fact, told [Ms. Schipsi] not seven weeks before he killed her that he was going to kill her and he was going to burn her house down."  22 RT 2535.

The state ignores the prosecutor's repeated references to the August 24 death threat throughout closing argument.  But the Ninth Circuit takes a decidedly different view.  *See*, *e.g.*, *Dow*, 729 F.3d at 1049-1050 (in holding false testimony material, requiring a grant of habeas relief, court examines "prosecutor's arguments based on that testimony."); *Hayes*, 399 F.3d at 986 (same); *Brown*, 851 F.2d at 1017 (same).  "[T]he force of a prosecutor's argument can enhance immeasurably the impact of false or inadmissible evidence."  *Brown*, 851 F.2d at 1017.  The Supreme Court agrees, granting relief where in closing argument the prosecutor "consisten[ly] and repeated[ly]" relied on false evidence. *Miller*, 386 U.S. at 6.  *Accord Blumberg v. Garcia*, 687 F.Supp.2d 1074, 1127 (C.D.Cal. 2010) (granting habeas relief based on presentation of false evidence where '[o]ne need look no further than the prosecutor's closing argument to appreciate the full measure of [the false] testimony to the prosecution's case.").  Here, too, because the prosecutor "consistently and repeatedly" referenced the false evidence, the Court "need look no further than the prosecutor's closing argument" to see how important the

1  false evidence was to the state's case.[13]

2      In the final analysis, all petitioner had to do with his testimony was raise a

3  reasonable doubt.  In a case where the entire defense theory was to raise a reasonable

4  doubt by having defendant testify credibly about his alibi, false evidence as to the

5  viability of that alibi and petitioner's credibility, and false evidence that petitioner

6  threatened to kill the victim only seven weeks before her murder, were plainly material.

7  **II.   TRIAL COUNSEL'S FAILURE TO EXPOSE THE STATE'S FALSE
8         EVIDENCE IN CONNECTION WITH BOTH THE VIDEO EVIDENCE
          DESTROYING PETITIONER'S ALIBI AND CREDIBILITY, AND THE
          AUGUST 24 DEATH THREAT, REQUIRE RELIEF.**

9      Petitioner alleged that defense counsel's failure to correct the state's false evidence

10 violated his right to the effective assistance of counsel.  Defense counsel has forthrightly

11 conceded he had no tactical reason for failing to correct the state's false video or death-

12 threat evidence.  Petition, Exhibit E at paras. 12, 14-15, Exhibit PP at para. 10.  The state

13 habeas court rejected this claim.

14     The state first argues that the superior court's ruling constituted a summary denial

15 and, as such, this Court "must determine what arguments or theories supported or, as

16 here, could have supported, the state court's decision; and then it must ask whether it is

17

18 _____

19     [13]    The state notes that the jury requested the phone records for Ms. Schipsi
20 and petitioner.  Resp. Mem. 59.  But this actually made matters worse.

21     Roy Endemann's phone records – (831) 207-2669 -- were *not* introduced
22 into evidence.  Ms. Schipsi's telephone records *were* introduced.  The problem is that
   without Endemann's phone records, Ms. Schipsi's records did not aid the defense.
23 Instead, they actually confirmed what jurors heard from Officer Moore -- that Ms. Schipsi
   had received a blocked call at 12:50 on August 24 and called police.  Even if jurors were
24 savvy enough to do what defense counsel did not -- and compare the telephone number
   associated with the 12:50 call with petitioner's telephone records -- all they would have
25 learned was that the 12:50 call was not made from that particular telephone number.
26 Without affirmatively knowing who owned the (831) 207-2669 number that had placed
   the 12:50 call, the telephone records gave no reason to doubt Ms. Schipsi's statements
27 that petitioner made the call, albeit from a different number.

28

Traverse and Supporting Memorandum        34

possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Resp. Mem. 72. On the merits, the state argues that counsel's complete failure to expose the truth about either the video evidence or the August 24 threat was entirely reasonable. Resp. Mem. 75-79 (video evidence); 79-81 (August 24 threat). Alternatively, the state reincorporates the prejudice argument made in connection with the false evidence claim and argues that any deficient conduct was harmless. Resp. Mem. 81.

