1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7   BULOS ZUMOT,                              Case No.  3:19-cv-01319-WHO

8              Petitioner,

9        v.                                   **ORDER GRANTING PETITION FOR A
                                              WRIT OF HABEAS CORPUS**
10  DEAN BORDERS, Warden                      Re: Dkt. No. 1

11             Respondent.

12

13          In 2011, habeas petitioner Bulos Zumot was convicted of the first-degree murder of his

14  girlfriend Jennifer Schipsi and of arson of their shared cottage in Palo Alto, California.  At trial,

15  the prosecution presented and argued a straightforward case:  Zumot's testimony was not to be

16  believed.  Material to that argument were two pieces of evidence.  Video evidence showed that his

17  arrival at the café he owned foreclosed his timeline of events and his alibi defense.  And not only

18  did he have a history of domestic violence toward Schipsi, but on August 24, 2009, just weeks

19  before the murder, Zumot called Schipsi from a blocked number and threatened to kill her.

20          Yet in state post-conviction proceedings, the state conceded and the superior court found

21  that surveillance video shows Zumot inside the café earlier than the time communicated to the jury

22  at trial.  And phone records and a post-conviction interview with Schipsi's longtime friend Roy

23  Endemann confirm that Endemann, not Zumot, called Schipsi from a blocked number on August

24  24, 2009.  In spite of this, the state courts denied Zumot's petitions for a writ of habeas corpus.

25          Before me is Zumot's petition for a writ of habeas corpus on the grounds that his

26  conviction was obtained using two types of false evidence and that his counsel rendered

27  ineffective assistance of counsel for failing to expose it.  Applying de novo review, because the

28  last reasoned decision from the Superior Court of California, County of Santa Clara is not entitled

United States District Court
Northern District of California

to deference since the court ignored critical facts bearing on Zumot's claims and applied the wrong standard of materiality, I conclude that false evidence was presented with respect to both the surveillance video and the August 24 phone call. That false evidence was material because it obviated the need for the jury to grapple with the parties' conflicting timelines of events and to assess the credibility of numerous witnesses, most notably Zumot. Further, there was no tactical reason for trial counsel to fail to present and debunk evidence that directly bore on Zumot's alibi defense and his credibility as a witness. Accordingly, all three of the claims before me merit relief. Justice requires the issuance of the writ.

<strong>BACKGROUND</strong>

On July 22, 2010, Zumot was charged with the October 15, 2009 murder of Jennifer Schipsi along with arson of the cottage they lived in together at 969 Addison Avenue in Palo Alto. 2 CT 393; *see* 20 RT 2033. Zumot pleaded not guilty and was represented at trial by Mark Geragos. 2 CT 397. The trial began with opening statements on January 3, 2011. 2 CT 554.

## I.    EVIDENCE AT TRIAL

### A.    Domestic Violence in Zumot and Schipsi's Relationship

Zumot and Schipsi met in the fall of 2007 and immediately began dating. 18 RT 1924-25. On March 17, 2008, Schipsi reported to San Jose police that Zumot had assaulted her, damaged her car, and harassed her. 13 RT 1474-75. She had broken up with Zumot recently, and she was nervous and scared and fearful that Zumot "would harm her at some point." 13 RT 1476. She reported that Zumot had kicked both the grill of her car and the door, denting the latter. 13 RT 1476. Schipsi showed the officer harassing text messages in which Zumot called her a "cancer" and told her that he needed to get her out of his life "at any price." 13 RT 1479. In other texts, Zumot told Schipsi that he loved her and begged for her forgiveness. 13 RT 1479. Schipsi also told the officer that a few days before, Zumot had approached her at a Starbucks, called her a "bitch" and a "fucking whore," and spit in her face. 13 RT 1480; 20 RT 2090-21. The officer who took Schipsi's report did not see any injuries, and he did not send the report to the district attorney's office or recommend filing domestic violence charges. 13 RT 1475, 1484-85. Although he sent the report to the department's family violence unit, no further action was taken. 13 RT

2

United States District Court
Northern District of California

1487.  In the same month, however, Schipsi obtained a restraining order against Zumot and he pleaded guilty to making harassing phone calls to Schipsi and was sentenced to three years of probation and fifty-two domestic violence classes.  18 RT 1930-31.

Craig Robertson was Schipsi's neighbor and friend in San Jose, and she worked as his realtor until he had to fire her because "she wasn't functioning" or returning his phone calls.  13 RT 1488, 1490.  In late 2007 or early 2008, Robertson was in the hallway going into his apartment at the same time that Schipsi and Zumot were there.  13 RT 1497.  After hearing a slap, Robertson turned and saw Schipsi holding her face.  13 RT 1491.  Robertson advised Schipsi to leave Zumot and get a restraining order, but she said she was "afraid for her life."  13 RT 1492.

Jacob Allen, who had been engaged to Schipsi and lived with her for nine years, also testified about her relationship with Zumot.  While Schipsi was living in San Jose, she "was kind of afraid to leave the place," so Allen would bring food to her.  14 RT 1616.  While spending time with Schipsi, Allen observed that her phone went off constantly, and he saw texts from Zumot that alternated between messages like "I hope you die" and statements of love.  14 RT 1617, 1631.  Allen observed that Schipsi was "very thin," "wasn't eating," and suffered from "anxiety a lot."  14 RT 1617.  On one occasion when helping Schipsi move out of the house she shared with Zumot, Allen saw ripped art and broken vases that Schipsi said Zumot had destroyed.  14 RT 1612-14.  On another occasion, Schipsi's mother told Allen that Schipsi had a safety deposit box at Wells Fargo bank and that if anything happened to her, Zumot did it.  14 RT 1637-38.

Heather Winters testified that on a few occasions, she had seen bruises on Schipsi's face and arms; when asked, Schipsi said "she had gotten them [from] being clumsy."  14 RT 1641.  During periods when Zumot and Schipsi were broken up, Winters and Schipsi would speak a few times per day; when the couple got back together, Schipsi stopped spending time with Winters.  14 RT 1642-43.

Zumot also testified about his relationship with Schipsi.  He admitted that he had kicked Schipsi's car after she filed a police report against him.  18 RT 1926.  He also admitted to spitting on her as noted in the March 2008 police report, stating that Schipsi had told him she was sleeping with her boss.  18 RT 1928.

B.     **August 2009 Reports**

The prosecution presented three witnesses to testify about death threat(s)[1] that Schipsi reported to them in August 2009.  Officer Adrienne Moore responded to a call Schipsi made to Palo Alto police on Monday, August 24, 2009.[2]  16 RT 1766.  She and Office Monroe went to Schipsi's house, where Schipsi told them that Zumot "had called her and had threatened her life over the phone."  16 RT 1767.  Schipsi said that Zumot had called her a "bitch" and "said that he was going to kill her."  16 RT 1767.  According to Moore's testimony, the call was "earlier that day."[3]  16 RT 1769.  Moore described Schipsi as "very scared," "nervous," and "in fear for her life."  16 RT 1767-69.  Schipsi obtained an emergency protective order against Zumot.  17 RT 1776-77.

Leslie Mills owned the building in downtown Palo Alto that Zumot rented for his café Da Hookah Spot.  16 RT 1778; 4 RT 407-08.  She testified that Schipsi called her on a Monday in August 2009 when the police were at Schipsi's house.  16 RT 1781, 1783-1784.  Schipsi told Mills that Zumot had called her and threatened that "he would kill [her] and burn [her] house down."  16 RT 1781.

Heather Winters also testified that in August 2009, Schipsi told her that Zumot had called her after a car incident and threatened to kill her.  16 RT 1760.  Schipsi's phone records reflect that she made an outgoing call to Winters at 5:23 p.m. on August 24, 2009 and that the call lasted 22 minutes and 19 seconds.[4]  Pet. Ex. W at 7.  Schipsi also told Winters that Zumot planned to burn down Da Hookah Spot, making it look accidental in order to collect the insurance money.  16 RT 1761.

---

[1] The parties dispute whether the three women were testifying about the same or different threats; I address those arguments below.

[2] Schipsi called the police at 12:51 p.m.  Pet. Ex. W.

[3] According to Moore's police report, the call came in at 12:50 p.m.  Pet. Ex. V (Police Report of August 24, 2009) at 4.

[4] During discovery, the state disclosed a recording of the call, in which Schipsi told Winters that Zumot said, "I'm going to fucking kill you" and "fucking bitch, you're dead" before hanging up on her.  Pet. Ex. MM (transcript of call between Schipsi and Winters).  During the call with Winters Schipsi also mentioned that she "had . . . Officer Monroe here"; he, along with Moore, responded to the August 24 call.  *See id.*

United States District Court
Northern District of California

On September 16, 2009, Schipsi filed a declaration in which she recanted her accusations against Zumot with respect to the August 24, 2009 phone call.  16 RT 1786-87.  She declared, "Someone did call me and make a threat and I assumed it was Mr. Zumot."  16 RT 1786.  "After further reflection" she "realize[d] that call came from a restricted telephone number," and she was "convinced that Bulos Zumot did not threaten [her]."  16 RT 1786.

Richard Ferry, a domestic violence expert, testified about patterns in abusive relationships. He testified that victims might provoke violence to "get it over with" and appease abusers with strategies like offering sex.  *See* 12 RT 1322, 1329-30.  Ferry also told the jury that in approximately 75% of cases, victims recant an accusation they have made against an abuser.  12 RT 1332-33.

Zumot testified, denying that he called Schipsi and threatened her life on August 24.  18 RT 1954.

### C.      Other Reports by Schipsi

In August 2009, Schipsi called police to report that Zumot had crashed his car into her parked car.  14 RT 1567.  The investigating officer found no damage consistent with the report and concluded that Schipsi's claim was "unfounded."  14 RT 1568.

On September 24, 2009, Schipsi reported to police that she had received a threatening call from a named individual who said, "I'll fuck you up if you show up to court with Bulos."  17 RT 1826.  Surveillance video from that day showed that Zumot did not make a threatening phone call. 17 RT 1829.

### D.      Evening of October 14, 2009

Schipsi planned a birthday dinner for Zumot on October 14, the night before her murder.  4 RT 436-437.  Prosecution witness Victor Chaalan testified that he drove Zumot and Schipsi to the party at about 7 p.m.  4 RT 437.  At the end of the party, one guest suggested that they collect money to pay the bill, but Zumot did not want the guests to contribute money.  4 RT 439-40.  The group decided to go to Zumot's café after dinner.  4 RT 440.  On the way there, Zumot and Schipsi got into a fight over whether Schipsi had accepted money from guests for the bill; when Zumot accused her of lying, Schipsi started to cry.  4 RT 442-44.  Chaalan testified that it was the

5

first time he had seen Zumot and Schipsi argue.  4 RT 491.  Schipsi cried during the whole ride

from the restaurant in Sunnyvale to Palo Alto.  4 RT 500.

Schipsi, who was still crying when they arrived at the café, did not go inside with Chaalan

and Zumot.  4 RT 446, 500.  Schipsi eventually decided to walk home.  8 RT 859.  During the rest

of the evening, she and Zumot exchanged texts; Schipsi told him not to come home that night, that

she had been followed down the street and "harassed," and that she had broken the heel off her

shoe.  8 RT 859-870.  She called Zumot a "fag," "little pussy bitch," "limp dick," and told him to

"go fuck a cousin or two."  8 RT 762-764.  She told Zumot to clear his things out of their house,

and she threatened legal action if he did not give her a check for $11,200 by the following day.[5]  8

RT 870-72.