The state's arguments should be rejected. As the state itself recognizes elsewhere in its Answer, the state habeas court's ruling here was *not* a summary denial, it was a reasoned decision. Accordingly, because the reasoned decision ignores critical facts, the state has the standard of review wrong. On the merits, not only has counsel himself conceded the lack of any tactical reason for his failures, but the state suggests no genuinely plausible reasons why counsel would want the jury deciding his client's fate to think petitioner (1) lied about his alibi and (2) threatened to kill the victim only seven weeks before her murder. Relief is required.

### A.    De Novo Review Is Appropriate.

On page 2 of its supporting memorandum, the state accurately notes that in November 2016, the state superior court denied petitioner's claims "in a reasoned decision." Resp. Mem. 2. In contrast, the state observes that subsequent state habeas petitions were "summarily denied" by the state appellate and supreme courts. *Ibid*.

On page 28 of its supporting memorandum, the state accurately notes that the superior court issued a "reasoned decision" in this case. Resp. Mem. 28 and n. 8. In contrast, the state again observes that the subsequent state habeas petitions were "denied . . . summarily" by the state appellate and supreme courts. Resp. Mem. 28.

On page 72 of its supporting memorandum, however, the state takes precisely the opposite position. Now, in connection with petitioner's *Strickland* claim, the state argues that "[t]he state superior court, court of appeal, and supreme court all denied the claim summarily." Resp. Mem. 72. There is a reason the state switches gears so dramatically.

1    As discussed in Argument I, above, when state courts have adjudicated a

2    defendant's federal claim on the merits, § 2254(d) requires the defendant to establish that

3    the state-court decision was contrary to or unreasonably applied clearly established

4    federal law or was based on an unreasonable determination of the facts.  The Supreme

5    Court has established two general frameworks for this inquiry, depending on whether the

6    state decision was summary or reasoned.

7    Where state courts have adjudicated the claim in a reasoned decision, the federal

8    court must "train its attention on the particular reasons—both legal and factual—why

9    state courts rejected a state prisoner's federal claims." *Wilson v. Sellers*, 584 U.S. ___,

10   138 S.Ct. 1188, 1191–1192 (2018).  And when the state court decision ignores key facts,

11   gets facts wrong or relies on irrelevant facts, the decision is unreasonable and § 2254(d)

12   will not bar relief.  *Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *Milke*, 711 F.3d at 1008;

13   *Taylor,* 366 F.3d at 1001; *Greene*, 288 F.3d at 1092.  But where the state court denies the

14   claim summarily -- such as by issuing a one-word order "denied" or by not expressly

15   addressing the claim -- the framework changes.  In that situation "a habeas court must

16   determine what arguments or theories supported or, as here, could have supported, the

17   state court's decision; and then it must ask whether it is possible fairminded jurists could

18   disagree that those arguments or theories are inconsistent with the holding in a prior

19   decision of this Court."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

20   The state's switch in positions -- changing its characterization of the habeas

21   court's ruling from a "reasoned decision" (on pages 2 and 28 of its supporting

22   memorandum) to a "summary denial" (on page 72) -- seeks to take advantage of the more

23   state-friendly *Richter* standard applicable to summary denials.  But this sea change in

24   positions not only ignores both state and federal law, but the position the state itself took

25   about the habeas court's ruling when defending that ruling in the state appellate court.

26   Petitioner will start with state law.  Here, petitioner's original state habeas petition

27   was filed with the state appellate court along with his appeal.  The state appellate court

28   found a prima facie case and issued an Order to Show Cause returnable before the

Superior Court.  Under long-standing state law, "[t]he issuance of . . .  the order to show cause creates a 'cause,' thereby triggering the state constitutional requirement that the cause be resolved "in writing with reasons stated."  *People v. Romero*, 8 Cal.4th 728, 740 (1994).  In short, while state law permits summary rulings in habeas cases *prior* to an Order to Show Cause, it simply does not permit them *after* an Order to Show Cause has issued.  The state court's four-page single-spaced ruling in this case, issued after an evidentiary hearing, was not a summary denial under state law.