Around 2:00 a.m., Zumot asked Chaalan to call Schipsi, who thanked Chaalan for driving

them that evening.  4 RT 453-55.  Chaalan drove Zumot home to the cottage.  4 RT 456-57.

Schipsi was in the bedroom with the door closed when they arrived, and Zumot invited her to

smoke a hookah with them, which she declined.  4 RT 460-461.  After Chaalan left, he received a

text from Mr. Zumot saying "we are okay," and later another text saying, "she is cool now and

honestly. She has the cleanest heart . . . I love her."  4 RT 466-67.  Zumot testified that after

Chaalan left, he and Schipsi smoked a hookah, ate birthday cake, talked, had sex, and went to bed

around 4:20 a.m.  20 RT 1996; *see* 16 RT 1742 (video on Schipsi's phone of her and Zumot

having sex at 3:52 a.m. on October 15, 2009).

### E.     Morning of October 15, 2009

Zumot testified that he and Schipsi woke up "around 10:54" a.m. when the police called

about a report Schipsi had made that was unrelated to Zumot.  20 RT 1997.  Zumot left with the

intention of picking up a copy of the police report.  Schipsi had asked him for a hug and told him

to get her a latte on his way back home.  20 RT 1998.  But after failing to find parking near the

police station, Zumot returned home without the report or latte.  20 RT 1999.  At 11:15 a.m.,

Schipsi repeated her demands from the previous day for money, stating, "I'm serious. Bring me

---

[5] According to Zumot's testimony, Schipsi fabricated allegations that he had vandalized his car,
resulting in $8,000 of damage, because she thought he was cheating on her.  18 RT 1953-55.

United States District Court
Northern District of California

1   my fucking check and I'll go buy an espresso MF." 21 RT 2230. Schipsi also texted petitioner

2   that she was going to the police department to file charges by 3:00 p.m. if her check was not there.

3   21 RT 2233. Zumot testified that he thought Schipsi was trying to get a reaction from him

4   because he had not given her a hug. 20 RT 2000. His second attempt to find parking near the

5   police station also failed, but he got Schipsi a latte. 20 RT 2002.

6            **F.        The Cottage Fire**

7            A neighbor of Zumot and Schipsi's, Susie Schlopp, testified that while she was unloading

8   groceries in her driveway at 6:20 p.m., she saw Zumot speeding away from the cottage in a dark

9   SUV. 6 RT 656-57. *But see* 16 RT 1734-1735; 22 RT 2614 (showing that Zumot was driving a

10  silver car that night). She testified that she stared at the driver of the car because she was angry at

11  all of the speeding in her neighborhood and hoped it would make him slow down. 6 RT 568-69.

12  Scholpp had initially told police that she saw nothing unusual on the night of the fire, but said that

13  she came forward three months later after recognizing Zumot's picture in the newspaper. 6 RT

14  565-70, 575. Cell phone evidence at 6:16 p.m., four minutes before Scholpp testified to seeing

15  Zumot near the cottage, showed that he was four miles away from the cottage,. 22 RT 2548-49.

16           John Eckland, who rented the cottage to Zumot and Schipsi and lived in another house on

17  the property, passed the cottage at 6:25 and 6:35 and did not see Zumot's car at either time. 7 RT

18  692. Eckland testified that "everything looked fine" when he passed at 6:35 p.m. 7 RT 692, 716-

19  17. Another witness passed the cottage at 6:25 on the way to Eckland's house for dinner and

20  testified that nothing was amiss. 7 RT 655, 678. The shades in the cottage were drawn when both

21  individuals passed. 7 RT 678, 693-94.

22           At 6:39 p.m., a witness called 911 after he observed smoke pouring out of the cottage. 2

23  RT 219-20. When no one answered the door at the cottage, the witness knocked on Eckland's

24  door. 2 RT 221-22. Firefighters found Schipsi's body on the bed with a red melted gas container

25  lying near her. 2 RT 171, 201; 9 RT 1004. Based on Schipsi's injuries and the absence of smoke

26  in her lungs, the doctor who performed the autopsy determined that she had been strangled to

27  death before the fire started. 3 RT 377, 381. The exact time of death was uncertain. 3 RT 385-86,

28  396.

The fire expert determined that someone had intentionally started the fire by pouring gasoline onto the bed and lighting it.  3 RT 269, 272, 287-88.  In reliance on the accuracy of Eckland's testimony that he had not seen anything unusual at 6:35, the expert testified that the start time of the fire could be "narrowed down" to "basically some time between 6:35 and 6:40," the time of the fire alarm.  3 RT 204, 294-95, 305.  A fire captain present at the scene of the fire explained that it had burned "fast and hot."  1 RT 204.

### G.     Other Evidence Uncovered During the Investigation

During the investigation of the cottage after the fire, authorities observed that the far-right burner on the stove was turned on high, with the metal protector removed and with aluminum foil encircling it.  2 RT 171.  Gas was flowing freely from the burner, and a candle was on the floor in front of the stove.  2 RT 171-72, 190.  Zumot's fingerprint was found on the foil.[6]  2 RT 194.

A fire detection dog named Rosie searched the cottage, Zumot's car, Zumot's clothing, and the café.  In the cottage, she gave a strong alert to the bed where Schipsi was found and to Schipsi's hair, and she alerted to the candle in front of the stove.  3 RT 328-31.  Rosie gave a positive alert near the gas tank of the car Zumot had been driving but no alerts inside the car.[7]  3 RT 321-22.  She gave no positive alerts in the café.  3 RT 322-23.  A few days later, Rosie searched the clothes Zumot was wearing on the day of the murder.  3 RT 334.  She "definitely" gave a positive alert to the waist of his pants, and she also alerted to the upper area of his sweatshirt, his socks, and his shoes.  3 RT 335-37.

When the state's forensic chemist tested Zumot's clothing, she was not able to conclude that an ignitable fluid was present.  *See* 9 RT 1037, 1042-43, 1065; 10 RT 1054-56.  While gasoline was detected on both of Zumot's shoes, the chemist noted that "petroleum products have been known to be found in the manufacturing of shoes."  10 RT 1050-52, 1054.

The jury also heard testimony that Zumot's clothes from the day of the day smelled

---

[6] According to Chaalan, when he and Zumot were preparing a hookah in the early morning hours of October 15, Zumot put a piece of foil on the burner to prevent ash from falling into the stove.  4 RT 487-88.

[7] His other car was in the shop at the time of the murder.  4 RT 470-71.

1  strongly of cologne and that police found two cologne samples on the driveway of the cottage. 9

2  RT 1036, 1063; 2 RT 173.

3  Zumot waived his *Miranda* rights and spoke with Sunseri for several hours on the night of

4  the murder. *See* 16 RT 1720, 1722. He admitted to deleting text messages and said that he and

5  Schipsi had been getting along "fine" the night before. 16RT 1719. He said that Schipsi had been

6  angry when he left the house that morning because he had not given her a hug. 16 RT 1720.

7  **H.      Cell Phone Evidence**

8  As noted, Zumot deleted many of the text messages exchanged during the fight. *See* 8 RT

9  762-880. When testifying he explained that he learned in his domestic violence class to "shut out"

10  negative and bad things, which is why he deleted some messages and not others. 20 RT 2021-23.

11  Messages were also deleted from Schipsi's phone. *See* 8 RT 762-880.

12  Based on the cell tower data, the state's cell phone expert concluded that Zumot's and

13  Schipsi's phones were in the same location and traveling together from 2:56 p.m. through 7:45

14  p.m. on October 15, 2009. 11 RT 1185-87. His testimony was based on the premise that cell

15  tower data indicated the location of the receiver's telephone. 11 RT 1185-87. On cross-

16  examination, defense counsel questioned the accuracy of the expert's theory, noting it would

17  suggest that on the morning of September 12, 2009, Schipsi was in San Jose at 9:02 a.m. but in

18  Hawaii seven minutes later. 12 RT 1253-54; *see also* 12 RT 1255-312 (questioning about similar

19  examples). The defense's expert presented a contrary theory regarding the phone records,

20  testifying that when a call from AT&T customer goes to the voicemail of another AT&T

21  customer, the caller's location is listed in both customers' records. 18 RT 1912-14.

22  **I.      Zumot's Alibi Defense**

23  Zumot testified in his own defense. He told the jury that he loved Schipsi and did not kill

24  her. 18 RT 1924-25. The two had discussed getting married, and he was planning to propose in

25  Palm Desert that weekend during a trip they had planned with friends. 20 RT 2039-40, 2044-45.

26  Zumot also told the jury where he had been during the day and evening on October 15,

27  2009. He testified that he ran errands in the morning, and when he returned, Schipsi was still in

28  bed. 20 RT 2000, 2002. In the early afternoon, he went to the Palo Alto police station to pick up

United States District Court
Northern District of California

9

the police report, to a warehouse to pick up items for the café, to put gas in his car, and to a restaurant supply store. 20 RT 2003-05. Other evidence in the record confirmed these stops. *See* 16 RT 1709; 17 RT 1896-1897; 13 RT 1506.

Zumot testified that after leaving the restaurant supply store, he went to his domestic violence class in San Jose, arriving early before the class and leaving after the class ended.[8] 20 RT 2005, 2007. The class instructor confirmed that Zumot was already there when he arrived for class at 3:40 p.m.[9] 12 RT 1246-47, 1250. The instructor recalled letting the class out at 5:55, but it could have been 5:45 p.m. 12 RT 1349-50.

Zumot testified that he drove from his domestic violence class in San Jose directly to the café, which usually took about 35 to 40 minutes. 20 RT 2012, 2014. He had just located parking near the café when he called his employee Jehad Al-Bataneh at 6:39, told him that he was parking, and told him to make a tea and hookah. 20 RT 2013-14. Café employee Alaghabash also testified that Zumot called Jehad before Zumot arrived at the café, asking that Jehad make a tea and hookah for him. 17 RT 1854, 1861. Only the Ramona Street entrance is open after 6:00 p.m. 17 RT 1855. Zumot testified that he entered the café from the Ramona Street entrance, went upstairs to his office to check email, and then returned downstairs. 20 RT 2015. Consistent with Zumot's testimony, Alaghabash testified that Zumot arrived at the café sometime between 6:30 and 6:40 p.m., about ten minutes before the firetruck went by the café. 17 RT 1849, 1851-52. Zumot went outside when he heard the firetruck and then returned inside for his tea and hookah. 20 RT 2015.

Monterey County Sheriff Joseph Martinez, a friend of Zumot's and an investor in the café, testified to two conversations he had with Zumot about the day of the fire. *See* 4 RT 405, 407-08, 418-19, 423. On October 15, 2009, Zumot called saying that the cottage was on fire, that he had last seen Schipsi at 11:30 a.m., and that he had spent the afternoon going to the Restaurant Depot,

---

[8] Zumot attended the domestic violence classes as part of his sentence for pleading guilty in March 2008 to making harassing phone calls to Schipsi. 18 RT 1930-31.

[9] During the domestic violence class, Zumot texted Schipsi's mother and his friend Joseph Martinez to tell them he was planning to propose to Schipsi that weekend. 20 RT 2051-52.

his domestic violence class in San Jose, and the café.  4 RT 419.  The next day Martinez spoke to

Zumot again, and this time Zumot said that he had gone by the cottage after his class, seen Schipsi

sleeping, and gone onto the café.  4 RT 423.  Zumot testified that he had never told Martinez that

he returned to the cottage after the domestic violence class.  20 RT 2053.