Nor was it a summary ruling under federal law.  The Supreme Court has described a "summary ruling" as one in which "a state court rejects a federal claim without expressly addressing that claim" or which involves "a one word order, such as affirmed or denied."  *Wilson*, 138 S.Ct. at 1192; *Johnson*, 568 U.S. at 301.  Here, the habeas court neither issued a one word order (nor could it do so in light of the state law discussed above) nor did it fail to "expressly address the claim."  To the contrary, immediately after concluding that any false evidence was not prejudicial the habeas court went on to rule "[petitioner's] claims of ineffective assistance also fail."  Petition, Exhibit C at 4.

Indeed, it is worth noting that in defending the state habeas court's ruling before the state appellate court, the state itself recognized the basis for the habeas court's ruling on the *Strickland* claim, stressing the logical relationship between the habeas court's ruling on the false evidence claims and its ruling on the *Strickland* claim.  The state noted that the habeas "court concluded that the ineffective assistance of counsel claims premised on the false evidence claims also failed."  Answer, Exhibit 21 at 16.  The state explained that "if the prosecutor did not violate section 1473 and the federal constitution, then by definition he did not present false evidence.  Accordingly, counsel could not have rendered ineffective assistance by failing to 'expose' it."  Answer, Exhibit 21 at 37.  In other words, when in state court, the state's position was that rejection of the *Strickland* claim based on failing to expose false evidence was proper because the state court had found (1) no false evidence had been presented and (2) any such evidence was harmless.  Having explained the rationale for the state habeas court's rejection of the *Strickland*

1    while in state court, the state should not now be permitted to flee from that position and

2    maintain that -- in fact -- no reasoning supports the habeas court's ruling and it must

3    therefore be viewed as a summary denial. (*See New Hampshire v. Maine*, 532 U.S. 742,

4    749 (2001) ("where a party assumes a certain position in a legal proceeding, and succeeds

5    in maintaining that position, he may not thereafter, simply because his interests have

6    changed, assume a contrary position . . . ."]; *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th

7    Cir. 1990) (noting that by changing its position during the pendency of a single case, the

8    state was "playing fast and loose with the courts.")

9           To the extent the state habeas court's ruling was premised on its finding that no

10   false evidence had been presented, or that any such evidence was not prejudicial, de novo

11   review is proper. As discussed in Argument I-B above, the state court's conclusion that

12   no false evidence was presented ignored critical facts in connection with both the video

13   footage and the August 24 threat. The state court's alternative conclusion that the false

14   evidence was not prejudicial relied on a standard of prejudice contrary to Supreme Court

15   precedent. Either reason warrants de novo review here as well.

16          But even setting these errors aside, the state habeas court's decision on the

17   *Strickland* claim ignored an entirely new set of key undisputed facts which requires de

18   novo review. Insofar as the video footage was concerned, the habeas court ignored (1)

19   defense counsel never viewed a copy of the Lorex footage provided by the state prior to

20   trial and (2) counsel conceded he did not make a tactical decision not to show the actual

21   Lorex footage and would have used it had he been aware of it. Insofar as the August 24

22   death threat was concerned, the state court ignored: (1) the position counsel himself

23   argued to the jury was that petitioner did not make the threat, (2) counsel had petitioner

24   testify that he did not make the threat, and (3) yet again, counsel conceded he did not have

25   a tactical reason for failing to investigate and present telephone records proving counsel's

26   own position. As the Ninth Circuit concluded in *Taylor* "[a] rational fact finder might

27   discount [these facts] or, conceivably, find [them] incredible, but no rational fact-finder

28

1  would simply ignore [them]."  366 F.3d at 1001.  De novo review is warranted.[14]

2  **B.**  **Defense Counsel's Failure To Review The Lorex Footage And Expose**

3  **The Truth About The Footage Fell Below The Standard Of Care**.

4  In sworn declarations, defense counsel states that (1) prior to trial he never saw

5  any video footage showing petitioner in the café prior to 6:47:38, (2) he was unaware

6  such footage existed, (3) he did not look at the DVD prepared by Agent Sunseri, because

7  he assumed it contained what Sunseri said it contained in his police reports (that

8  petitioner did not enter the café until 6:47:38), (4) until post-conviction investigation, he

9  was unaware there was footage of petitioner in the café prior to 6:47 when the fire engine

10  passed, and (5) he did not make a tactical decision not to use this footage and would in

11  fact have used it had he been aware of it.  Petition, Exhibit E, F, OO, PP.