**J.      Lorex Video Evidence**

Zumot's café had a video surveillance system known as Lorex.  Footage from the Lorex

video on the night of the fire was introduced into evidence.  In his opening statement, the

prosecutor told the jury, "Surveillance video puts the defendant walking into his café at about 6:47

p.m."  2 RT 141.  He said, "At 6:47, before the defendant has even walked into the café, you can

see the red lights of an emergency vehicle going eastbound on University Avenue towards

Addison.  It's only then that the defendant enters his café, at 6:47 p.m."  2 RT 143.

Palo Alto Police Officer Benjamin Quisenberry testified about the video recorded by the

Lorex surveillance at the cafe.  13 RT 1406, 1408-20.  He explained that there was a one-hour-

seven-minute time difference between the time stamp on the video and the actual time.[10]  13 RT

1407-10.  According to Quisenberry, the video showed Zumot entering the café at 6:47 p.m.  13

RT 1420-21.  During cross-examination, defense counsel focused on the time that Zumot was first

visible in the footage.  *See* 13 RT 1423-35.  Quisenberry testified that he had not focused on the

question of when Zumot first appeared in the footage.  *See* 13 RT 1423, 1426.  Officer Aaron

Sunseri also testified about the Lorex footage, stating that Zumot was visible at 6:47, nine seconds

after the firetruck passed the café.  *See* 15 RT 1726-27.

**K.      The Prosecution's Closing Argument**

In closing arguments, the prosecutor argued to the jury that Zumot had not arrived at the

café until after the firetruck passed.  22 RT 2626.  He told them not to believe Ahmed

Alaghabash's testimony that Zumot had arrived before the truck went by because, "Well, we saw

the video."  22 RT 2549.  The prosecutor also made at least eleven references to the testimony that

Zumot had made a death threat against Schipsi on August 24.  *See* 22 RT 2535, 2542-43, 2558,

---

[10] The parties agreed the Lorex video time stamp was off by one hour and seven minutes; the times cited in this Order are the correct, adjusted times.  13 RT 1407-1412.

United States District Court
Northern District of California

1   2560-62, 2602, 2627

2       **L.     Conviction and Sentence**

3       On February 10, 2011, the jury convicted Zumot both first degree murder and arson.  3 CT

4   691-92.  On October 28, 2011, the court sentenced Zumot to a 25 year-to-life term for the murder

5   and added an eight-year upper term for arson, to run consecutively.  3 CT 753-54, 756.

6   **II.    POST-CONVICTION PROCEEDINGS**

7       Zumot appealed his conviction to the Court of Appeal, Sixth Appellate District, and on

8   December 12, 2013, his conviction and sentence were affirmed.  *See People v. Zumot*, 2013 Cal.

9   App. Unpub. LEXIS 1971 (2013).  Zumot's petition for review in the California Supreme Court

10  was denied on March 19, 2014.  Pet. Ex. SS (*People v. Zumot*, S215836).

11      On September 9, 2013, while Zumot's appeal was pending, he filed a petition for a writ of

12  habeas corpus also in the Court of Appeal, Sixth Appellate District.  Pet. Ex. TT (*In re Bulos*

13  *Zumot*, H040124).  The appellate court issued an Order to Show Cause returnable in the Santa

14  Clara County Superior Court.  Pet. Ex. UU (*In re Bulos Zumot*, H040124); Ans. Ex. 10.

15      On October 14, 2013, officer Sunseri interviewed Roy Endemann about the August 24,

16  2009 phone call.  Pet. Ex. KK (Endemann Interview).  Endemann told Sunseri that at one point

17  when Schipsi was pursuing an emergency stay away order against Zumot, she was "having

18  [Endemann] call from a blocked number so then it looked like she had more blocked calls."  *Id.* at

19  3 (noting "it was something she wanted [him] to do").  Although Endemann did not recall an

20  August 24 call or remember how many times he called Schipsi from a blocked number, he was

21  "sure it was more than once."  Pet. Ex. KK at 3, 5 (noting that it "probably" happened that day if it

22  was close to the time of the stay away order), 7 (answering "I don't know" when asked whether he

23  remembered that the star 67 blocked call on August 24 was for the purpose of a stay away order).

24      In the briefing before the superior court, the state conceded that Zumot was visible inside

25  the café "at 6:47:16, 11 seconds before the clip shown at trial" and that the "the third person seen

26  in the upper right portion of the screen from 6:45:49-6:45:52 is probably Petitioner."  Pet. Ex. DD

27  (Return to Order to Show Cause) at 41; *see also id.* at 78 ("Upon further review, Respondent

28  acknowledges that it is 'probable' that enhanced footage from the Lorex shows that the petitioner

United States District Court
Northern District of California

may have been there closer to 6:45, less than two minutes earlier than discussed at trial.").

Further, the state did not contest the evidence of Roy Endemann's phone records showing that he

had made the blocked call to Schipsi at 12:50 p.m. on August 24, 2009.  *See* Pet. Ex. DD at 44-45.

The superior court held an evidentiary hearing on May 20, 2016.  Ans. Exs. 14-15.  The

parties agreed that no testimony was needed for the August 24, 2009 phone call in light of the

state's concessions, and no testimony was heard for Zumot's ineffective assistance of counsel

claim.  *See* Pet. Ex. NN (Reporter's Transcript of Evidentiary Hearing, May 20, 2016) at 1-6.  The

court heard argument on the evidence on September 2, 2016.  Ans. Ex. 16.

On November 22, 2016, the superior court denied relief:

> The hearing on Petitioner's writ of habeas corpus was submitted to the court for
> decision on September 2, 2016. After review of the pleadings, files, briefs, evidence, and
> arguments of counsel, the court makes the following decision.
>
> Petitioner was convicted of murder and arson following a trial by jury. He now
> claims his convictions are defective because false evidence was presented to the jury by the
> prosecution. The alleged false evidence was based upon surveillance footage taken from
> the cafe on the evening of the murder, testimony regarding that footage, and testimony
> concerning a telephone call to the victim's phone on August 24, 2009, about six weeks
> before the murder.
>
> Summary
>
> On October 15, 2009, the Palo Alto Fire Department responded to a 911 call
> reporting a fire in a cottage on Addison Street. The call was made at 6:39 p.m. The
> reporting party, Daren Beaumont, testified the windows of the cottage were broken out and
> flames were coming out of the window when he noticed the fire. The fire investigator
> testified the fire was started with an accelerant, gasoline. She estimated it would take five
> to ten minutes for the fire to develop in the room to the point windows would break. On
> cross-examination she said it was possible the fire started between 6:35 and 6:40 p.m., but
> was only sure of the time of the 911 call. The only time that was definitively established
> was that of the 911 call.
>
> Medical evidence proved the victim was strangled before the fire.
>
> The time the fire was set or started was not established with certainty. John Eckland
> did not notice a fire at 6:30 to 6:35 when he drove by the cottage. The fire investigator's
> estimate the fire could have started between 6:35 and 6:40 is suspect since the fire was
> reported at 6:39, when flames were already coming out of the eaves and windows were
> already broken out at that time. The expert testified the fire would have had to be burning
> for "some period" to progress to the point the windows would break.
>
> Lorex Video
>
> Petitioner claims video footage from the café's Lorex surveillance system proves
> he was in the cafe at 6:41 p.m. and that he therefore could not have had time to start the
> fire between 6:35 and 6:40, drive to the cafe, park, and be inside the cafe by 6:41. As proof
> he was in the cafe at 6:41, he relies on a portion of the video where a person who cannot be
> identified is seen. Two former employees of the cafe testified at the hearing they think the

13

person is Petitioner based on his gait. Their testimony is not persuasive. The court finds the person seen on the video at 6:41 is not the petitioner.

The video footage at 6:41 p.m. was discussed at length during the hearing on this matter. It was undisputed that the red wall and lighting in the cafe makes some light colored clothing appear red on the video. It was also undisputed that the café employee's shirttail ends slightly below his waist and that the petitioner's sweatshirt ends at about waist level. In Exhibit 3A of People's Pre-Evidentiary Brief, the image at 6:48:03 shows the employee's (not Petitioner) shirttail below his waist.[13] This is also true for images at 6:48:04, 6:48:05, 6:48:07, and 6:48:11. The shirttail is blurred in 6:48:12 and appears to be, at least partially, at waist level in 6:48:13.

The images in Exhibit 3B depict the person at 6:41 p.m., which Petitioner claims is himself and establishes his alibi for starting the fire at the cottage. There are four images with the same timestamp of 17:34:02, which is 6:41:02 p.m. after correction. In these images the end of the shirttail appears below the waist, indiscernible, and/or consistent with the level of the employee's shirttail in the 3A images, respectively.

The prosecution claims the person seen at 6:41 is Ahmed Alaghbash. The person at 6:41 walks toward the restroom. At 6:41:51, it is undisputed that Ahmed Alaghbash is seen leaving the restroom area. Petitioner testified at trial regarding his actions when he first arrived at the cafe. Significantly, he said he first went to his upstairs office. He did not say he went to the bathroom. (RT 2014-2015). This is further evidence the person seen at 6:41 is not Petitioner.

Petitioner claims the testimony regarding the Lorex video that was presented at trial was false. He first claims the 6:41 portion was not shown to the jury. He also claims that if it was viewed by the jury, they did not have the benefit of a thorough examination of that part of the footage.

The Lorex video was admitted into evidence in its entirety. The jury asked to review Lorex footage that encompassed 6:41 p.m., and a member of the jury was instructed on the operation of the Lorex system with the approval of the prosecutor and defense counsel. The jury was therefore able to view any footage from any camera they chose. Exactly what the jurors viewed, or how many times they viewed any particular segment during their deliberations, is unknown. Therefore, the claim the jury did not see the 6:41 footage is speculative at best. While it is true the 6:41 footage was not debated at trial, the court finds the petitioner's claim that, had the jury seen that footage with the benefit of expert testimony, it is reasonably likely that the petitioner's trial would have turned out differently, to be unpersuasive. Even with the testimony of the two cafe employees, no reasonable juror could conclude the petitioner is the person in the video at 6:41.

The court finds the prosecution did not present false testimony concerning the video. The prosecutor presented no evidence of when the petitioner entered the cafe. He presented evidence when the petitioner was seen on the video inside the cafe. Police reports stating when the petitioner entered the cafe were not introduced in evidence. They were never seen by the jurors and could not have misled them.

Petitioner's claim the video provides him an alibi for the time the fire may have started is also questionable in light of the testimony of Susie Scholpp. She was "100 percent" certain she saw the petitioner driving from the area of the cottage toward the cafe at approximately 6:20 p.m. She said the petitioner was speeding down the street. Her testimony, disputed by Petitioner, was contrary to the alibi theory, and gave him more than enough time to start the fire and get to the cafe. Further, all the evidence concerning why Ms. Scholpp should not have been believed was heard and considered by the jury and argued by counsel. The evidence also supports an inference the fire was started by the

United States District Court
Northern District of California

petitioner earlier than the admittedly imprecise 6:35 to 6:40 time frame testified to by the investigator.

The petitioner claims the prosecution is arguing in this proceeding that the fire started at an earlier time than that argued at the trial. However, the prosecution did not present a specific time that the fire started during the trial. The estimate given by the fire expert was elicited by Petitioner's counsel during cross-examination. The court finds the People did not change their theory of when the fire started between the trial and the present proceeding.