12  The state recognizes that defense counsel Harris swore under oath that he was "at

13  no point . . . 'shown' footage depicting petitioner inside the café before the fire engines

14  passed it at 6:47 p.m." by Agent Sunseri.  Resp. Mem. 76-77.  The state recognizes that

15  for his part, defense counsel Geragos swore that he was "unaware footage depicting

16  petitioner inside the café prior to 6:47 p.m. existed, and he had never seen such footage

17  until it was shown to him by post-conviction counsel."  Resp. Mem. 75.

18  The state nevertheless disputes counsels' sworn statements.  The state argues the

19  "more plausible" explanation is that counsel either (1) "viewed the [Lorex footage] DVD

20  that was given to him but did not recognize petitioner" or (2) "viewed [the Lorex footage

21  showing petitioner inside the café prior to 6:47:38] but did not believe that a 106-second

22  difference was momentous" and elected not to present the evidence.  *Ibid.*

23  The state's suggestion that the most "plausible" explanation is that defense counsel

24  viewed the footage but did not recognize petitioner not only ignores defense counsel's

25

26  [14]  There may be no need to resolve the standard of review.  As discussed

27  below, no fairminded jurist could accept the tactical justifications the state now offers to explain why defense counsel would elect to have jurors believe petitioner (1) lied about

28  his alibi and (2) threatened to kill the victim only seven weeks before she was murdered.

sworn declaration to the contrary, but suffers from even more basic problem of logic. When shown this same video footage in post-conviction proceedings, the footage was so clear that the state itself conceded petitioner was in the café at 6:47:12 and 6:45.  If the footage is so clear that the state itself recognized petitioner in the café prior to 6:47:38, it is hardly "more plausible" to suggest that defense counsel was unable to recognize his own client.  The more plausible explanation is exactly the one given by defense counsel under oath: the problem here was *not* that he saw the footage and could not tell if it was petitioner, the problem was *that he never saw the footage in the first instance*.

The state's alternative suggestion -- that counsel recognized petitioner but decided *not* to present the video because it only aided his alibi by 106 seconds -- is no more plausible.  This too is squarely contradicted by the sworn declaration of both defense counsel.  Moreover, as discussed above, the state's "106 second time difference" argument fails to account for the fact that unless petitioner spontaneously appeared in the café, he must actually have arrived at some point prior to 6:45, just as he testified to at trial.  Given that petitioner would have had to arrive in the café prior to 6:45, it strains credulity to think that counsel would forego exposing the state's falsity and, instead, permit the prosecutor to rely on false evidence to destroy petitioner's credibility and alibi.

At the end of the day, the performance prong assessment here is simple.  The actual video footage supported petitioner's alibi and credibility.  Defense counsel admits he failed to examine the footage and that he did not make a tactical decision not to present the footage.  In this situation, defense counsel's performance is unreasonable.  *See*, *e.g.*, *Wiggins v. Smith*, 539 U.S. at 526 (counsel's failure to investigate unreasonable where it "resulted from inattention not reasoned strategic judgment.")

**C.   Defense Counsel's Failure To Review The Telephone Records And Expose The Truth About The August 24 Threat Fell Below The Standard Of Care**.

Turning to counsel's failure to introduce Roy Endemann's telephone records, the state does not dispute that these records show that the August 24 call came from Roy Endemann.  Resp. Mem. 79-81.  Rather, the state argues that counsel's declaration fails to

1  show did not make a tactical decision not to present this evidence.  Resp. Mem. 80.

2      The argument is puzzling.  Defense counsel forthrightly stated that he "did not

3  make some kind of decision not to present this evidence."  Petition, Exhibit PP at para.

4  10.  It is difficult to imagine how counsel could more directly have made clear that he did

5  not make a tactical reason not to introduce this evidence.