Evidence was presented by way of declarations concerning the time it took investigators to travel from the cottage to the cafe around the time of the fire. As pointed out by the People in their brief, the time taken by the petitioner's investigators does not establish the time it would have taken Petitioner to travel from the cottage to the cafe on the day of the murder. The speed the petitioner drove, where he parked, and his exact route are unknown. Also, Ms. Scholpp's testimony the defendant was seen speeding toward the cafe a block from the cottage at approximately 6:20, would have given him time to arrive and be seen in the café video at 6:41, even assuming the defense investigators' driving times are applicable.

<u>Telephone Call</u>

Petitioner's second claim of false evidence concerns the testimony that petitioner made a death threat to the victim in a telephone call on August 24. At trial, the jury heard evidence regarding a call made to the victim on August 24. They also heard evidence the victim recanted her statement that the petitioner made that phone call. Since the trial, further investigation demonstrates the August 24 telephone call was probably made by the victim's friend, Roy Endeman, in an effort to bolster the victim's request for a restraining order against the petitioner.

Petitioner essentially ignores other evidence presented to the jury that he had, on other occasions, threatened the victim, spit on her, slapped her, made harassing calls, kicked her car, was in court ordered domestic violence counseling, had an obsession with committing the perfect crime, was fascinated with forensic TV shows, said she "was dead", and said he was going to burn the cafe to collect insurance money (commit arson). Further, Petitioner essentially ignores evidence the victim recanted her statement to the police that he made the August 24 call. (There was no evidence the victim recanted other statements she made concerning Petitioner's threats against her.)

The court finds the prosecution did not present false evidence concerning the August 24 call. Mr. Endeman, who likely made that particular call since it came from his phone, did not testify he made the call. The call from Mr. Endeman's phone on August 24 showed a restricted calling number. Phone company records were admitted at trial. The reason defense counsel did not review the records and present proof the call was from Endeman's phone is not known. Evidence of the victim's recantation, however, was sufficient to prove Petitioner did not make the call.

Further, in making this argument, the petitioner ignores detrimental inferences that could have been made had Petitioner proved definitively that Endeman made the call on August 24. For example, emphasizing the victim had a friend make the call tends to show she was so fearful of the petitioner, and so desperate for a restraining order, that she would go to great lengths to obtain it. From such actions the jury could have also drawn conclusions regarding the petitioner's personality and disposition which would have negatively impacted the defense case. It was probably a better course for the defense to leave the jury with a negative impression of the victim for having recanted her declaration.

<u>Conclusion</u>

It is the burden of Petitioner to prove that false evidence was presented at trial and if the true facts were known by the jury, there is a reasonable probability the outcome of the trial would have been different. First, as stated above, the court finds false evidence was not presented to the jury on either of Petitioner's claims. However, even if evidence were determined to be false, the evidence must be "substantially material or probative on the issue of guilt." (Penal Code, section 1473(b)(1)) *In Re Sassounian* (1995) 9 Cal 4th 535, states, ". . . [F]alse evidence passes the indicated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different. The requisite 'reasonable probability,' we believe, is such as undermines the reviewing court's confidence in the outcome. [Citation] . . . . It is dependent on the totality of the relevant circumstances. [Citation] It is also, we believe, determined objectively. [Citation]" (*Sassounian*, at page 546, Emphasis in original.)

The totality of the relevant circumstances points overwhelmingly to the petitioner's guilt. In the present case much evidence was presented concerning the unstable nature of the relationship between the victim and Petitioner. Text messages between the two demonstrated as much, although Petitioner attempted to delete many of the victim's texts. Petitioner's testimony was impeached and/or contradicted on several points. He told a friend two versions of his whereabouts on the day in question, one version placing him at the murder scene. Expert testimony concerning the petitioner's and victim's cell phones during the afternoon of the day of the murder showed the two phones traveled together between Palo Alto and San Jose. Forensic evidence proved the victim was strangled before the fire. Petitioner gave an "explanation" of the foil tent over the gas stove burner which was left on. Rosie, the dog trained to identify accelerants, alerted to Petitioner's clothing and shoes. The numerous threats by Petitioner toward the victim, his domestic violence counseling ordered by the court, his obsession with the "perfect murder", and other evidence also supported the jury's verdict. This discussion is not intended to be an exhaustive iteration of the evidence presented regarding Petitioner's guilt. More can be derived from the trial transcript.

In summary, the petitioner has failed to prove that false evidence was presented to the jury. He has also failed to prove the alleged false evidence was substantially material or probative on the issue of guilt as required by P.C. 1473(b)(1). His claims of Ineffective Assistance of Counsel also fail.

Pet. Ex. CC (*In re Bulos Zumot*, BB943863, Order of November 22, 2016) (hereinafter "Superior Court Order").

On January 19, 2017, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal for the Sixth Appellate District. Pet. Ex. QQ (*In re Bulos Zumot*, H044302). On August 31, 2017, the court of appeal summarily denied the petition. Pet. Ex. RR (*In re Bulos Zumot*, H044302). On October 25, 2015, petitioner filed a petition for writ of habeas corpus in the California Supreme Court. Pet. Ex. VV (*In re Bulos Zumot*, S245050). On March 14, 2018, the California Supreme Court denied the petition. Pet. Ex. WW (*In re Bulos Zumot*, S245050).

On March 12, 2019, Zumot filed the instant petition for a writ of habeas corpus under 28

1    U.S.C. § 2254.  Dkt. No. 1.  After several extensions, the state filed its Answer on January 3,

2    2020, and Zumot filed his Traverse on January 28, 2020.  Dkt. Nos. 19-1, 21.

3                                                **LEGAL STANDARD**

4           Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this court

5    may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the

6    judgment of a State court only on the ground that he is in custody in violation of the Constitution

7    or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).  The petition may not be granted

8    with respect to any claim that was adjudicated on the merits in state court unless the state court's

9    adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

10   unreasonable application of, clearly established Federal law, as determined by the Supreme Court

11   of the United States; or (2) resulted in a decision that was based on an unreasonable determination

12   of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

13          "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

14   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

15   the state court decides a case differently than [the] Court has on a set of materially

16   indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).  "Under the

17   'unreasonable application' clause, a federal habeas court may grant the writ if the state court

18   identifies the correct governing legal principle from [the] Court's decisions but unreasonably

19   applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court

20   may not issue the writ simply because that court concludes in its independent judgment that the

21   relevant state court decision applied clearly established federal law erroneously or incorrectly.

22   Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court making

23   the "unreasonable application" inquiry should ask whether the state court's application of clearly

24   established federal law was "objectively unreasonable."  *Id.* at 409.

25                                                  **DISCUSSION**

26          Zumot presents two false evidence claims, one for ineffective assistance of counsel

27   ("IAC"), and the other for cumulative error.  There is no dispute that his petition is timely.

28

## I.       FALSE EVIDENCE CLAIMS

The Due Process Clause of the Fourteenth Amendment prevents the state from obtaining a conviction using false evidence and obligates it to correct false evidence or testimony during trial. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see Giglio v. United States*, 405 U.S. 150, 151 (1972). (applying *Napue* where the false testimony arose during the defense's cross-examination).  False evidence can taint a conviction whether or not that evidence bears directly on the defendant's guilt.  *See Napue*, 360 U.S. at 269–70 (granting relief where the false evidence related to the credibility of a key witness for the state).  False evidence that undercuts a theory of the defense can also violate the Due Process Clause.  *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (granting habeas relief where false witness testimony that he had only a casual friendship with the defendant's wife undercut the defense's theory that he murdered his wife in the heat of passion after seeing her embrace the witness).

"To prevail on a claim based on *Mooney-Napue*, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material."  *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003); *see Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (noting that obtaining a conviction with false evidence is "inconsistent with the rudimentary demands of justice"); *United States v. Agurs*, 427 U.S. 97, 103 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").

Zumot argues that the prosecution presented two types of false evidence, each of which independently requires that a federal writ of habeas corpus issue:  (1) that he first entered the café at 6:47.38 on the night of the murder and (2) that he called Schipsi from a blocked number on August 24, 2009 and threatened her life.  Before addressing the merits of Zumot's claim, I must determine the appropriate standard of review.

### A.       Whether the State Court's Decision is Entitled to Deference

The parties first dispute whether the superior court's decision on Zumot's habeas claims is

entitled to deference.[11]   According to Zumot, I should apply de novo review for two reasons. First, the superior court "ignored critical facts, ignored the state's concessions[,] and relied on facts which simply do not relate to the claim" when it determined that the prosecution did not present false testimony.  Pet. 56–61.  Second, the superior court applied the wrong standard when it determined in the alternative that the evidence was not material to the outcome of the case.  Pet. 61–63.  The state contends that the decision is owed deference under Section 2254(d) but counters only Zumot's second argument, asserting that rather than applying the wrong standard to the federal false evidence claim, the superior court simply did not address that claim at all.  Ans. 28–30.  According to the state, with no reasoned decision on the *Napue* claim, I must ask "what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  *See Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under Section 2254(d), where a state court has adjudicated a claim on the merits, federal habeas relief cannot be granted with respect to that claim unless the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.A. § 2254(d).  If either prong of Section 2254(d) is satisfied, federal courts "resolve the claim without the deference AEDPA otherwise requires," namely by reviewing de novo questions of law along with mixed questions of law and fact.  *See Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (internal quotation marks and citation omitted).

### 1.    Finding that the prosecution did not present false testimony

Zumot first asserts that the state court failed to consider critical evidence when it

---

[11] Because the court of appeal and the California Supreme Court summarily denied Zumot's petitions, I "look through" those denials to the last reasoned decision.  *See Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir.), *amended on denial of reh'g,* 733 F.3d 794 (9th Cir. 2013).

1    determined that the prosecution did not present false evidence related to the video surveillance and

2    the August 24, 2009 death threat.  Although the state failed to address these arguments, I will

3    analyze the state court's analysis and conclusion with respect to both of the video evidence and the

4    phone call.

5                                  a.        Lorex video

6         In habeas briefing before the superior court, the state conceded that the video footage

7    shows Zumot inside the café prior to 6:47:38.  Pet. Ex. DD (Return to OSC) at 41 ("Respondent

8    admits that the footage depicts the petitioner at the café at 6:47:16, 11 seconds before the clip

9    shown at trial.") ("Respondent admits that in Exhibit N, the third person seen in the upper right

10   portion of the screen from 6:45:49-6:45:52 is probably Petitioner."), 78 ("Upon further review,

11   Respondent acknowledges that it is 'probable' that enhanced footage from the Lorex shows that

12   the petitioner may have been there closer to 6:45, less than two minutes earlier than discussed at

13   trial.").  Despite this concession, the superior court determined that the prosecutor did not present

14   false evidence because, as it explained, "The prosecutor presented no evidence of when the

15   petitioner *entered* the café.  He presented evidence when the petitioner was seen on the video

16   *inside* the café."  Pet. Ex. CC (Superior Court Order) at 3 (emphasis in original).