6      Nevertheless, the state argues that "[o]n the subject of Roy Endemann's records, it

7  is unclear what petitioner claims Geragos should have done."  Resp. Mem. 80.  This

8  argument is puzzling as well; given that defense counsel's theory was that petitioner did

9  not make the call, exactly what counsel should have done is entirely clear -- he should

10 have properly investigated the August 24 threat by taking three steps:

11
12      (1)    First, counsel should have examined Officer Moore's police report about
              the threat  (disclosed to him in discovery) and learned that the threatening
13             call came in at 12:50 on August 24;

14      (2)    Second, counsel should have examined Ms. Schipsi's phone records for
15             12:50 on August 24 (disclosed to him in discovery) and learned that the
               12:50 call came from (831) 207-2669, which was not petitioner's number;
16
        (3)    Third, counsel should have examined the phone records for (831) 207-2669
17             (disclosed to him in discovery) and learned that the 12:50 call was made by
               Roy Endemann.

18     This alone would have been enough to show the August 24 threat false.  And all of

19 this could have been accomplished simply by looking at records which the state had

20 disclosed to counsel in discovery.  At that point, of course, competent counsel would have

21 interviewed Endemann, and learned exactly what he admitted to police after trial had

22 ended: that he made the August 24 call at the bequest of Ms. Schipsi to make it look like

23 petitioner was calling and threatening her from a blocked line.

24     The state disagrees.  Disregarding defense counsel's sworn declaration, the state

25 opines that defense counsel may have made a tactical reason not to introduce Endemann's

26 phone records because counsel would have "to account for the likelihood that the

27 prosecutor could have rebutted [the evidence] by putting Endemann on the stand live to

28 explain or deny the call."  Resp. Mem. 80.

Traverse and Supporting Memorandum          41

1
2
3
4
5
6
7
8

In light of Endemann's post-trial interview with police, this argument is difficult to fathom.  As just noted, when Mr. Endemann was interviewed by police about the August 24 call, he admitted the August 24 call was made at Ms. Schipsi's direction in order to make it look like petitioner was harassing her and calling her from "a blocked number." Petition, Exhibit KK at 3.  Contrary to the state's argument, competent defense counsel would not have feared Endemann's testimony, he would have welcomed it.  Indeed, had defense counsel performed competently, he would have known what Endemann had to say, and would himself have called Endemann to testify.

9
10
11
12
13

Once again, the performance assessment here should be simple.  Counsel admits he failed to examine telephone records in his possession which directly supported the defense presented.  Petition, Exhibit PP at paras. 9, 10.  He also admits that he had no tactical reason not to present the evidence.  Petition, Exhibit PP at para. 10.  As such, defense counsel's performance is unreasonable.  *See e.g., Wiggins*, 539 U.S. at 526.[15]

14

## CONCLUSION

15
16
17

For all these reasons, and the reasons set forth in the Petition, the writ should be granted.  To the extent that any portion of respondent's Answer can be seen as creating a factual dispute on a material issue, this Court should order an evidentiary hearing.[16]

18
19
20
21
22
23

DATED: <u>January 28, 2020</u>                Respectfully submitted,

CLIFF GARDNER
LAZULI WHITT

<u>/s/ Cliff Gardner</u>
By Cliff Gardner
Attorney for Petitioner

24
25
26

[15]       Alternatively, the state reincorporates its earlier prejudice argument and argues any deficient conduct was harmless.  Resp. Mem. 81.  For the same reasons discussed in Argument I-E above, because the false evidence was material, the failure to expose the falsity of that evidence undermines confidence in the outcome of trial.

27
28

[16]       Petitioner considers the remaining claims to be fully joined by the briefs on file with this Court.  Accordingly, no further discussion of those claims is warranted.

Traverse and Supporting Memorandum                42

1

## CERTIFICATE OF SERVICE

2 Case Name: Zumot v. Borders

3 I hereby certify that on January 28, 2020, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

4

5 TRAVERSE TO ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

6

7 I certify to my knowledge that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

8 In addition, upon the party named below by depositing a true copy in a United States mailbox in Berkeley, California, in a sealed envelope, postage prepaid, and addressed as follows:

9

10 Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
11 San Francisco, California 94102

12 I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed January 28, 2020, at Berkeley, CA.

13

14 /s/Cliff Gardner
Declarant

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Traverse and Supporting Memorandum