17        Zumot points to evidence in the record showing the contrary.  Pet. 57.  In his opening

18   statement, the prosecutor set the stage for evidence from the surveillance videos that would show

19   Zumot "walking into" his café at "about 6:47."  *See* 2 RT 141 ("Surveillance video puts the

20   defendant walking into cafe at about 6:47 p.m."), 143 (noting that the "red lights of an emergency

21   vehicle" were visible outside at 6:47 "before the defendant ha[d] even walked into the café" and

22   "only then" did he enter).  The prosecutor questioned Quisenberry, who worked with the Lorex

23   surveillance system to determine that there was a one-hour-seven-minute time difference between

24   the time stamp on the video and the actual time.  13 RT 1407-10.  Reviewing the footage with

25   Quisenberry, the prosecutor elicited testimony that the video showed the defendant entering the

26   café at 6:47 p.m.  13 RT 1420-21.  The prosecution also elicited testimony about the Lorex

27   footage from Sunseri.  As part of a discussion about when Zumot was first seen on the Lorex

28   footage, Sunseri testified that Zumot was visible at 6:47 after the firetruck passed.  *See* 15 RT

United States District Court
Northern District of California

20

1    1726-27 (eliciting answers about the discrepancy between the time stamp and the actual time when

2    "[the defendant] would have first been on [the Lorex system] tape"). In closing, the prosecutor

3    argued that "it's only after the fire truck arrives that the defendant's seen on tape." 22 RT 2626.

4    He invited the jury to look back at the tape and see that despite Zumot's testimony, he was "not

5    there" earlier. 22 RT 2626. Accordingly, he told the jury, Zumot had, "in essence, absolutely no

6    alibi" for the day of the murder. 22 RT 2544; *see also* 22 RT 2617 (arguing that Zumot lacked an

7    alibi). He argued that the jurors should not credit Alaghbash, who testified that Zumot was at the

8    café smoking hookah for ten minutes before the firetruck passed, because "we saw the video." 22

9    RT 2549.

10           The state court's adjudication was based on an unreasonable determination of the facts in

11   light of the evidence; it is not entitled to deference. In the state habeas briefing, the state conceded

12   that the video footage shows Zumot inside the café prior to 6:47:38—at both 6:47.12 and 6:45—

13   meaning he must have arrived to the café and entered it prior to the time put forth by the

14   prosecution. The state court's decision reflects no attempt to grapple with the evidence that is

15   contrary to its ultimate conclusion that the prosecution did not present false evidence. *See Milke v.*

16   *Ryan*, 711 F.3d 998, 1008 (9th Cir. 2013) ("[W]e can't accord AEDPA deference when the state

17   court has before it, yet apparently ignores, evidence that is highly probative and central to

18   petitioner's claim.") (internal quotation marks omitted). The state court's denial of Zumot's false

19   evidence claim based on the Lorex video is not entitled to deference.

20                          **b.      August 24 death threat**

21           The superior court next determined that the prosecution did not present false evidence that

22   Zumot made a death threat against Schipsi on August 24. According to Zumot, to reach this

23   conclusion the court ignored critical facts and considered facts not relevant to the question before

24   it. Pet. 58–61. As noted above, the state does not address Zumot's arguments regarding the state

25   court's reasoning or ultimate conclusion on the telephone call.

26           During the prosecution's case, three witnesses testified about death threat(s) Zumot made

27   against Schipsi in August 2009. *See* 15 RT 1642, 16 RT 1766-70, 1781-1784. Moore, who

28   responded to Schipsi's domestic violence call, noted in her August 24, 2009 police report that

United States District Court
Northern District of California

1    Schipsi said Zumot called her at 12:50 p.m. and threatened her life.  Pet. Ex. V.  Schipsi's phone

2    records instead show that at 12:50 that day Schipsi received a call from her longtime friend

3    Endemann, calling from a blocked number.  Pet. Ex. W.  His records confirm the outgoing call,

4    which was blocked by dialing "67" before the phone number.  Pet. Ex. Y; *see* Pet. Ex. AA

5    (declaration of cell phone forensics expert Robert Aguero).  At an October 14, 2013 interview

6    with police during the pendency of the state post-conviction proceedings, Endemann admitted that

7    on more than one occasion he called Schipsi from a blocked number at her request in order to help

8    her obtain a stay away order against Zumot.  Pet. Ex. KK (Endemann interview).  He could not

9    recall a call specifically on August 24.  *Id.*

10          The state admitted the contents of these phone records, and the superior court

11   acknowledged that Endemann "likely" made the August 24 call "in an effort to bolster the victim's

12   request for a restraining order against the petitioner."  *See* Ex. CC (Superior Court Order) at 3-4,

13   Ex. DD (Return to Order to Show Cause) at 45.  Nonetheless the court concluded that the

14   prosecution did not present false evidence because of the other evidence of domestic violence

15   presented to the jury and because Schipsi's sworn declaration recanting her accusation against

16   Zumot was "sufficient" to prove that Zumot was not the threatening caller on August 24, 2009.[12]

17   Pet. Ex. CC (Superior Court Order) at 4.

18          The state court's decision was based on an unreasonable determination of the facts in light

19   of the evidence.  As Zumot points out, the initial question before the court was whether the

20   prosecution had presented false evidence regarding the August 24, 2009 phone call.  Instead of

21   addressing this question, the state court went straight to assessing materiality, determining both

22   that the call was insignificant in light of the other evidence of domestic violence and that the jury

23   would not have believed that Zumot made the call because of Schipsi's recantation.  The state

24   court's reasoning therefore does not support its conclusion with respect to the question of whether

25   false evidence was presented at Zumot's trial.  *See Andrews v. Davis*, 944 F.3d 1092, 1111 (9th

26

27   _____

     [12] The state court also made note of other evidence in the record:  of other threats Zumot made
28   against Schipsi, other occasions on which he mistreated her, and other evidence that he was
     obsessed with crime and planning to burn his café to collect insurance money.  According to the
     state court, Zumot "essentially ignore[d]" this other evidence.  State Decision 3–4.

United States District Court
Northern District of California

1  Cir. 2019) (determining the state court unreasonably denied a habeas claim where the reason given

2  did not support its conclusion); *Greene v. Lambert*, 288 F.3d 1081, 1092 (9th Cir. 2002)

3  (affirming the district court's grant of habeas relief where the state court relied on facts that "did

4  not bear" on the claim).  Because it is based on an unreasonable determination of the facts in light

5  of the evidence, the superior court's rejection of Zumot's false evidence claim is not entitled to

6  deference.

7  **2.**      **Alternative finding that the evidence was not material**

8  According to Zumot, the superior court's rejection of his *Napue* false evidence claims is

9  not entitled to deference for a second, independent reason:  it applied the wrong standard when it

10  alternatively concluded that even if the prosecution presented false evidence, that evidence was

11  not material.  Pet. 61-63.  While the state acknowledges that the state law standard for materiality

12  differs from the federal standard, it asserts that the state court's determination is nonetheless

13  entitled to deference.  Ans. 28-30.

14  Applying the materiality standard from *In re Sassounian*, 9 Cal. 4th 535, 544-46 (1995),

15  the state court analyzed whether there was a "'reasonable probability' that, had [the false

16  evidence] not been introduced, the result would have been different."  Pet. Ex. CC (Superior Court

17  Order) at 4.  The court concluded that the evidence was not material because "[t]he totality of the

18  relevant circumstances point[ed] overwhelmingly to the petitioner's guilt."  *Id.*  According to the

19  Ninth Circuit, this state law standard is "more difficult for the defendant to meet than the standard

20  prescribed by the Supreme Court."  *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

21  The state contends that deference is still owed to the superior court's denial of Zumot's

22  *Napue* claim because rather than apply the wrong standard to Zumot's federal false evidence

23  claim, the court did not address his federal claim at all.  Ans. 28.  While I would ordinarily look

24  through the summary denials from the court of appeal and California Supreme Court to the

25  superior court's reasoned decision, here the look-through presumption is rebutted.  Ans. 29.

26  According to the state, I should not assume that the higher courts adopted a ruling that did not

27  exist.  Ans. 29.  Instead, I should assume that the California Supreme Court denied Zumot's

28  *Napue* claim silently and, with no reasoned decision from any state court, I must determine "what

23

United States District Court
Northern District of California

arguments or theories . . . could have supported, the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *See Harrington*, 562 U.S. at 102; Ans. 30.

The state's argument runs counter to the presumption outlined in *Johnson v. Williams*, where the Supreme Court addressed the appropriate presumption a federal habeas court should apply when "a state court rules against the defendant and issues an opinion that addresses some issues but does not expressly address the federal claim in question." *See Johnson v. Williams*, 568 U.S. 289, 292–93 (2013); Trav. 12. The Court held that the federal court should presume the state court adjudicated the federal claim on the merits and apply deference as set forth in Section 2254(d). That presumption applies here, and the state has not adequately rebutted it; its suggestion that the superior court addressed the state false evidence claim in detail while ignoring the federal claim is implausible. Accordingly, I must conclude that the state court adjudicated Zumot's federal false evidence claim on the merits. In so doing, it applied a materiality standard that is directly contrary to Supreme Court precedent; its decision is not entitled to deference.

The state court's adjudication of Zumot's federal false evidence claims is not entitled to deference for two independent reasons. Accordingly, below I apply de novo review.

**B.    Whether Zumot is Entitled to Habeas Relief**

As described above, to prevail on his *Napue* claim for the Lorex video evidence and/or the August 24 phone call evidence, Zumot must show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *Zuno-Arce*, 339 F.3d at 889.

**1.    The Lorex Video**

**a.    Whether false evidence was presented**

There is no question that the Lorex tape shows Zumot inside the café at 6:45 and at 6:47:12; the state conceded as much during state post-conviction proceedings. The question is whether that fact means that false evidence was presented to the jury.

The prosecutor referenced the Lorex footage in his opening statement, in his closing

United States District Court
Northern District of California

argument, and when questioning two witnesses.  In his opening statement, the prosecutor set the stage for evidence from the surveillance videos that would show Zumot "walking into" his café at "about 6:47."  2 RT 141.  He further asserted that the video would show the "red lights of an emergency vehicle" outside at 6:47 "before the defendant ha[d] even walked into the café"; "only then," according to the prosecutor, did Zumot enter.  2 RT at 143.  Quisenberry testified that accounting for the one-hour-and-seven-minute time difference, the video showed the defendant entering the café at 6:47 p.m.  13 RT 1420:21–1421:1.  In response to questions about when Zumot "would have first been on [the Lorex system] tape," Sunseri testified that he was visible at 6:47 after the firetruck passed.  *See* 15 RT 1726-27.  In closing, the prosecutor argued that "it's only after the fire truck arrives that the defendant's seen on tape."  22 RT 2626:4–6.  He invited the jury to look back at the tape and see that despite Zumot's testimony, he was "not there" earlier. 22 RT 2626.  Accordingly, he told the jury, Zumot had, "in essence, absolutely no alibi" for the day of the murder."  22 RT 2544; *see also* 22 RT 2617.  He argued that the jurors should not credit Alaghbash's testimony that Zumot was at the café smoking hookah for ten minutes before the firetruck passed because "we saw the video."  22 RT 2549.

Now the state has admitted that the video surveillance shows Zumot inside the café before 6:47:38, at both 6:45 and at 6:47:12.[13]  As Zumot points out, the fact that the footage shows him *inside* the café at these earlier times means he must have arrived and entered before then—making it indisputable that he was there earlier than the time the prosecution presented to the jury through witness testimony and prosecutor argument.  The state's attempts to minimize the time discrepancy go to materiality, not whether the evidence was false.  *See, e.g.*, Ans. 44 ("Regardless, the prosecutor's comments were mostly accurate . . . ."), 45 (acknowledging that the prosecutor's last comment in his closing "is, since trial, admittedly inaccurate by 106 seconds").

Despite the state's concessions, it raises several reasons why I should not conclude that the evidence presented was "false" such that it could violate Due Process.  First, according to the

---

[13] Zumot does not argue that I should conclude, contrary to the superior court's conclusion, that he is the individual visible on the tapes at 6:41.  *See* Trav. 15 ("Regardless of whether petitioner arrived at 6:40, 6:41 or 6:42, it is indisputable that the prosecutor's evidence and argument that he did not enter the café until 6:47:38 was false.").

United States District Court
Northern District of California

state, neither the prosecutor nor the witnesses argued a specific time when Zumot arrived at the café; instead, they merely identified when he was visible on the security footage, in their view.  In light of the colloquies and argument reproduced above, I am not persuaded by this characterization of the record.  Even if Quesinberry and Sunseri intended to testify about the time they observed Zumot on the tape, rather than when he in fact entered the café, the record demonstrates that neither the prosecutor's questions nor their answers clearly or consistently distinguished between the two.[14]  *See* Ans. 42.  Further, it is immaterial that Quesinberry and Sunseri may have testified accurately according to their own knowledge from viewing the video footage:  "*Napue*, by its terms, addresses the presentation of false evidence, not just subornation of perjury."  *See Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005) ("The fact that the witness is not complicit in the falsehood is what gives the false testimony the ring of truth, and makes it all the more likely to affect the judgment of the jury.  That the witness is unaware of the falsehood of his testimony makes it more dangerous, not less so."); Ans. 45 (arguing that the witnesses did not lie about what they observed).  In addition, whether or not some of the false testimony occurred during defense counsel questioning, *Napue* applies "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *See Napue*, 360 U.S. at 269; Pet. Ex. DD (Return to OSC) at 43-44.

Neither am I am persuaded by the state's contention that statements and arguments by the prosecutor cannot form the basis for a *Napue* claim.  *See* Ans. 42.  Indeed, the Ninth Circuit has granted habeas relief on false evidence claims based at least in part on the prosecution's use of false evidence during closing argument.  *See Dow*, 729 F.3d at 1045 (noting that the prosecutor had "exploited her knowing presentation of false evidence" in argument); *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991) ("Improprieties in closing arguments can, themselves, violate due process.").  Here, the prosecutor argued to the jury about what the video evidence showed and what the jury should conclude from that evidence—namely that Zumot had no alibi for the time of

---

[14] In addition, in the context of Zumot's alibi defense—namely that he was at the café by 6:40 or 6:41—it is clear that the prosecution relied on the Lorex video evidence showing his true arrival time to undermine Zumot's account of his evening and time of arrival.

1 the fire.

2   The state's remaining arguments also fail.  The record is at best unclear with respect to

3 whether the early footage was shown to the jury during trial, *see* Ans. 46–47, but in any event, the

4 state's own briefing in state post-conviction proceedings suggests that it was not.  *See* Pet. Ex. DD

5 (Return to OSC) at 41 ("before the clip shown at trial"), 59 ("earlier than believed at the time of

6 trial"), 78 ("earlier than discussed at trial"); *see also* Pet. Ex. OO (10/13/14 declaration of trial

7 counsel Mark Geragos) (stating that the Lorex footage showing Zumot in the café prior to 6:47:38

8 was not played at trial).  Finally, the fact that the jury had access to the full video does not alter my

9 conclusion that false evidence was presented; not only does this argument go to materiality, but it

10 is speculative to presume that the jury watched the earlier footage, identified Zumot in it,[15]

11 corrected the prosecution's inaccurate timeline in its deliberations, and convicted Zumot anyway.

12       **b.  Whether the prosecutor knew or should have known**

13   Next Zumot must show that "the prosecution knew or should have known that the

14 testimony was actually false."  *Zuno-Arce*, 339 F.3d at 889.  The state argues that it would be

15 unreasonable to conclude that the prosecutor knew or should have known that Zumot was visible

16 in the video prior to 6:47:38 because the video quality was poor and because defense counsel

17 could not identify his own client.  Ans. 54-56.  Crediting the state's assertion that the prosecutor

18 and witnesses acted in good faith, I will assume that the prosecutor missed Zumot's presence in

19 the earlier footage due to the poor quality of the video.  But the video quality is clear enough (or

20 capable enough of being clarified) that the state conceded, and the superior court acknowledged,

21 that Zumot appears earlier than the time the prosecution presented at trial.  If Zumot was

22 identifiable in the video during post-conviction proceedings soon after trial, then he was

23 identifiable during trial.  The poor quality does not excuse the prosecution from its obligation not

24 to present false evidence.  The prosecutor should have known that the evidence that Zumot did not

25 enter the café until 6:47:38 was false.

26

27                  _____

28 [15] Further, this argument is inconsistent with the state's later assertion that it would be
unreasonable to expect the prosecutor to have identified Zumot in the earlier footage.

1

2          **c.      Whether the evidence was material**

3          "*Napue*'s materiality standard asks whether 'there is any reasonable likelihood that the

4   false testimony could have affected the judgment of the jury.'" *Mendez v. Swarthout*, 734 F.

5   App'x 421, 424 (9th Cir. 2018); *see Giglio v. United States*, 405 U.S. 150, 154 (1972) ("A new

6   trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the

7   judgment of the jury . . . .'").  Habeas relief is merited where a witness's "testimony and

8   credibility [is] crucial to the State's case" in light of each side underscoring it in closing

9   arguments.  *See Hayes v. Brown*, 399 F.3d 972, 985–86 (9th Cir. 2005).  By contrast, evidence is

10  not material if it is "unimaginable" that the jury could have reached a different conclusion "with or

11  without" the evidence at issue.  *See Phillips v. Ornoski*, 673 F.3d 1168, 1191 (9th Cir. 2012).

12          In *Alcorta*, the Supreme Court determined that false evidence violated the defendant's Due

13  Process rights where it "tended squarely to refute" the theory of his defense.  *Alcorta v. Texas*, 355

14  U.S. 28, 31 (1957).  The defendant was convicted in state court of murdering his wife with malice.

15  *Id.* at 28.  While he had admitted to the killing, he argued that he had done so in "a fit of passion"

16  after coming upon her kissing another man.  *Id.* at 28–29.  The other man, who witnessed the

17  killing, falsely testified that he had "nothing more than a casual friendship" with the defendant's

18  wife and had merely given her a ride home from work on the night she was killed.  *Id.* at 29.  State

19  habeas proceedings revealed that the other man had in fact been having an affair with the

20  defendant's wife and that the prosecutor had knowledge of the affair during the trial.  *Id.* at 30–31.

21  The Supreme Court noted that the other man's testimony "tended to squarely refute" the theory of

22  the petitioner's heat-of-passion defense.  *Id.* at 31.  By contrast, accurate evidence about the

23  relationship "would have . . . tended to corroborate petitioner's contention that he had found his

24  wife embracing [the other man]" and could have led to a verdict more favorable to the defendant.

25  *See id.* at 31–32.

26          Zumot, through his own testimony, presented an alibi defense that centered on the time of

27  his arrival at the café.  He testified that he drove from his domestic violence class in San Jose

28  directly to the café.  20 RT 2012; *see also* 12 RT 1349-50 (class instructor Fernando Alcobo)

(testifying that he believed he excused the class at 5:55 p.m., but it could have been 5:45 p.m.).

1   Zumot had just located parking near the café when he called his employee Jehad Al-Bataeneh at

2   6:39, told him that he was parking, and told him to make a tea and hookah.  20 RT 2013-14.

3   Zumot entered the café from the Ramona Street entrance,[16] went upstairs to his office to check

4   email, and then returned downstairs.  20 RT 2015.  When he heard a firetruck passing, he went

5   outside to see it, then returned inside for his tea and hookah.  20 RT 2015.  Café employee

6   Alaghabash also testified that Zumot called before he arrived at the café, asking Jehad to make a

7   tea and hookah for him.  17 RT 1854, 1861.  He testified that Zumot arrived at the café sometime

8   between 6:30 and 6:40 p.m., about ten minutes before the firetruck went by the café.  17 RT 1849,

9   1851-52.

10          In the context of this case, the false video evidence was material.  The prosecution

11   positioned the video as foreclosing Zumot's alibi defense for the fire at the cottage.  According to

12   the prosecutor, the jury could and should outright reject the testimony of both Zumot and

13   Alaghabash about Zumot's arrival at the café because "we saw the video."  In so doing, the

14   prosecution painted a difficult case—one that required assessing multiple witnesses' credibility

15   and nailing down uncertain timeliness—as simple.  Contrary to the state's arguments, the

16   discrepancy is not immaterial because it is only 106 seconds or because the prosecution did not

17   attempt to prove an exact start time for the fire.  Not only does the earlier footage show Zumot

18   inside the café—meaning that he arrived at some point before it was captured—but this evidence

19   would have prevented the prosecution from arguing that the jury could so easily reject Zumot's

20   alibi.  Accurate video evidence would have forced the jury to grapple with the parties' respective

21   timelines of events along with the credibility of various witnesses on both sides.  In this case, the

22   false suggestion of a definite entry point was critical; the prosecution framed it as lending certainty

23   in spite of the inexact timeline.[17]  *See* Trav. 26.

24          The state further argues that the evidence of Zumot's guilt was "overwhelming."  Ans. 56;

25   _____

26   [16] Alaghabash also testified that only the Ramona Street entrance is the only open entrance after
     6:00 p.m.  17 RT 1855.

27   [17] The respondent also argues that the timeline and the distances mean that Zumot could have
28   started the fire and still arrived at the café when he said he did.  This argument would be
     appropriately presented to a jury; it does not make the false evidence I evaluate here immaterial.

United States District Court
Northern District of California

1    *see also* Pet. Ex. CC (Superior Court Order) at 4 (applying the more burdensome state standard of

2    materiality) ("The totality of the relevant circumstances points overwhelmingly to. the petitioner's

3    guilt.").[18]  Although the state points to evidence that could certainly support a conviction, that

4    evidence does not make a different verdict "unimaginable." *See Phillips*, 673 F.3d at 1191.  The

5    evidence and the inferences permitted from that evidence involve too many genuine disputes for

6    me to determine that there is no reasonable likelihood that the false evidence impacted the

7    judgment of the jury.

8         Consider these conflicts.  There was no sign of forced entry into the cottage and nothing

9    was taken, but while the police suspected that Schipsi struggled with her attacker, Zumot had no

10   scratches or other injuries.  Ans. 59; Trav. 29.  There was a long history of domestic violence in

11   Zumot and Schipsi's relationship, and they had a big fight on October 14, the day before Schipsi

12   was killed, during which Schipsi told Zumot she was leaving him and threatened to go to the

13   police if she did not return money he owed her.  Ans. 57-58.  But Zumot testified that they smoked

14   a hookah and talked later that night, and there was video evidence on Schipsi's phone of the

15   couple having sex in the early morning hours of October 15.  Pet. 52-53; Trav. 29.  The jury had

16   reasons to doubt Zumot's credibility, including his testimony denying any physical violence in his

17   relationship with Schipsi, but the post-conviction evidence discussed here corroborates parts of his

18   testimony along with the testimony of others.  Ans. 62-63; *see* Trav. 28.

19        Neighbor Susie Scholpp testified that she was "100 percent" certain she saw Zumot

20   speeding down her street away from the cottage at approximately 6:20 p.m.  Ans. 60.  But she

21   came forward three months after telling the police she had seen nothing unusual.  She identified

22   the wrong color car.  And she testified to seeing Zumot near the cottage even though other

23   evidence shows that he was four miles away at 6:16.  Pet 52.  Zumot's fingerprint was found on a

24   piece of foil near the gas burner that had been turned on high, but he and Chalaan testified that

25   Zumot used foil to prepare a hookah in the early morning of October 15.  Ans. 60; Pet. 25.  There

26

27   ───────────────

28   [18] The superior court relied on false evidence of the August 24, 2009 phone call—addressed
     below—to reach its conclusion.  The state similarly relies on the discredited contents of Schipsi's
     report in its Answer.  *See* Ans. 58-59.

1    was limited if any physical evidence connecting Zumot to the gas can that was actually used to

2    start the fire, and Rosie the dog's positive alert for the presence of ignitable liquids on Zumot's

3    clothes for the day was contradicted by laboratory results. *See* Pet. 24-25, 52.

4        The question I am charged with deciding is whether there is a reasonable likelihood that

5    the false evidence could have affected the jury's judgment. The evidence in the record does not

6    foreclose such a reasonable likelihood. In light of Zumot's alibi defense, the fact that he was a key

7    witness in his own defense, and the state's use of the false evidence to undermine his credibility

8    and foreclose his alibi, the false video evidence could well have affected the judgment of the jury.

9                    **2.      The August 24, 2009 Death Threat**

10                    **a.      Whether false evidence was presented**

11        At trial, the prosecution presented evidence from police officer Adrienne Moore that on

12   Monday, August 24, 2009, she responded to a domestic violence call made by Schipsi. RT 1766.

13   When Moore arrived at about 1:30 p.m., Schipsi reported that Zumot had called her on the phone

14   earlier that day, called her a "bitch" and a "whore," and threatened to kill her. 16 RT 1768-70.

15   Schipsi told Moore that Zumot was fascinated with forensics shows, that he was interested in

16   "planning the perfect crime" and "getting away with it," and that he planned to burn down the café

17   to collect insurance money. 16 RT 1768-70. According to Moore, Schipsi was "very scared,"

18   "nervous," and "in fear for her life." 16 RT 1767-69. Later Schipsi recanted her statements to

19   Moore, and in that declaration she also stated that the August 24 call had come from a restricted

20   number. 16 RT 1786. Further, Leslie Mills testified that Schipsi called her on a Monday in

21   August 2009 when the police were at her house and said that Zumot had threatened to kill her and

22   burn her house down. 16 RT 1781-1784. Finally, Heather Winters testified that Schipsi told her

23   about a death threat by Zumot in August 2009. 15 RT 1642.

24        The phone records show that Schipsi's phone did not receive a call from any of Zumot's

25   known phone numbers on August 24, 2009. CT 706; 16 RT 1717; 23 RT 2661. Instead, as the

26   superior court acknowledged and the state now concedes, the 12:50 phone call from a restricted

27   number on August 24 came from Endemann's phone. *See* Pet. Ex. CC (Superior Court Order) at 3

28   ("Since the trial, further investigation demonstrates the August 24 telephone call was probably

1    made by the victim's friend, Roy Endeman, in an effort to bolster the victim's request for a

2    restraining order against the petitioner."); Ans. 48–49 (citing Pet. Exs. W, Y).  In a post-conviction

3    interview with Sunseri on October 14, 2013, Endemann admitted that he had called Schipsi using

4    a blocked number on more than one occasion in order to help her to obtain a stay-away order

5    against Zumot.  *See* Pet. Ex. KK (Endemann interview).

6          Despite those concessions, the state argues that the evidence the jury heard was not false.

7    Ans. 48.  It claims that the evidence Zumot cites does not "establish falsity" with regard to what

8    Schipsi told Moore, instead "allow[ing] conflicting inferences, at best."  *Id.* at 48, 50.  I disagree.

9    The phone records establish that there were no calls between Zumot's and Schipsi's phones on

10   August 24, 2009.  Schipsi's phone *did* receive a call from a blocked number that day at 12:50

11   p.m.—from Endemann's number.  This evidence is sufficient to establish that the jury heard false

12   testimony that Zumot threatened Schipsi's life by calling from a blocked number on August 24,

13   2009.  Zumot need not establish that Endemann recalled calling Schipsi on August 24, 2009 at

14   12:50 p.m., that Endemann made threats against Schipsi during that call, or that Endemann

15   pretended to be Zumot threatening Schipsi during that call.  Whatever the contents of the

16   conversation at 12:50, Zumot did not make the call, much less threaten Schipsi's life during it.

17         Second, the state argues that Zumot has failed to show that Moore, Mills, and Winters

18   were testifying about the same threatening phone call in August 2009.  Ans. 51-54.  Although

19   Moore's testimony alone would be enough for a finding that false evidence was presented,[19] I will

20   address the state's argument in more detail because it is relevant to the materiality analysis.

21   According to the state, based on differences in each woman's testimony, the prosecutor reasonably

22   concluded that Schipsi told them about three distinct death threats Zumot made against her in

23   August 2009.  The state points out that (i) Schipsi told Mills that Zumot had threatened to burn

24   down her house, a threat that she did not report to Moore, Ans. 51 (citing 16 RT 1766-67) and (ii)

25   Schipsi told Winters that Zumot had hit her after a car incident but did not tell her about a threat to

26   burn down the house, Ans. 52 (citing 16 RT 1641-42, 1760, 1760).

27   _____

28   [19] The fact that Moore testified truthfully about her contact with Schipsi is immaterial in light of
     the facts showing that Schipsi's report was false.  *See* Ans. 48.

United States District Court
Northern District of California

The state's suggestion that each of the women was testifying about a distinct death threat is implausible. Mills testified that the police were at Schipsi's house when she called on a Monday in August 2009; not only was August 24, 2009 a Monday, but there is no evidence in the record that police were at Schipsi's home on any other Monday in August. *See* 16 RT 1781-84. And phone records indicate that Schipsi called Winters on August 24, 2009, and a recording of that call reflects that she told Winters that Zumot threatened to kill her and called her a bitch. *See* 15 RT 1642; Pet. Exs. W at 7, LL, MM. The slight differences in the contents of the women's testimony are not enough to support a theory that Moore, Mills, and Winters each heard about a different phone call death threat. Notably, the prosecutor's closing argument suggests that, like me, he viewed the three witnesses' testimony as referring to one and the same call; he argued to the jury that there was only one person who had "told [Schipsi] not seven weeks before he killed her that he was going to kill her *and he was going to burn her house down*." *See* 22 RT 2535 (emphasis added).

The record demonstrates that Schipsi did not receive a blocked call from Zumot on August 24 at 12:50 p.m.; that call came from Endemann, presumably at Schipsi's request. Accordingly, false evidence was presented.

**b.      Whether the prosecutor knew or should have known**

The prosecutor either knew or should have known that Zumot did not make a threatening phone call to Schipsi on August 24.[20] The prosecution had in its possession the phone records of Zumot, Schipsi, and Endemann. *See* Ans. 48 ("Petitioner does not dispute that trial counsel Mark Geragos received, in pretrial discovery, the August 24, 2009, police report, and phone records for petitioner, Schipsi, and Endemann covering August 24, 2009."). Schipsi's phone records show that she received a call from (831) 207-2669 on August 24 at 12:50; that number belonged not to Zumot but to Endemann, whose records confirm an outgoing call to Schipsi at that time. *See* Pet. Ex. BB (declaration of Cliff Gardner) ¶ 3, atch. 1. If the prosecutor did not conclude from this information that Schipsi's report to Moore was false, and thus that Moore's testimony was false,

---

[20] In fact, the state asserts that none of Zumot's arguments regarding the August 24 death threat rest on new facts.

1    he should have.  And for the reasons described above, it was not reasonable to conclude that Mills

2    and Winters were testifying about distinct phone calls.

3                         **c.**         **Whether the evidence was material**

4            As I wrote earlier, to assess the materiality of the false evidence I look to "whether 'there is

5    any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"

6    *Mendez*, 734 F. App'x at 424.  In light of the entire record before me, the answer is affirmative

7    with respect to the August 24 death threat.[21]  The prosecutor referenced the threat at least eleven

8    times in closing arguments.  *See* 22 RT 2535, 2542-43, 2558, 2560-62, 2602, 2627; *see* Pet. Ex.

9    DD (Return to OSC) at 18-20 (quoting the prosecutor's references to the death threat in his closing

10   argument and rebuttal).  He argued to the jury, "[T]here's only one person who had the motive, the

11   opportunity, the desire, and, in fact, told [Schipsi] not seven weeks before he killed her that he was

12   going to kill her and he was going to burn her house down."  22 RT 2535.  The record

13   demonstrates that the prosecution made the threat a central part of its case.  The materiality of the

14   evidence is more apparent when considered in light of Zumot's denials when he testified.  *See* 18

15   RT 1954.  The testimony of Moore, Mills, and Winters directly contradicted Zumot's version of

16   events, including his express denial of the August 24 phone call, and thus undercut his credibility.

17   As noted above, Zumot was a key witness in his own defense.  In light of the prosecution

18   repeatedly highlighting of the false evidence, which implicated not only motive but also Zumot's

19   broader credibility as a witness, there is a reasonable likelihood that the false evidence of the

20   August 24 phone call could have affected the judgment of the jury.

21            Schipsi's declaration recanting her accusation against Zumot with respect to the August 24

22   call does not alter my conclusion.  *See* 16 RT 1786-87 (stating she was "convinced" Zumot had

23   not been the threatening caller on August 24); *see also* Pet. Ex. DD (Superior Court Decision)

24

25    ─────────────────
   [21] Based on its assertion that Zumot fails to show that Moore, Mills, and Winters were testifying
26   about the same call, the state asserts that "Petitioner's claim at best removes only one harassing
   phone call and one threat from his history."  Ans. 53.  As explained above, the record indicates
27   that all three witnesses were testifying about the same August 24, 2009 phone call death threat and
   that the prosecutor understood them as the same and presented them to the jury as the same.
28   Accordingly, I assess the materiality with the understanding that the testimony of all three
   witnesses was false.

United States District Court
Northern District of California

1   ("Evidence of the victim's recantation, however, was sufficient to prove Petitioner did not make

2   the call."). First, the prosecution actively sought to undermine Schipsi's declaration with

3   additional evidence. Prosecution witness Richard Ferry testified to explain why domestic violence

4   victims withdraw accusations against their abusers. 12 RT 1332. Second, the state ignores

5   another implication of this evidence. If the jury had the benefit of the full and accurately

6   characterized evidence before me, which confirms that Schipsi falsely reported a threatening

7   phone call from Zumot on August 24 at 12:50, then it could cast Schipsi's other accusations in a

8   different light. There is, of course, additional evidence of violence and tumult in Zumot's

9   relationship with Schipsi, from which a jury could infer that Zumot committed the murder;

10   however, at trial the prosecution explicitly criticized the defense for suggesting that the jury

11   should believe Zumot over Schipsi, Mills, and Winters. *See* 22 RT 2534, 2542 ("Leslie Mills

12   apparently is a liar as well . . . ."), 2543 ("Heather Winters, she's a liar") ("[B]lame the victim,

13   she's a liar."), 2560. Accurate evidence could have bolstered Zumot's credibility as witness and in

14   so doing, added complexity to issues that the prosecution made appear simple to the jury.

15       Further, as detailed above, the remaining evidence was not so overwhelming that there is

16   no reasonable possibility that the false evidence affected the judgment of the jury. *See supra*

17   Section I.B.1.c. For these reasons, Zumot has shown that the two types of false evidence

18   introduced at his trial violated his due process rights. He is entitled to habeas relief.

19   **II.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM**

20       To prevail on an IAC claim, a petitioner must make two showings. First, he must establish

21   that counsel's performance was deficient, i.e., that it fell below an "objective standard of

22   reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668,

23   687 (1984). Second, he must establish that counsel's deficient performance prejudiced him, i.e.,

24   that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

25   proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability

26   sufficient to undermine confidence in the outcome." *Id.* "Judicial scrutiny of counsel's

27   performance must be highly deferential," and "a court must indulge a strong presumption that

28   counsel's conduct falls within the wide range of reasonable professional assistance." *See*

*Strickland*, 466 U.S. at 689; *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (internal citation omitted).

### A.    Standard of Review

The parties again dispute the appropriate standard of review.  Zumot argues that de novo review is required because either (i) the superior court failed to adjudicate the merits of the performance prong under *Strickland* or (ii) it did adjudicate the merits but in so doing, failed to consider critical facts that bear on Zumot's IAC claim.  According to the state, I am required to defer to the state courts' denials of this claim because while the superior court's denial of Zumot's petition as a whole was a reasoned decision, its denial of this *claim* was summary.  *Compare* Ans. 2 (noting the state court denied Zumot's habeas "in a reasoned decision"), 28 (arguing that de novo review is inapplicable because the "last reasoned decision" did not apply the wrong standard of review), 28 n.8 (noting that the California Court of Appeal and California Supreme Court issued summary denials) *with* Ans. 72 (asserting that the state courts summarily rejected Zumot's IAC claim).  The state argues that because the superior court issued a summary denial, *Harrington* requires that I determine "what arguments or theories . . . could have supported" the state courts' decision and ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  Ans. 72 (quoting *Harrington*, 562 U.S. at 101).

De novo review is appropriate.  First, the superior court expressly denied Zumot's IAC claim as part of a reasoned decision of four single-spaced pages.  The state's position is contrary to the California Constitution, which requires that a reasoned opinion follow an order to show cause like the one issued in response to Zumot's petition.  *See* Pet. Ex. UU (California Court of Appeal for the Sixth Appellate District Order to Show Cause before the Santa Clara County Superior Court); *People v. Romero*, 8 Cal. 4th 728, 740, 883 P.2d 388 (1994), *as modified on denial of reh'g* (Jan. 5, 1995) ("The issuance of either the writ of habeas corpus or the order to show cause creates a 'cause,' thereby triggering the state constitutional requirement that the cause be resolved

United States District Court
Northern District of California

'in writing with reasons stated.'") (quoting Cal. Const., art. VI, § 14).  The state provides no

support for its contention that a one-sentence decision on a particular claim, in the context of a

four-page single-spaced reasoned decision, constitutes a summary denial.  *Cf. Wilson v. Sellers*,

138 S. Ct. 1188, 1192 (2018) (noting as an example that a summary decision "may consist of a

one-word order, such as 'affirmed' or 'denied'"); *Johnson*, 568 U.S. at 301 (noting that a state

court may reject a claim "without expressly addressing that claim").  I will not excise the denial of

the IAC claim from the superior court's reasoned decision adjudicating all of Zumot's claims.[22]

The superior court's denial of the IAC claim is not entitled to deference.  If the court

denied the IAC claim because the false evidence claims failed, then review is de novo is

appropriate for the same reasons described above, namely that the court ignored evidence relevant

to the false evidence claim and that it applied the wrong standard of materiality.  If the superior

court denied the IAC claim based on other reasoning, then de novo review is appropriate because

it failed to consider the following facts:

- Counsel never viewed the Lorex footage prior to trial.  Pet. Ex. E ¶¶ 13-14.[23]
- Counsel did not make a tactical decision not to show the earlier Lorex footage and would have used it if he had been aware of it.  Pet. Ex. E ¶¶ 11-12, 14, 15; Pet. Ex. PP ¶ 8.
- Counsel did not "make some kind of decision" not to present telephone records proving his position that Zumot did not make the August 24, 2009 call to Schipsi.  Pet. Ex. PP ¶¶ 9-10.
- If counsel had known that Schipsi had asked Endemann to call her from a blocked number, and that Endemann had called Schipsi from a blocked number on August 24, 2009, he would have used that evidence.  Pet. Ex. OO ¶¶ 8-9.

Whatever the case, de novo review is appropriate.

## B.    Whether Zumot is Entitled to Habeas Relief

To succeed on his IAC claim, Zumot must show that counsel's performance was deficient

---

[22] Further, the state's argument that the superior court did not issue a reasoned decision on the IAC claim seems to contradict its position about the relationship between the false evidence claims and the IAC claims. Trav. 37-38.  Specifically, the state argued before the court of appeal that Zumot's IAC claim failed precisely because the false evidence claims failed.  *See* Ans. Ex. 21 (Opposition to Petition for Writ of Habeas Corpus before the California Court of Appeal for the Sixth Appellate District) at 37.  It repeats that argument here.  *See* Ans. 74 ("If the prosecutor did not present false, or even false but immaterial, evidence, however, then trial counsel could not have rendered ineffective assistance by failing to 'expose' it.").

[23] Exhibits E, OO, and PP to the Petition are declarations from Zumot's trial counsel Mark Geragos.  Exhibit E was signed on September 4, 2013, Exhibit OO was signed on October 13, 2014, and Exhibit PP was signed on November 13, 2013.

1    and that the deficient performance prejudiced him.  *See Strickland*, 466 U.S. at 687, 694.

2                    **1.      Performance**

3            Zumot argues that counsel's performance fell below the standard of care with respect to

4    both the Lorex video and the August 24, 2009 phone call.  I address each one in turn.

5            According to his declaration, counsel never reviewed the DVD of the Lorex footage he

6    received in discovery, instead assuming that it would be consistent with Sunseri's police report.

7    Pet. Ex. PP, ¶ 8.  As described above and as counsel notes, the defense presented an alibi to the

8    jury, arguing that Zumot could not have started the fire because he was at his café in San Jose at

9    the time.  Pet. Ex. E ¶ 2, Ex. OO ¶ 2.  If counsel had known about the earlier footage showing

10   Zumot, he would have used it to support Zumot's alibi; his failure to use the video was not a

11   tactical decision.  Pet. Ex. E ¶¶ 11-12, 14, 15, Ex. PP ¶ 8.

12           The state argues that I should not credit counsel's declaration that he did not view the

13   footage and instead conclude that counsel simply did not recognize Zumot in the earlier footage or

14   that he "did not believe that a 106-second difference was momentous."  Ans. 78.  The state's

15   explanations for counsel's failure to rely on the video are not more plausible than his multiple

16   sworn statements that he never watched the footage (including in direct response to similar

17   arguments by the state in earlier proceedings).  As Zumot points out, the footage was clear enough

18   for the state to concede Zumot's appearance in prior post-conviction proceedings, and further, the

19   106-second difference is material for the reasons I have described.  *See supra* Section I.B.1.c.; *see*

20   *also* Trav. 39–40.  Any reasonable counsel whose client was relying on an alibi defense would

21   review and present video evidence supporting that defense.  Counsel's performance fell below the

22   objective standard of reasonableness.

23           With respect to the evidence of the August 24, 2009 threatening phone call, counsel stated

24   in his declaration that he "did not make some kind of decision" not to present evidence showing

25   that the 12:50 call on August 24, 2009 came from Endemann's number rather than Zumot's

26   number.  Pet. Ex. PP ¶ 10.  If counsel had been aware of the evidence, he would have used it to

27   discredit the prosecution's theory that Zumot threatened to kill Schipsi on that day, and he would

28   have used Schipsi's false reporting to undercut other evidence of domestic violence that relied on

United States District Court
Northern District of California

United States District Court
Northern District of California

1    her reports to third parties.  Pet. Ex. OO ¶¶ 8-9.  The state argues that counsel likely made a

2    tactical decision not to present Endemann's phone records in order to prevent the prosecutor from

3    rebutting that evidence by putting Endemann on the stand, where he would have explained just

4    how desperate Schipsi was to obtain a restraining order against Zumot.  Ans. 80-81.  Further, the

5    state asserts that the phone records of Zumot and Schipsi, which were already before the jury,

6    were enough to establish that Zumot did not make the 12:50 call.[24]

7         There was no sound tactical reason for failing to introduce Endemann's phone records into

8    evidence.  The records would have done more than merely eliminate one threat from the record;

9    they would have bolstered Zumot's credibility—which was critical for the jury's assessment of his

10   testimony and alibi—and harmed the credibility of other reports that Schipsi made to third parties

11   about her relationship with Zumot.  The possibility of testimony from Endemann does not alter the

12   fact that any reasonable attorney would have used the phone records to prove his client did not

13   threaten the victim's life weeks before the murder, to bolster the credibility of his client's

14   testimony, and to cast doubt on the accuracy of the other reports the victim had made.  As Zumot

15   explains, there are "no genuinely plausible reasons why counsel would want the jury deciding his

16   client's fate to think petitioner (1) lied about his alibi and (2) threatened to kill the victim only

17   seven weeks before her murder."  Trav. 35.  Counsel's performance fell below an objective

18   standard of reasonableness.

19              **2.    Prejudice**

20        The evidence that counsel failed to investigate and present to the jury could have directly

21   impacted the jury's assessment of Zumot's credibility and his alibi along with its assessment of the

22   reports Schipsi made to third parties about Zumot.  In light of this record, counsel's errors

23   undermine confidence in the outcome of the trial.  *See Strickland*, 466 U.S. at 694; *see also*

24   *Wiggins v. Smith*, 539 U.S. 510, 536-37 (2003) (noting that if confronted with the "considerable

25   mitigating evidence," there was "a reasonable probability that at least one juror would have struck

26

27   [24] The state also argues that a reasonable attorney would have elected to avoid a mini-trial into
     whether Moore, Mills, and Winters were testifying about the same threat.  Ans. 53.  For the

28   reasons described above, the evidence makes it overwhelmingly likely that the threats were one
     and the same; accordingly, the state's argument is unpersuasive.

                                            39

United States District Court
Northern District of California

1    a different balance" on sentencing).

2          Counsel's deficient performance prejudiced Zumot; he is entitled to habeas relief based on

3    ineffective assistance of counsel.

4    **III.      CUMULATIVE ERROR CLAIM**

5          Finally, Zumot argues that even if none of the errors individually requires a new trial,

6    together they do.  Pet. 28.  The Ninth Circuit has found a cumulative error or cumulative prejudice

7    claim cognizable under § 2254(d).  *See Thomas v. Hubbard*, 273 F.3d 1164, 1179-81 (9th Cir.

8    2002).  Because I have found that Zumot's other claims require the issuance of the writ, I do not

9    address his cumulative error claim.

10                                  **CONCLUSION**

11          For the reasons set forth above, justice requires that a writ of habeas corpus issue.  The

12   petition is GRANTED.  Respondent shall release Zumot unless the state commences proceedings

13   to retry him within 120 days of this Order.

14          **IT IS SO ORDERED.**

15   Dated: September 2, 2020

16

17   _____

18                                  William H. Orrick
                                     United States District Judge

19

20

21

22

23

24

25

26

27

28